1

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

```
ROBERT BARROR,                  )
                                )
        Plaintiff,              )
                                )
    vs.                         )  No. 3:20-cv-00731-SB
                                )
CITY OF SAINT HELENS, and       )
ADAM RAETHKE, in his            )
individual capacity,            )
                                )
        Defendants.             )
_____ )
```

DEPOSITION OF ADAM RAETHKE

Taken in behalf of the Plaintiff

\* \* \*

September 14, 2021

Amy A. Dalton Court Reporting (503) 267-4666

Exhibit 1
Page 1 of 10

```
                                                                    2
 1         BE IT REMEMBERED that the deposition of ADAM

 2    RAETHKE was taken before Amy A. Dalton, Certified

 3    Court Reporter and Notary Public, on

 4    September 14, 2021, commencing at the hour of 3:06

 5    p.m., in the conference room of the law firm of

 6    Chock Barhoum, in the City of Portland, County of

 7    Multnomah, State of Oregon.

 8

 9                       APPEARANCES:

10

11   STEFFEN LEGAL SERVICES
        Counsel for Plaintiff
12      205 SE Spokane St, #300
        Portland, OR 97202
13         BY JUSTIN STEFFEN
           info@steffenlegal.com
14

15

16   CHOCK BARHOUM
        Counsel for Defendant
17      121 SW Morrison St, Ste 500
        Portland, OR 97204
18         BY JEFFREY W. HANSEN
           jeff.hansen@chockbarhoum.com
19         BY JORDYN PARSONS
           jordyn.parsons@chockbarhoum.com
20

21

22

23

24

25
```

Amy A. Dalton Court Reporting (503) 267-4666

Exhibit 1
Page 2 of 10

```
                                                              4
 1                      ADAM RAETHKE
 2   was thereupon produced as a witness in behalf of the
 3   Plaintiff and, having first been duly sworn, was
 4   examined and testified under oath as follows:
 5
 6   EXAMINATION BY MR. STEFFEN:
 7       Q.   Good afternoon, Officer Raethke.  My name
 8   is Justin Steffen.  I am Robert Barror's attorney,
 9   and I -- I assume you understood that he's filed a
10   lawsuit against you and the City of St. Helens and
11   I'm here to ask you questions under oath just as if
12   you were testifying in court in front of a judge,
13   subject to penalties of perjury?
14       A.   Yes, sir.
15       Q.   And have you ever been deposed in a civil
16   or criminal case before?
17       A.   No.
18       Q.   Well, it's -- just a couple, you know,
19   guidelines here.  It's important for both of us not
20   to try to speak over each other.  I know it's human
21   nature.  I'm sure I'll do it several times during
22   the deposition, but it's important we wait for each
23   other to finish speaking so the court reporter can
24   get a clear "yes" or "no."  And it's also important
25   if I ask you a "yes" or "no" question, you respond
```

Amy A. Dalton Court Reporting (503) 267-4666

Exhibit 1
Page 3 of 10

10

1    A.    Yes, sir.
2    Q.    Can you describe the annual use-of-force
3  training that you undergo?
4    A.    Yes, sir.  St. Helens Police Department
5  uses both in-person and virtual training.  In person
6  the use-of-force instructor, his name is Sergeant
7  Eustice, he'll put on use-of-force classes.  And we
8  also have a -- a training application, I guess you'd
9  call it, called Police One Academy that is also used
10  for training and -- but that's only been in place
11  for -- the Police One Academy has only been in place
12  for a year now.
13    Q.    Okay.  This program is some sort of
14  computer program or online --
15    A.    Training videos.
16    Q.    Training videos.  Okay.
17          And when is use of force authorized,
18  according to your training materials?
19    A.    According to our policy, it's to defend
20  myself or another or to make an arrest.
21    Q.    So I assume you're saying that use of force
22  is authorized to make an arrest if the subject is
23  resisting arrest; is that correct?
24    A.    I mean, yes and no.  Can you maybe
25  elaborate on that?

```
                                                              15
 1   number.  From time to time.  I don't know if
 2   that's --
 3       Q.   Okay.
 4       A.   -- if that's --
 5       Q.   Yeah.  I mean, I think I understand.
 6            Well, would you say more than once a month?
 7   Less than once a month?
 8       A.   I -- I can't say, sir.  It varies.
 9       Q.   Okay.  Okay.  Let's talk about August 6th.
10   Do you recall assisting Oregon State Police in
11   arresting Robert Barror on August 6th of 2019?
12       A.   Yes, sir.
13       Q.   Can you please describe how you came to be
14   involved in that incident?
15       A.   Yes.  I was near the intersection of South
16   Eighth and Columbia Boulevard in St. Helens on an
17   unrelated call, and I believe it was -- because
18   Oregon State Police and the local agencies like
19   Scappoose and St. Helens, we have different
20   dispatch.  I believe it was the dispatch for, like,
21   St. Helens and stuff that had aired the call or
22   aired the general broadcast of the incident.  And it
23   was a -- it was a gray Chevy pickup northbound on
24   the highway -- I don't remember the nearest cross --
25   going about a hundred miles an hour.  And without
```

```
                                                           16
 1   looking at my report, that's what I can recall.  And
 2   then -- did you want me to elaborate or is that --
 3   did that answer your question?
 4        Q.   Well, no.  So what happened next?
 5        A.   I'm not sure I -- I know that -- I want to
 6   say that at some point the vehicle had gotten to
 7   either Bachelor or South Bachelor, and those two
 8   roads cross.  I don't remember the route I took to
 9   get there.  So I drove west up Bachelor Road, and at
10   that time when I arrived, Mr. -- is it Barror?  Is
11   that how I say it?
12        Q.   It's Barror.
13        A.   -- Mr. Barror's vehicle was stopped facing
14   eastbound on Bachelor and there were two Oregon
15   State troopers on scene with their guns drawn aimed
16   at the vehicle and Mr. Barror.  So I -- I had
17   come -- basically, we were facing one another.
18   There was another officer in front of me.  He
19   momentarily stopped.  He pulled forward, parked
20   somewhere behind the trooper's patrol vehicles, not
21   necessarily sure where.  And then I got -- got out
22   of my patrol vehicle and as I started to approach
23   the troopers, from what I recall, we started just
24   kind of file -- or I kind of filed into like a -- a
25   column, you know, or a line.  And I forget if I was
```

Amy A. Dalton Court Reporting (503) 267-4666

Exhibit 1
Page 6 of 10

```
                                                                    18
 1   drawn?
 2        A.    That was undetermined at that time.
 3        Q.    Okay.
 4        A.    There was other officers with me that were
 5   assisting.
 6        Q.    Okay.  So after you're -- you're telling
 7   Mr. Barror to get out of the car or words to that
 8   effect --
 9        A.    Yes.
10        Q.    -- and then what happened?
11        A.    Again, without having the report in front
12   of me, don't know exactly where my hand placement
13   was, but, you know, went to remove him from the
14   vehicle.  He had leaned away from me towards the
15   passenger's side of the vehicle.  I don't -- and I
16   didn't know at that time if he was leaning away from
17   me to resist my attempts or if he was reaching for
18   something.  I became growingly concerned of -- of
19   that.  I was able to, after some time, get him from
20   the vehicle.  And when I got him out of the vehicle,
21   I -- I guess the best way to say it is he kind of
22   turned and kind of faced me and got into this squat
23   position and backed up and was able to go into --
24   like, place his -- the back side of his body into
25   like the V of the door, you know, where the -- yeah,
```

                                                                19
1    the door hinges are.  So like by his right hand was
2    the -- you know, the door compartment.  By his left
3    hand was the -- like the opening of the cab or
4    whatever.  And so then -- and I don't -- I don't
5    know if I -- oh, never mind.
6            So, anyway, after that, I had regained
7    control and got him onto the ground.  I don't know
8    if I can recall what side of the body he was on or
9    what side of his body he was -- he was lying on.
10   And as he's on the ground, it had trans -- it
11   transitioned from saying "Get out of the car" to --
12   or "Get out of the F-ing car" to "Stop resisting."
13   The reason why I said that is because as he was
14   lying -- he was lying on one side of his -- of his
15   body.  One shoulder was touching the ground.  And as
16   he's lying on the ground he has his hands kind of
17   near his -- like his midsection or his beltline.
18   Again, growingly concerned because we have this
19   report of a firearm.  And, I'm sorry, I think I may
20   have -- in the CAD report or in -- CCOM had advised
21   that Mr. Barror possibly aimed a firearm at a female
22   in the area.  So I'm sorry if I --
23       Q.   No.  It's --
24       A.   -- glanced over that.  I apologize.
25       Q.   That's okay.

                Amy A. Dalton Court Reporting (503) 267-4666

Exhibit 1
Page 8 of 10

20

1   A.   So, anyway, so that's why the -- there was
2   a kind of concern of getting Mr. Barror detained at
3   this point because, like I said, we still hadn't
4   determined where this firearm was, if he was in
5   possession of a firearm.  So he had his hands like
6   right near at his beltline or in front of his body.
7   And we couldn't get his arms -- couldn't get --
8   guide his arms behind his back to handcuff him.  So
9   I delivered the first knee strike and then we still
10  couldn't get his arms behind.  And at this point we
11  still haven't determined if there's a firearm.  You
12  know, it's kind of a more recent thought.  Delivered
13  a second knee strike.  At that time I recognized
14  that Mr. Barror's -- Mr. Barror wasn't so rigid, I
15  guess you could say, and we were able to guide his
16  arms behind his back.  At that point I stopped
17  delivering knee strikes.
18          After that, for some time I -- or between
19  the time that he was detained, at some point I read
20  him Miranda -- his Miranda rights, and then I
21  believe he was placed in the back of the trooper's
22  vehicle.
23      Q.   Then did you at any point search Mr. Barror
24  or his vehicle?
25      A.   I -- I don't think I, like, physically went

```
                                                              56
 1   STATE OF OREGON     )
                         ) ss.
 2   COUNTY OF MULTNOMAH )

 3           I, Amy A. Dalton, Certified Court Reporter

 4   and Notary Public, do hereby certify that ADAM

 5   RAETHKE personally appeared before me at the time

 6   and place mentioned in the caption herein; that the

 7   witness was by me first duly sworn under oath and

 8   examined upon oral interrogatories propounded by

 9   counsel; that said examination, together with the

10   testimony of said witness, was taken down by me in

11   stenotype and thereafter reduced to typewriting;

12   and, that the foregoing transcript, pages 1 to 55,

13   both inclusive, contains a full, true and correct

14   record of all such testimony adduced and oral

15   proceedings had and of the whole thereof.

16           Witness my hand and notarial stamp at

17   Portland, Oregon, this 18th day of January, 2022.

18

19

20

21   _____
     Amy A. Dalton
22   Certified Court Reporter
     CCR No. 3353
23   Notary Commission No. 1001815
     My commission expires 7-20-24
24

25
```

Amy A. Dalton Court Reporting (503) 267-4666

Exhibit 1
Page 10 of 10