UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ROBERT BARROR, | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
|    vs. | )   No. 3:20-cv-00731-SB |
| | ) |
| CITY OF SAINT HELENS, and | ) |
| ADAM RAETHKE, in his | ) |
| individual capacity, | ) |
| | ) |
|         Defendants. | ) |
| _____ | ) |

DEPOSITION OF ADAM RAETHKE

Taken in behalf of the Plaintiff

\*   \*   \*

September 14, 2021

2

```
 1        BE IT REMEMBERED that the deposition of ADAM

 2   RAETHKE was taken before Amy A. Dalton, Certified

 3   Court Reporter and Notary Public, on

 4   September 14, 2021, commencing at the hour of 3:06

 5   p.m., in the conference room of the law firm of

 6   Chock Barhoum, in the City of Portland, County of

 7   Multnomah, State of Oregon.

 8

 9                    APPEARANCES:

10

11   STEFFEN LEGAL SERVICES
        Counsel for Plaintiff
12      205 SE Spokane St, #300
        Portland, OR 97202
13          BY JUSTIN STEFFEN
            info@steffenlegal.com
14

15

16   CHOCK BARHOUM
        Counsel for Defendant
17      121 SW Morrison St, Ste 500
        Portland, OR 97204
18          BY JEFFREY W. HANSEN
            jeff.hansen@chockbarhoum.com
19          BY JORDYN PARSONS
            jordyn.parsons@chockbarhoum.com
20

21

22

23

24

25
```

3

```
 1                    EXAMINATION INDEX

 2                                              Page

 3   EXAMINATION BY MR. STEFFEN                   4

 4

 5

 6                    EXHIBIT INDEX

 7   Exhibit           Description             Page

 8   1         Police Report                    25
     2         9-22-19 Memo                     34
 9   3         OSP Incident Details             41

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                    ADAM RAETHKE
 2   was thereupon produced as a witness in behalf of the
 3   Plaintiff and, having first been duly sworn, was
 4   examined and testified under oath as follows:
 5
 6   EXAMINATION BY MR. STEFFEN:
 7       Q.   Good afternoon, Officer Raethke.  My name
 8   is Justin Steffen.  I am Robert Barror's attorney,
 9   and I -- I assume you understood that he's filed a
10   lawsuit against you and the City of St. Helens and
11   I'm here to ask you questions under oath just as if
12   you were testifying in court in front of a judge,
13   subject to penalties of perjury?
14       A.   Yes, sir.
15       Q.   And have you ever been deposed in a civil
16   or criminal case before?
17       A.   No.
18       Q.   Well, it's -- just a couple, you know,
19   guidelines here.  It's important for both of us not
20   to try to speak over each other.  I know it's human
21   nature.  I'm sure I'll do it several times during
22   the deposition, but it's important we wait for each
23   other to finish speaking so the court reporter can
24   get a clear "yes" or "no."  And it's also important
25   if I ask you a "yes" or "no" question, you respond
```

5

1    with a "yes" or "no" rather than "uh-huh" or

2    "huh-uh" just so the court reporter has an easier

3    time.  Does that make sense?

4        A.    Yes, sir.

5        Q.    Are you currently taking any medications or

6    other substances that would affect your ability to

7    recall events?

8        A.    No, sir.

9        Q.    And other than with your attorney, have you

10   reviewed any documents in order to prepare yourself

11   for this deposition?

12       A.    What do you mean?

13       Q.    Well, for example, did you look at your

14   police report last night because you knew I was

15   probably going to ask you questions about it?

16       A.    Yes.  Yes, sir.

17       Q.    Okay.  And did you review any other

18   documents besides your police report?

19       A.    Yes, sir.

20       Q.    And what documents were those?

21       A.    The OS -- the Oregon State Police report

22   authored by Trooper Killens and the -- the multiple

23   computer-automated dispatcher CAD reports that were

24   generated from the case.

25       Q.    Any other documents?

6

1      **A.   I don't believe so.**

2      Q.   Okay.  And, again, other than your

3  attorney, have you talked to anyone else about this

4  lawsuit or the fact that you're being deposed today?

5      **A.   My supervisors are aware, yes, sir.**

6      Q.   Okay.  And who's your supervisor?

7      **A.   I spoke with Sergeant Evin Eustice and**

8  **Sergeant Jon Eggers prior to coming here.**

9      Q.   Okay.  And what did you tell them?

10      **A.   I let them know I was going to -- my**

11  **appointment time was here at 3 o'clock and that I**

12  **was going to leave at about 1:30, and the case that**

13  **I was speaking with them about, and just kind of**

14  **asked them, like, what a deposition's like since**

15  **I've never been a part of one.**

16      Q.   Okay.  And starting with Sergeant Eustice,

17  what did he tell you?

18      **A.   Basically, just answer the questions.**

19      Q.   Okay.  And, I'm sorry, who was the other --

20  you said there's another sergeant?

21      **A.   Sergeant Eggers.**

22      Q.   Is that E-C-K --

23      **A.   It's E-G-G-E-R-S.**

24      Q.   Okay.  And did he tell you, essentially,

25  the same thing?

7

1    **A.   Yeah, just answer the question, and he said**

2    **he'd never been deposed before.**

3    Q.   Okay.  Can you please describe your current

4    position with the City of St. Helens?

5    **A.   Yes.  I'm a patrol officer.**

6    Q.   And is this the same position you held in

7    August of 2019?

8    **A.   Yes, sir.**

9    Q.   And how long have you worked for the City

10   of St. Helens?

11   **A.   A little bit over two years now.**

12   Q.   And where did you work before you became a

13   patrol officer at St. Helens?

14   **A.   The Columbia County Sheriff's Office.**

15   Q.   And were you a deputy with Columbia County?

16   **A.   Yes, sir.**

17   Q.   And how long were you a deputy with

18   Columbia County?

19   **A.   With the patrol division, ten months, and**

20   **with -- I'm sorry.  I have to think about that.**

21   **It's been some time.  I believe with the corrections**

22   **division it was ten months, so I worked in the jail,**

23   **and then with the patrol division, maybe a year and**

24   **a half or so.**

25   Q.   Okay.  Did you work for the patrol division

8

1    first or the corrections division?

2        **A.    Corrections first.**

3        Q.    Okay.  And why did you leave your position

4    with Columbia County?

5        **A.    St. Helens Police Department offered better**

6    **pay.**

7        Q.    Okay.  So you voluntarily chose to leave,

8    then?

9        **A.    Yes, sir.**

10       Q.    And as a patrol officer with the City of

11   St. Helens, what are your typical duties in that

12   position?

13       **A.    I mean, I investigate criminal stuff.  We**

14   **get a lot of civil stuff.  And we, you know, can't**

15   **help too much, but, you know, "Hi, my neighbor's**

16   **come to my house," and, like, a wide variety of**

17   **things, really, traffic enforcement, deterring**

18   **crime, investigating crimes, just really everything.**

19       Q.    When you say "investigating crimes," does

20   that mean you're assisting in the investigation or

21   you're in charge of particular investigations?

22       **A.    At times you're assisting and at times**

23   **you're the one investigating.**

24       Q.    Does the City of St. Helens have dedicated

25   detectives in the police force?

9

1    **A.    Yes.  Currently we have two right now.**

2    Q.    Okay.  But there are other investigations

3    that the -- the detectives would typically handle --

4    **A.    Yes.**

5    Q.    -- for various reasons?

6    **A.    Yes.**

7    Q.    Okay.  I'm assuming there are certain,

8    probably, annual training or continuing education

9    to -- in order for you to maintain your position --

10    **A.    Yes.**

11    Q.    -- is that true?

12    **A.    Yes, sir.**

13    Q.    Can you describe what annual training is

14    required?

15    **A.    As a whole, I mean, I know we have annual**

16    **firearms training that we do every year.  How many**

17    **hours, I don't know.  I just know that we're**

18    **assigned training time to go do it.  Annual**

19    **use-of-force training.  We have blood**

20    **certifications.  We have to be using our intoxilyzer**

21    **card a certain number -- or I believe it's once a**

22    **year for it to remain valid, but, yes, we have**

23    **annual trainings that we attend.**

24    Q.    And are you current on all your training

25    requirements?

10

1     A.   Yes, sir.

2     Q.   Can you describe the annual use-of-force

3  training that you undergo?

4     A.   Yes, sir.  St. Helens Police Department

5  uses both in-person and virtual training.  In person

6  the use-of-force instructor, his name is Sergeant

7  Eustice, he'll put on use-of-force classes.  And we

8  also have a -- a training application, I guess you'd

9  call it, called Police One Academy that is also used

10 for training and -- but that's only been in place

11 for -- the Police One Academy has only been in place

12 for a year now.

13    Q.   Okay.  This program is some sort of

14 computer program or online --

15    A.   Training videos.

16    Q.   Training videos.  Okay.

17         And when is use of force authorized,

18 according to your training materials?

19    A.   According to our policy, it's to defend

20 myself or another or to make an arrest.

21    Q.   So I assume you're saying that use of force

22 is authorized to make an arrest if the subject is

23 resisting arrest; is that correct?

24    A.   I mean, yes and no.  Can you maybe

25 elaborate on that?

11

1    Q.   Well, you wouldn't need to use force if

2    someone you're arresting was complying with all your

3    orders, right?

4    **A.   Well, I mean, technically, applying**

5    **handcuffs would, in some sense, be use of force.**

6    **That's why it's hard to answer that question.**

7    Q.   Okay.  Yeah.  I understand.  And, please,

8    if you don't understand my questions, please let me

9    know.  I'm not trying to trick you or anything.

10   **A.   No.  I just want to make sure I'm answering**

11   **the questions.**

12   Q.   Yeah.  That's great.  Thank you.  And,

13   again, if you don't know something or can't

14   remember, let me know.

15   **A.   Yes, sir.**

16   Q.   If you don't say that, I'm going to assume

17   that you can remember or that you do understand my

18   questions.

19   **A.   Yes, sir.**

20   Q.   Okay.  Now, as part of these use-of-force

21   training materials and the use-of-force policy with

22   the City of St. Helens, is there any specific

23   training related to detaining individuals that might

24   have physical or mental disabilities?

25   **A.   I don't know.**

1      Q.   Well, for example, you know, if,

2   hypothetically, someone was in a wheelchair and you

3   needed them to stand up so you could put handcuffs

4   on them, obviously they can't stand up, right --

5      **A.   Yes, sir.**

6      Q.   -- so you'd have to alter your --

7      **A.   Yes, sir.**

8      Q.   -- your response there.  So I'm wondering

9   if there's any specific training that details what

10  to do in those kind of situations or similar

11  situations?

12     **A.   Not that I can recall.**

13          MR. HANSEN:  And you're referring

14  specifically to physically handicapped in

15  wheelchairs or did you mean that follow-up question

16  to be more broad?

17          MR. STEFFEN:  Yeah, more -- more broad is

18  what I was referring to.  Just if someone has a -- a

19  physical or a mental disability that would --

20          MR. HANSEN:  Why don't you take them one at

21  a time.

22          MR. STEFFEN:  Yeah.  Sure.

23          THE WITNESS:  Okay.

24          MR. HANSEN:  That's probably better.

25  BY MR. STEFFEN:  (Continuing)

13

1    Q.   So to ask it again, Officer Raethke, can

2  you recall any training you've undergone with the

3  City of St. Helens related to use of force as it

4  relates specifically how use of force should be

5  applied to people with physical disabilities?

6    **A.   I'm recalling this is a training**

7  **specifically for, like, persons that are pregnant**

8  **and stuff like that.  I mean, I don't have the**

9  **policy here in front of me, so it kind of makes that**

10 **difficult to, you know, really answer your question.**

11   Q.   I understand.

12        And I'm going to ask the same question as

13 it relates to mentally-disabled individuals, that is

14 a -- does your use-of-force training have any

15 differences in how force is applied when you are

16 dealing with someone that has a mental disability?

17   **A.   Again, with the -- with the policy not,**

18 **like, right in front of me, I can't flip through**

19 **every paragraph.  It's -- it's -- I mean --**

20   Q.   I understand.

21   **A.   I know there's -- I mean, there's**

22 **trainings, but I'm trying to think of, like, the**

23 **actual paper policy.**

24   Q.   But right now, today, you -- you can't

25 recall any just off the top of your head?

                                                                            14

1     **A.    No.**

2     Q.    Sorry.  I'm going to back up a little bit.

3     **A.    Okay.**

4     Q.    Before you were a corrections deputy with

5     Columbia County, what -- where did you work?

6     **A.    I worked for a small flooring company**

7     **called Sturdy Floors.**

8     Q.    Okay.  So Columbia County in the

9     corrections division was your first law enforcement

10    position?

11    **A.    Yes, sir.**

12    Q.    Okay.  And since you started at Columbia

13    County all the way to the present, other than the

14    incident on October -- sorry -- on August 6th of

15    2019, have you been involved in any use-of-force

16    incidents?

17    **A.    Just in general?**

18    Q.    Yeah.  Well, I mean, to the extent where

19    you would file any kind of report detailing your use

20    of force.

21    **A.    Yes.  We're required to write a report when**

22    **there is force used.**

23    Q.    Okay.  About how often does that happen in

24    the regular course of your duties?

25    **A.    I mean, I don't know if I can give you a**

1    number.  From time to time.  I don't know if

2    that's --

3        Q.    Okay.

4        A.    -- if that's --

5        Q.    Yeah.  I mean, I think I understand.

6              Well, would you say more than once a month?

7    Less than once a month?

8        A.    I -- I can't say, sir.  It varies.

9        Q.    Okay.  Okay.  Let's talk about August 6th.

10   Do you recall assisting Oregon State Police in

11   arresting Robert Barror on August 6th of 2019?

12       A.    Yes, sir.

13       Q.    Can you please describe how you came to be

14   involved in that incident?

15       A.    Yes.  I was near the intersection of South

16   Eighth and Columbia Boulevard in St. Helens on an

17   unrelated call, and I believe it was -- because

18   Oregon State Police and the local agencies like

19   Scappoose and St. Helens, we have different

20   dispatch.  I believe it was the dispatch for, like,

21   St. Helens and stuff that had aired the call or

22   aired the general broadcast of the incident.  And it

23   was a -- it was a gray Chevy pickup northbound on

24   the highway -- I don't remember the nearest cross --

25   going about a hundred miles an hour.  And without

1    looking at my report, that's what I can recall.  And

2    then -- did you want me to elaborate or is that --

3    did that answer your question?

4        Q.   Well, no.  So what happened next?

5        A.   I'm not sure I -- I know that -- I want to

6    say that at some point the vehicle had gotten to

7    either Bachelor or South Bachelor, and those two

8    roads cross.  I don't remember the route I took to

9    get there.  So I drove west up Bachelor Road, and at

10   that time when I arrived, Mr. -- is it Barror?  Is

11   that how I say it?

12       Q.   It's Barror.

13       A.   -- Mr. Barror's vehicle was stopped facing

14   eastbound on Bachelor and there were two Oregon

15   State troopers on scene with their guns drawn aimed

16   at the vehicle and Mr. Barror.  So I -- I had

17   come -- basically, we were facing one another.

18   There was another officer in front of me.  He

19   momentarily stopped.  He pulled forward, parked

20   somewhere behind the trooper's patrol vehicles, not

21   necessarily sure where.  And then I got -- got out

22   of my patrol vehicle and as I started to approach

23   the troopers, from what I recall, we started just

24   kind of file -- or I kind of filed into like a -- a

25   column, you know, or a line.  And I forget if I was

17

1    **in the rear or in the middle or where I was**

2    **positioned with those troopers, but we were in a**

3    **line.  And we got to the driver's side of**

4    **Mr. Barror's vehicle and --**

5    Q.   And you're guns were drawn at this point,

6    correct?

7    **A.   Yes.**

8    Q.   Okay.  And, I'm sorry, continue.  You got

9    to Mr. Barror's -- the door of his vehicle?

10    **A.   Yes.**

11    Q.   And then what happened?

12    **A.   The trooper started -- began to, like,**

13    **assist him or remove him from the vehicle.  At that**

14    **time, it -- you know, I was kind of -- my view was**

15    **obstructed.  I put my firearm away.  And I had moved**

16    **closer to the -- I guess, the opening of the door,**

17    **and I loudly exclaimed -- do you want to use, like,**

18    **verbatim what I said?  It's in the report.  I said,**

19    **"Get out of the fucking car" multiple times.**

20    Q.   Why did you holster your weapon?

21    **A.   Because I can't grab someone if I have a**

22    **firearm in my hand.**

23    Q.   Well, I guess what I'm getting at is that,

24    did you determine that there was no firearm or no

25    danger that would necessitate you having your gun

18

1    drawn?

2         A.    That was undetermined at that time.

3         Q.    Okay.

4         A.    There was other officers with me that were

5    assisting.

6         Q.    Okay.  So after you're -- you're telling

7    Mr. Barror to get out of the car or words to that

8    effect --

9         A.    Yes.

10        Q.    -- and then what happened?

11        A.    Again, without having the report in front

12   of me, don't know exactly where my hand placement

13   was, but, you know, went to remove him from the

14   vehicle.  He had leaned away from me towards the

15   passenger's side of the vehicle.  I don't -- and I

16   didn't know at that time if he was leaning away from

17   me to resist my attempts or if he was reaching for

18   something.  I became growingly concerned of -- of

19   that.  I was able to, after some time, get him from

20   the vehicle.  And when I got him out of the vehicle,

21   I -- I guess the best way to say it is he kind of

22   turned and kind of faced me and got into this squat

23   position and backed up and was able to go into --

24   like, place his -- the back side of his body into

25   like the V of the door, you know, where the -- yeah,

19

1    the door hinges are.  So like by his right hand was

2    the -- you know, the door compartment.  By his left

3    hand was the -- like the opening of the cab or

4    whatever.  And so then -- and I don't -- I don't

5    know if I -- oh, never mind.

6              So, anyway, after that, I had regained

7    control and got him onto the ground.  I don't know

8    if I can recall what side of the body he was on or

9    what side of his body he was -- he was lying on.

10   And as he's on the ground, it had trans -- it

11   transitioned from saying "Get out of the car" to --

12   or "Get out of the F-ing car" to "Stop resisting."

13   The reason why I said that is because as he was

14   lying -- he was lying on one side of his -- of his

15   body.  One shoulder was touching the ground.  And as

16   he's lying on the ground he has his hands kind of

17   near his -- like his midsection or his beltline.

18   Again, growingly concerned because we have this

19   report of a firearm.  And, I'm sorry, I think I may

20   have -- in the CAD report or in -- CCOM had advised

21   that Mr. Barror possibly aimed a firearm at a female

22   in the area.  So I'm sorry if I --

23        Q.   No.  It's --

24        A.   -- glanced over that.  I apologize.

25        Q.   That's okay.

1      A.    So, anyway, so that's why the -- there was

2    a kind of concern of getting Mr. Barror detained at

3    this point because, like I said, we still hadn't

4    determined where this firearm was, if he was in

5    possession of a firearm.  So he had his hands like

6    right near at his beltline or in front of his body.

7    And we couldn't get his arms -- couldn't get --

8    guide his arms behind his back to handcuff him.  So

9    I delivered the first knee strike and then we still

10   couldn't get his arms behind.  And at this point we

11   still haven't determined if there's a firearm.  You

12   know, it's kind of a more recent thought.  Delivered

13   a second knee strike.  At that time I recognized

14   that Mr. Barror's -- Mr. Barror wasn't so rigid, I

15   guess you could say, and we were able to guide his

16   arms behind his back.  At that point I stopped

17   delivering knee strikes.

18           After that, for some time I -- or between

19   the time that he was detained, at some point I read

20   him Miranda -- his Miranda rights, and then I

21   believe he was placed in the back of the trooper's

22   vehicle.

23      Q.    Then did you at any point search Mr. Barror

24   or his vehicle?

25      A.    I -- I don't think I, like, physically went

21

1    into the vehicle.  I peered in, didn't see any other

2    people, nothing like that.

3        Q.   And as far as you're aware, was there ever

4    a handgun found on -- or any weapon found?

5        A.   Without having conducted a full search of

6    the vehicle, no.

7        Q.   When you were approaching the vehicle,

8    before Mr. Barror got out of it or before he was

9    pulled out of the vehicle, did you hear him try to

10   explain that he couldn't raise his hands and that he

11   was injured?

12       A.   No, sir.

13       Q.   Do you recall Mr. Barror saying anything

14   from when -- between the time you got out of the car

15   and the time he was pulled out of the vehicle?

16       A.   Do I recall from the time I got to the door

17   until he was out of the vehicle?

18       Q.   No.  From the time you got out of your

19   patrol car to the time Mr. Barror was taken out of

20   the vehicle, do you recall Mr. Barror making any

21   statements?

22       A.   No, sir.

23       Q.   Are you aware of any -- excuse me.  Of the

24   other troopers or officers that were assisting in

25   detaining Mr. Barror, are you aware if any of them

22

1  had to strike Mr. Barror either with their feet,

2  knees, or --

3      **A.   No.**

4      Q.   And do you recall one or both of the state

5  troopers telling you to stop striking Mr. Barror?

6      **A.   I'm sorry.  Can you --**

7      Q.   Yeah.

8          Did you -- do you recall one of the state

9  troopers that was assisting you with the arrest, did

10 they say any words to the effect that you should

11 stop striking Mr. Barror with your knee?

12     **A.   That was not said.**

13     Q.   Okay.  Do you recall them telling you that

14 Mr. Barror was no longer resisting or words to that

15 effect?

16     **A.   I -- I know of the words that were written**

17 **in the report and I --**

18     Q.   Okay.

19     **A.   -- I -- I'm aware of --**

20     Q.   I believe that's -- they said, "He's good.

21 He's good" --

22     **A.   Yes.**

23     Q.   -- is that -- and what did you take them

24 to -- sorry.  Let me rephrase that.

25          What do you think the troopers meant when

23

1    they told you that Mr. Barror was good?

2        **A.    I actually wasn't aware that was said --**

3        Q.    Okay.

4        **A.    -- on scene.**

5        Q.    In one of the reports the state trooper --

6    and we'll look at it in a second, but for now, a

7    state trooper refers to a type of maneuver called

8    "slicing the pie."  Are you familiar with that term?

9        **A.    Yes, sir.**

10       Q.    Can you explain what that means?

11       **A.    Is it okay if I draw it or something?**

12       Q.    That's fine with me.

13       **A.    I don't know if I can put it into accurate**

14   **words.**

15       Q.    Sure.

16       **A.    So it's just -- let's pretend this is a**

17   **doorway (indicating).  This is a police officer,**

18   **just a person (indicating).  So you're going to have**

19   **line of sight right here (indicating), but it's only**

20   **going to be, you know, just a little bit from your**

21   **point of view, slowly move over, you can see more,**

22   **and slowly move over again, and you just keep doing**

23   **that until you have a full view of the doorway.**

24           **Does that --**

25       Q.    Okay.

24

```
1      A.   -- make sense?

2      Q.   Sure.

3           MR. HANSEN:  And you don't fully expose

4   yourself or your partner --

5           THE WITNESS:  Yes.

6           MR. HANSEN:  -- to the process --

7           THE WITNESS:  Yes.

8           MR. HANSEN:  -- until you're sure?

9   BY MR. STEFFEN:  (Continuing)

10     Q.   Okay.  So this slicing-the-pie technique

11  can be performed by just a single officer?

12     A.   Yeah.

13     Q.   Okay.  Do you recall if any -- if either of

14  the two state troopers had to physically restrain

15  you from using force against Mr. Barror?  And I

16  don't mean in a violent way, but, like, maybe put

17  their hands on you or pull you back or anything?

18     A.   I wasn't restrained.

19     Q.   Okay.  Were you wearing a body camera

20  during this incident?

21     A.   Yes.

22     Q.   And was this body camera turned on?

23     A.   Yes, sir.

24     Q.   Are these body cameras that need to be

25  turned on manually?  For example, if you have a
```

25

1   traffic stop, do you get out and then you switch on

2   the body camera or does it somehow come on

3   automatically?

4       **A.   Oh, it's -- we have to turn it on manually.**

5       Q.   Okay.  And did you turn it on manually when

6   you arrived at the scene on August 6th?

7       **A.   Actually, no.  It was -- it was on from**

8   **when I was on the unrelated call, and I don't**

9   **believe I had turned it off --**

10      Q.   Okay.

11      **A.   -- driving to the incident with Mr. Barror.**

12      Q.   Okay.  Well, we'll come back to that --

13      **A.   Okay.**

14      Q.   -- because we're going to look at the

15  report.

16          Okay.  So I'm going to show you something

17  that's going to be labeled as Exhibit 1?

18              (EXB. 1, Police Report, marked.)

19  BY MR. STEFFEN:  (Continuing)

20      Q.   And you can just thumb through that really

21  quick until you recognize the document.  Is this

22  your police report of the August 6th incident

23  involving Robert Barror?

24      **A.   Yes, sir.**

25      Q.   Okay.  So if you could look at -- it's

26

1    labeled "Defendant," a few zeros -- it's, basically,

2    Page 5, but I know in the middle it says Page 4 out

3    of 15, but I'm going to direct you to where it says

4    Defendant DF 000005?

5        **A.   Okay.  Yes.  I see it.**

6        Q.   Okay.  And at the last sentence of the top

7    paragraph, it says, "During this time my body worn

8    video camera was knocked off of my uniform and onto

9    the ground."

10       **A.   Yes, sir.**

11       Q.   Do you recall that happening?

12       **A.   I -- I didn't know about it until after.**

13       Q.   When did you realize that your body camera

14   had gotten knocked off?

15       **A.   I don't recall.**

16       Q.   Have you reviewed -- well, let me back up.

17   So there should have at least been footage of this

18   arrest until the body camera was knocked off of you;

19   is that correct?

20       **A.   Yes.**

21       Q.   Have you reviewed that footage?

22       **A.   It's not -- so we use -- no.**

23       Q.   Okay.  As far as you're aware, is that

24   footage still in the possession of the St. Helens

25   Police Department?

27

1      A.   I'm not totally sure, no.

2      Q.   Okay.  Do you know what the St. Helens

3  Police Department policy is in regards to retaining

4  video camera footage?

5      A.   We have a -- no.  There's a -- we use Axon,

6  so it just -- it has some, like, automatic retention

7  period.

8      Q.   Okay.  And do you know if this video camera

9  footage is uploaded automatically to somewhere, a

10 server or something, or does it have to be --

11     A.   I think --

12     Q.   -- transferred manually?

13     A.   I think it's a server.  We plug it into,

14 like, a docking station and it uploads

15 automatically.

16     Q.   But it -- it would have to be plugged in to

17 somewhere, right?

18     A.   Yes.

19     Q.   It doesn't go through the Cloud or internet

20 or anything?

21     A.   Nope.  Got to get plugged in.

22     Q.   And do you recall plugging it in to upload

23 this footage?

24     A.   On that specific day, no.

25     Q.   Okay.

28

1     **A.    But we, generally, do that at the end of**
2  **shift or something like that.**
3     Q.    Okay.  So once you retrieved the -- your
4  video camera, the body camera, it would have been
5  standard practice for you to upload whatever footage
6  was on there at the end of your shift?
7     **A.    If I -- yes.  If you plug it in, it just**
8  **automatically does it.**
9     Q.    Okay.
10    **A.    It's no -- no user effort.**
11    Q.    I got it.
12          So if you're taking it off at the end of
13 your shift --
14    **A.    Uh-huh.**
15    Q.    -- and you plug it in, it will
16 automatically upload?
17    **A.    Yes.**
18    Q.    Got it.
19          MR. STEFFEN:  And can we go off the record
20 for a second?
21              (Recess was taken:  3:38 p.m. - 3:40
22              p.m.)
23 BY MR. STEFFEN:  (Continuing)
24    Q.    Okay.  Officer Raethke, let's -- I'm going
25 to direct you to the second paragraph on that same

1   page.  It says, "The troopers and I pulled Robert

2   out of the vehicle by his arms a short time later.

3   When Robert was removed from the vehicle, Robert was

4   ordered to lie on the ground.  Robert began to back

5   away from the troopers and I and remained standing.

6   Robert lowered his body into a squat position.

7   Robert continued backing away from the troopers and

8   I.  Robert backed his body back towards the open

9   door of the Silverado."

10          So it almost sounds to me like Robert was

11   trying to lower his body to the ground.  Is that not

12   your impression?

13   **A.    No, sir.  He lowered his body into a squat**

14   **position and he didn't -- I mean, it wasn't -- it**

15   **wasn't him getting on the ground; it was him**

16   **squatting.**

17   Q.    Well, doesn't he need to lower himself

18   closer to the ground before he gets onto the ground?

19   **A.    Yeah.  But I don't believe backing away**

20   **would have anything to do with that.**

21   Q.    Okay.  How far did he back away?  What's

22   the span in feet, approximately?

23   **A.    I'm not sure.  At -- at the very most,**

24   **probably the -- the width of a -- the Silverado**

25   **door.  I'm not -- I'm not sure.  I don't know, to be**

30

1    honest.

2         Q.   Okay.  Well, and you also -- let's see.

3    You or the troopers were holding onto Robert, right,

4    at this time when you removed him from the vehicle?

5         **A.   I mean, yes.  I don't know if both troopers**

6    **were, but, yes, we were removing him from the**

7    **vehicle.**

8         Q.   How could he back away from you if you guys

9    were holding onto him?  Are you saying he pulled you

10   back with him?

11        **A.   No.  I -- I mean, it's -- it's -- it's hard**

12   **with it not being in the report, either -- so**

13   **there's two possibilities:  Either he pulled us or**

14   **we lost our grip.  I don't know which one.**

15        Q.   Okay.  Okay.  And then let's go to the

16   third paragraph.  It says, "Robert continued to

17   resist being taken into custody.  For officer safety

18   and to place Robert in handcuffs, Robert was guided

19   to the ground."  What do you mean "guided to the

20   ground"?

21        **A.   At least -- I mean, someone's hands on him**

22   **in some position and, like, moved downward.**

23        Q.   Okay.  Well, to me it sounds, "guided to

24   the ground" is like placing him on the ground as

25   opposed to throwing him down onto the ground.  And

31

1   I'm -- I'm trying to determine if that's your

2   interpretation when you say he was "guided to the

3   ground."  Was he guided gently down onto the ground

4   or was he thrown onto the ground?

5       **A.   I wouldn't say "thrown."  I mean, it says**

6   **right here that he's resisting, so there has to be**

7   **some force applied, but you're not -- it's --**

8   **it's -- there's -- forcefully guiding him, I guess.**

9   **I mean, I don't know.  I guided him.  It wouldn't --**

10  **I wouldn't -- I wouldn't categorize it as a throw.**

11      Q.   Okay.  Okay.  And the next paragraph it

12  says, "I delivered two focus blows with my right

13  knee to Robert's abdomen.  I continued to order

14  Robert to stop resisting."

15          So was he -- after those two blows, was he

16  still resisting?

17      **A.   After the second, no.**

18      Q.   Okay.  So then even though he wasn't

19  resisting anymore, you were still ordering him to

20  stop resisting?

21      **A.   Yes.**

22      Q.   Okay.  And then back to the -- the body

23  camera.  Under "Notes" down at the end of the page,

24  it does say, "Body worn video footage available"?

25      **A.   Yes.**

32

1      Q.   Are you saying that just because you know

2   you plugged in your body camera at the end of your

3   shift or you've actually reviewed the footage?

4      **A.   So when it's on the body -- it's hard to**

5   **explain.  I'm not really, like, the techy type.  So,**

6   **basically -- okay.  I think it's Bluetooth.  There's**

7   **a Bluetooth function where we can connect the**

8   **Bluetooth to our work phone.  You go and tag it with**

9   **the case number, suspect, or whatever's applicable.**

10  **And then once you tag it and then the -- sorry --**

11  **like the crime or type of case it was.  And then you**

12  **plug it in and it just goes so that way once**

13  **it's -- I don't know if it's right here.  So, like,**

14  **you would put this (indicating) in one portion of**

15  **the -- like, the ID tag.  So then when it says "body**

16  **camera footage available," you can refer to this**

17  **number and then go into the Axon website, I guess,**

18  **and find it.**

19     Q.   Okay.  Well, I guess what I'm getting at

20  is, are you saying here "body worn footage is

21  available" because you're assuming it's available

22  because you followed all the procedures for storing

23  body-cam footage or did you actually see the footage

24  so you know it's available?

25     **A.   I mean, I assume I probably watched it when**

33

1    I first wrote my report or something.

2        Q.    Okay.

3        A.    I'm not sure.  I just -- I know that we tag

4    it a certain way.  So when you tag it, you know

5    it's -- you know it's tagged.  You can't, like, take

6    it off.  And then you just plug it in.  Is that

7    answering your question?  I'm not sure if I'm really

8    understanding what you're asking.

9        Q.    Yeah.  And you -- I apologize if that

10   wasn't clear, but I -- I think we can move on.

11            During your time with Columbia County or

12   the City of St. Helens, has your -- any body cameras

13   you might have worn ever fallen off in the middle of

14   an arrest?

15       A.    It happens occasionally, yes.

16       Q.    Okay.  Can you be more specific as to how

17   often that happens?

18       A.    Not very often.  So at the time of this

19   incident, I was a new-ish officer.  You can see in

20   the video that I was wearing just a regular

21   button-up shirt.  It didn't have the MOLLE straps

22   like that -- a vest does, so I had to utilize just a

23   magnet.  So like that (indicating), that's -- it's

24   weaved -- it's woven in with the straps.  It still

25   happens from time to time with the magnet.  It's --

34

1    **I mean, it's a lot easier to get knocked off, so it**

2    **does happen.**

3        Q.   Okay.  Okay.  After Mr. Barror was detained

4    and was put in one of the -- the trooper's cars, at

5    some point did you recognize Mr. Barror and realize

6    who he was?

7        **A.   I -- I don't -- I didn't.**

8        Q.   Okay.

9        **A.   To my recollection, that's the only time I**

10   **have met him.**

11       Q.   Did you have any idea whether or not

12   Mr. Barror was known as a reckless driver in the

13   area?

14       **A.   No.**

15       Q.   Okay.  I'm going to ask you to take a look

16   at Exhibit 2.  And why don't you go ahead and read

17   this e-mail that's on the first and second page to

18   yourself and let me know when you're finished.

19                  (EXB. 2, 9-22-19 Memo, marked.)

20       **A.   Okay.  Okay.  I'm done with Page 2.**

21       Q.   Have you seen this e-mail before?

22       **A.   No.**

23       Q.   Okay.

24       **A.   First time.**

25       Q.   So as you can see, it's an e-mail from

35

1    Sergeant Eustice to Lieutenant Hogue.  And in the
2    second -- well, let's skip that.  One, two, three --
3    in the fourth paragraph it says, "Sergeant Eggers is
4    currently working on an FTEP manual not only for
5    recruit officers but a separate one for lateral
6    officers, due to their generally shortened training.
7    As part of the training we have identified several
8    areas where further training is needed."  And then
9    the next paragraph, the second sentence says, "New
10   hires will be instructed on the use of firearms,
11   defensive tactics, verbal conflict and control,
12   handcuffing, use of Tasers," and goes on, but I
13   wanted to ask you about the section that says "New
14   hires will be instructed on verbal conflict and
15   control."
16           Did you receive any training on verbal
17   conflict and control with the City of St. Helens
18   prior to August 6th, 2019?
19   **A.    I don't believe so, no.**
20   Q.    Okay.  Do you recall if you received any
21   training on verbal conflict and control after August
22   6th?
23   **A.    Yes.**
24   Q.    Okay.  And what -- can you give me an
25   overview of what that training was?

36

1    A.    Yes.   Sergeant Eustice and I spoke about

2    the incident, reviewed the Oregon State Police

3    dash-cam footage.   And he asked me why I was yelling

4    and cursing, and so I told him my reasons, and he

5    documented it.   I signed it.   I think it was on a --

6    I forgot if it -- it was a non-disciplinary form.   I

7    don't recall what the form was called.

8        Q.   Okay.   Can you look at the last page of

9    this exhibit?

10       A.    Yes.   The performance evaluation and

11   counseling form.

12       Q.   Okay.   So this -- this is the training

13   you're referring to?

14       A.    Let me -- let me look over all of it first.

15       Q.   Sure.

16       A.    Yes.

17       Q.   Okay.   So other than that instance, did you

18   receive any other training on verbal conflict and

19   control after August 6th, 2019?

20       A.    So that would fall under the use-of-force

21   policies, and we've had -- since had use-of-force

22   trainings, so, I mean --

23       Q.   Okay.   So as part of your subsequent

24   use-of-force training, that includes a subject on

25   verbal conflict and control?

37

1      **A.    Issuing verbal commands, yes.**

2      Q.    Okay.  And in relation to the handcuffing

3  training that is referred to on Page 1, did you

4  receive new or updated training on the proper use of

5  handcuffs after August 6th, 2019?

6      **A.    Yes.  We handcuff subjects in a -- like a**

7  **hands-on training.**

8      Q.    Okay.  But I assume you'd received prior

9  training on how to handcuff subjects before August

10  6th, right?

11      **A.    Yes.**

12      Q.    So I'm wondering, did the training

13  materials change after August 6th?

14      **A.    I don't believe so.**

15      Q.    Okay.

16      **A.    I'm not sure.**

17      Q.    And let's go on to, I guess, just the very

18  last page of this exhibit.

19      **A.    Okay.**

20      Q.    And these are -- are comments related to

21  this performance evaluation and counseling form.

22  And do you know who made these comments on the last

23  page?

24      **A.    The evaluator was Sergeant Eustice, I**

25  **believe.**

38

1      Q.   Eustice.  Okay.  I couldn't see the

2   signature earlier, so I wasn't sure.

3            Well, halfway down on the last page it

4   says, "I had an opportunity to review the

5   dash-camera video and audio from one of the OSP

6   troopers.  While reviewing the footage I noticed

7   that Officer Raethke's tone and body language while

8   giving commands during this highly stressful

9   incident seemed amplified beyond that of the other

10  officers on scene."

11           So you recall having this conversation with

12  Sergeant Eustice?

13     A.   Yes.

14     Q.   And why was he concerned that your body

15  language and verbal commands were amplified?

16     A.   Well, he -- he had asked me about the --

17  because I was yelling very loud and he asked me why

18  I was yelling so loud, and so I explained to him

19  that my thought process in it was that if I -- if I

20  yelled loud and projected my voice, that a subject

21  should be able to -- would be able to hear me and

22  that they had -- it wouldn't be a -- a statement of,

23  "Well, I couldn't hear him," so I talked to him

24  about that.  And he -- we talked about 21st Century

25  policing and kind of, you know, giving -- not sure

39

1    **of the word.  This isn't quoting him, but still**

2    **giving -- sorry.  I'm thinking of the word.  I'm**

3    **sorry.  Like -- like, you know, firm commands, but,**

4    **you know, like, I think he said bring it down a**

5    **couple octaves, I think was his statement, but**

6    **giving firm commands, but not yelling so much, I**

7    **think were his instructions.**

8        Q.    Do you recall if you were angry that day

9    for any reason?

10       **A.    I wasn't angry.**

11       Q.    You weren't in a bad mood?

12       **A.    Nope.**

13       Q.    Okay.  And then two paragraphs down from

14   that it says, "It was explained to Officer Raethke

15   that public perception is part of policing in the

16   21st century.  I played the dash-camera video for

17   Officer Raethke and he recognized that the footage

18   did not look good."

19            So what did you mean by that when you said

20   "the footage did not look good"?

21       **A.    So this wasn't typed by me.  This was typed**

22   **by Sergeant Eustice.**

23       Q.    Right.  But he's saying you agreed that

24   the -- you recognized that the footage did not look

25   good.

40

1    **A.    Yeah.   So it -- that's specifically**
2    **referring to the yelling, the cursing, how -- that**
3    **it may look like, I guess, third person or like --**
4    **so, again, going back to lowering the volume, still**
5    **giving verbal -- you know, loud, firm, verbal**
6    **commands, but just lowering the volume.   Does that**
7    **answer your question, sir?**
8         Q.    Yes.
9    **A.    Perfect.**
10        Q.    And the next sentence says, "Officer
11   Raethke and I spoke in length about -- in length
12   about some about" -- I think there's a typo there.
13   Sorry.   It says, "Raethke and I spoke in length
14   about the incident and I offered him some tools that
15   he could use in similar circumstances."   What were
16   the tools that Sergeant Eustice offered you?
17   **A.    So just from what I remember, again kind of**
18   **repeating myself, but -- I'm sorry.   I didn't mean**
19   **to sound -- did I sound rude when I said that?**
20        Q.    No, not at all.   You're doing fine.
21   **A.    Sorry about that.   Again, just from what I**
22   **recall, it was, you know, again still giving loud,**
23   **verbal commands, but not yelling so loud and not**
24   **using curse words that are placed in with those**
25   **yellings so that way, you know, I can still give**

41

1    **verbal commands that are heard, but it couldn't be,**

2    **I guess, perceived in a negative light, I guess.**

3        Q.   Okay.  Did Sergeant Eustice have any

4    concerns about the knee strikes you applied to

5    Robert Barror?

6        **A.   No, sir.  And it's -- I mean, it's not in**

7    **here, and it would have been.  If it was an issue, I**

8    **either would have been in trouble or it would have**

9    **been documented.**

10       Q.   So it -- based on your perception of this

11   conversation with Sergeant Eustice, he was mainly

12   concerned with your tone of voice rather than the

13   physical force you applied; is that correct?

14       **A.   Yes.  He -- like I said, he wanted me to**

15   **lower my volume --**

16       Q.   Okay.

17       **A.   -- and like -- I think he said a couple**

18   **octaves was what he said and just -- yeah.**

19            MR. HANSEN:  Eliminate the profanity?

20            THE WITNESS:  Yes.

21            MR. STEFFEN:  Okay.  Okay.  I think we're

22   done with that exhibit.  Now we're going to look at

23   something labeled Exhibit 3.

24                (EXB. 3, OSP Incident Details,

25                 marked.)

42

```
 1    BY MR. STEFFEN:  (Continuing)
 2        Q.   Okay.  Let's look at Page 43, also labeled
 3    Page 4 of 7.  And this is Trooper Killens' report of
 4    the incident on August 6th, and I'm kind of starting
 5    about halfway in his report here.  The one, two,
 6    three -- fourth paragraph down Trooper Killens says,
 7    "I could see the driver's arm was in between the
 8    seat belt and the door pillar so I moved the seat
 9    belt around his arm to allow us to remove him from
10    the vehicle.  Then St. Helens Officer Adam Raethke
11    started to yell 'Get out of the fucking car.  Get
12    out of the fucking car' and pushed his way past me
13    on my right side into the V of the door."
14             Do you remember pushing passed Trooper
15    Killens?
16        A.   No.
17        Q.   Okay.  And then starting at the next
18    paragraph down it says, "When the driver was on the
19    ground I took digital control of his left arm and
20    pulled it out from underneath his chest.  I saw
21    Officer Raethke strike the driver with a knee blow
22    and gave him the command to stop resisting.  I told
23    Officer Raethke 'he good' and to stop at that point
24    as no further force was necessary to effect
25    custody."
```

43

1          So it sounds like, according to Trooper

2     Killens, he already had Mr. Barror's left arm pulled

3     out from underneath his chest.  Do you recall if

4     Mr. Barror's arm was out from underneath his chest

5     when you struck him with your knee?

6          **A.    So I -- no.  I recall Mr. Barror being on**

7     **his side, so I don't know how his hand would be**

8     **under his -- sorry.  I'm trying to visualize it.**

9     **That would have to mean he was on his -- in a -- in**

10    **a prone position.  And from what I recall, he was**

11    **on -- lying on one side of his body, so, no, I don't**

12    **recall that.**

13         Q.    And correct me if I'm wrong, but I believe

14    you testified earlier that you don't recall any of

15    the troopers telling you that Mr. Barror was good

16    and that no further force was necessary?

17         **A.    Yeah.  I don't recall that, sir.**

18         Q.    Okay.  And then let's look at the next

19    page, the last paragraph before the section titled

20    "Arrest Report."  It says, "Medics then transported

21    Barror to the hospital and then I contacted Officer

22    Raethke with the St. Helens Police and requested he

23    write a supplemental report for his actions during

24    my stop and a copy of his body camera."

25         Do you recall being contacted by Trooper

44

1    Killens for that information?

2        **A.    Vaguely, yes.**

3        Q.    Okay.  And did you comply with that request

4    and write a supplemental report?

5        **A.    Yes.**

6        Q.    Okay.  And is the supplemental report going

7    to be the same as your report that's Exhibit 1 or is

8    that something different?

9        **A.    Nope.  It's this one.**

10       Q.    Okay.  If Trooper Killens did not ask you

11   to write a supplemental report, then would you not

12   have written this report at all?

13       **A.    No, I would have written it.**

14       Q.    Okay.  So to me -- it sounds like he's

15   asking for a supplemental report, which to me means

16   additional reporting other than the main report.  Is

17   that incorrect?

18       **A.    Yeah.  So the best way to explain it is**

19   **like if -- say I investigate a certain case and I'm**

20   **the case officer, I would write a primary report or**

21   **we call it a general offense report.  If there was a**

22   **second officer on scene with St. Helens, I would**

23   **say, Hey, can you write me a supplemental?"  And so**

24   **usually it would say "Supplemental," but because I'm**

25   **with a different agency, the direction is that if**

45

1    we're writing a, quote, unquote, "supplemental" for

2    them, that's fine, but we -- we, in house, would do

3    a general offense report.  And I -- I think probably

4    where the -- the verbiage is is that it would be

5    supplemental to his report.

6        Q.   I see.

7        A.   Does that answer your question, sir?

8        Q.   Yeah.  So I think I understand.

9        A.   Okay.

10       Q.   Since you were writing a report anyway,

11   that there would be no reason to write a

12   supplemental report because all the information is

13   contained in your initial report --

14       A.   I mean, this --

15       Q.   -- or like it's --

16       A.   So this -- this is my supplemental.  I

17   guess, it's supplemental to his because he's the

18   case officer, but this --

19       Q.   Okay.

20       A.   I understand it's not labeled

21   "Supplemental," but there's not -- there's not like

22   a second report or something.  This is the report,

23   but, yes.

24       Q.   Okay.  But it would be standard practice to

25   write a report about this incident, anyway,

46

1    regardless of whether he asked for this supplemental

2    report; is that correct?

3        **A.    Yep.**

4        Q.    But in this case they happened to be one

5    and the same?

6            MR. HANSEN:  Go ahead.  They're one and the

7    same for you, right?

8            THE WITNESS:  I'm sorry.  I missed the

9    question.

10           MR. HANSEN:  Yeah.  I think I can explain

11   what's going on here.

12           MR. STEFFEN:  Sure.

13           MR. HANSEN:  We can go off the record.

14               (Discussion held off the record.)

15   BY MR. STEFFEN:  (Continuing)

16       Q.    Okay.  Let's look at Page 45, please.  And

17   I know we've -- we've covered most of this, but

18   since it -- it's a different statement from Trooper

19   Cowen.  The last sentence on Page 45 says, "Both

20   Recruit Killens and I advised Officer Raethke, 'He's

21   good.  He's good.'  Officer Raethke stopped using

22   force at that point and Recruit Killens and I were

23   able to take him into custody."

24               And, again, you don't remember Trooper

25   Cowen saying words to that effect?

47

1      **A.    No.**

2      Q.    Okay.  And is it your testimony here today

3  that you stopped using force in the form of the knee

4  strikes because at that point Mr. Barror had stopped

5  resisting?

6      **A.    Yes.**

7      Q.    The cessation of the use of force was not

8  related to Trooper Killens' and Cowen's statements?

9      **A.    No.**

10     Q.    Okay.  And after you left the scene of the

11  arrest, did you see Robert Barror at any point while

12  he was in custody?

13     **A.    No.**

14     Q.    You had nothing to do with him being

15  transported to the hospital or his --

16     **A.    No, sir.**

17     Q.    -- time there?

18         MR. STEFFEN:  Okay.  Okay.  Let's take a

19  look at the video.  We can go off the record.

20             (Video was played.)

21  BY MR. STEFFEN:  (Continuing)

22     Q.    Officer Raethke, in this portion of the

23  video we watched there are two St. Helens patrol

24  vehicles that -- that come by on the left side of

25  the vehicle.  Are you in one of those vehicles?

48

1          **A.    Yes, sir.**

2                   (Video played.)

3          Q.    Officer Raethke, during that portion of the

4     video I just played, can you hear Mr. Barror saying

5     he can't put his hands up?

6          **A.    No, sir.**

7          Q.    You didn't hear that just now?

8          **A.    Oh, in the video, yes.**

9          Q.    Yeah.  I'm --

10         **A.    Sorry.**

11         Q.    I'm talking about just now watching the

12    video you could hear him say that?  I understand

13    that --

14         **A.    Yes.  While watching the video I can hear**

15    **him saying that.**

16         Q.    Okay.  But at the time when you were

17    actually there, you did not hear him say that,

18    right?

19         **A.    No, sir.**

20                  (Video played.)

21         Q.    In that portion we just played, Mr. Barror

22    is repeating that he cannot hold his hands up.  And,

23    again, same question, watching the video now, can

24    you hear Mr. Barror say that?

25         **A.    Yes.**

49

1    Q.   And you did not hear him say that when you

2    were actually there on the 6th?

3    **A.   No.**

4              (Video played.)

5    Q.   Okay.  Now, in that portion when Mr. Barror

6    is being pulled out of the car, you're yelling, "Get

7    out of the car.  Get out of the fucking car" --

8    **A.   Yes, sir.**

9    Q.   -- correct?

10             And it was your testimony that he was

11   resisting arrest at this point, correct?

12   **A.   Yes.**

13             (Video played.)

14   Q.   In the portion of the video we just played,

15   which is at approximately six minutes and 33 seconds

16   in, you're screaming, "Get out of the car.  Get out

17   of the car," correct?

18   **A.   Yep.**

19   Q.   And at this point in the video, Mr. Barror

20   is clearly out of the car?

21   **A.   Yes, sir.**

22   Q.   Do you remember why you were screaming for

23   him to get out of the car if he was not -- if he was

24   already out of the car?

25   **A.   I mean, yeah.  So I -- I recognized it and**

50

1    that's when I started saying, "Stop resisting."

2    It's just -- it -- it's stressful.  It's a stressful

3    situation.  You know, you -- there's, potentially, a

4    gun and we still don't have this individual secure.

5    It's just a stressful situation.

6         Q.   I understand.

7              When pulling Mr. Barror out of the car and

8    getting him on the ground, at any point did you see

9    a gun on Mr. Barror's person?

10        A.   Nope.

11             (Video played.)

12        Q.   And in the portion we just played, again,

13   just watching the video now, can you hear the

14   troopers saying, "He's good.  He's good"?

15        A.   Yes.

16        Q.   Okay.  And you did not hear that on the

17   actual date of August 6th?

18        A.   No, sir.

19             (Video played.)

20             MR. STEFFEN:  Okay.  I don't have any

21   questions at this moment.  We can go off the record

22   and I'm just going to review it again and see if

23   there's any more questions I want to ask.

24             MR. HANSEN:  Okay.

25             (Recess was taken:  4:28 p.m. -

51

1                    4:32 p.m.)

2    BY MR. STEFFEN:   (Continuing)

3        Q.   Okay.  Officer Raethke, I want to ask you

4    about this gentleman seen in the video here

5    (indicating).  This is at six minutes and twenty

6    seconds in.  This to me looks like it's another St.

7    Helens police officer.  Do you know who that is?  I

8    know it's hard to tell from the video.

9        **A.   Can you kind of play it so I can get a**

10   **moving view of him?**

11       Q.   Sure.

12                    (Video played.)

13       **A.   Yes.  That's Officer Dylan Gaston with St.**

14   **Helens PD.**

15       Q.   What's his last name?

16       **A.   I'm sorry.  Gaston, G-A-S-T-O-N.**

17       Q.   Okay.  Was he riding with you in one of the

18   patrol cars?

19       **A.   No.  He was -- he was -- he was in one of**

20   **the cars that comes up, like, the first part of the**

21   **video.  The two -- because we -- I want to say he**

22   **was the lead car and I was the rear car --**

23       Q.   Okay.

24       **A.   -- if I'm not mistaken, because we had both**

25   **came from the same place to the scene.**

52

1    Q.   And was any other officer in the vehicle

2    with you or were you by yourself?

3    **A.   By myself.**

4    Q.   And is that normal for patrol?  You don't

5    patrol with a partner?

6    **A.   Yep.  All on my lonesome.**

7    Q.   Okay.  And just a couple more questions.

8    We're done with the video.

9         Officer Raethke, in your time with Columbia

10   County or St. Helens, have you ever been named as a

11   defendant in another civil lawsuit related to your

12   law enforcement work?

13   **A.   Yes.**

14        MR. HANSEN:  Okay.

15        THE WITNESS:  Yeah.

16   BY MR. STEFFEN:  (Continuing)

17   Q.   And what -- well, who sued you?  Let me

18   start with that.

19        MR. HANSEN:  Is this something that

20   occurred after?

21        THE WITNESS:  It -- what are you referring

22   to?

23   BY MR. STEFFEN:  (Continuing)

24   Q.   Well, I'm just trying to -- you know, we've

25   alleged excessive use of force in this lawsuit

53

1    against you, and I'm trying to see if there have

2    been other lawsuits filed against you by other

3    plaintiffs that have alleged either use of force or

4    other alleged impropriety.

5            MR. HANSEN:  Do you know -- here, I'm going

6    to step out.

7                (Recess was taken:  4:35 p.m. - 4:36

8                p.m.)

9            THE WITNESS:  Okay.  I'd like to clarify.

10   There's no other outstanding lawsuits at this time.

11           MR. HANSEN:  That's good.

12   BY MR. STEFFEN:  (Continuing)

13      Q.   Okay.  Well, have you been named as a

14   defendant in any civil lawsuit?  Well, just any

15   civil lawsuit at all, have you been named as a

16   defendant?

17      **A.   So this is the only active lawsuit -- civil**

18   **lawsuit that I --**

19      Q.   Okay.  Well, I'm not talking about active.

20   I mean even inactive lawsuits that have been --

21   maybe been dismissed or settled?

22           MR. HANSEN:  There aren't any other

23   lawsuits, Justin.

24           MR. STEFFEN:  Okay.

25   BY MR. STEFFEN:  (Continuing)

The image shows a court document page.

54

1      Q.   As part of your training with the City of

2  St. Helens, have you been trained in any sort of

3  de-escalation techniques?  And what I mean is in an

4  effort to de-escalate a tense situation.

5      **A.   Yes.**

6      Q.   Okay.  Can you describe -- give me an

7  overview of that training and what that entails?

8      **A.   So it's -- actually, it's in our policy,**

9  **which was just revised probably eight months ago, so**

10 **it wouldn't have been policy at the time of this**

11 **incident.  But if -- if you'd like, I can still tell**

12 **you about it.**

13     Q.   Yes, please.

14     **A.   So, like I said, it -- about eight months**

15 **ago it was put into policy, so things like calling**

16 **Crisis Intervention or, I guess, creating space and**

17 **talking, I guess, for lack of a better word, stuff**

18 **like that.  I mean, nothing -- you know, speaking --**

19 **calling other, like, mental-health services, stuff**

20 **like that.  But also in that policy it also states**

21 **that there is nothing within the policy that**

22 **requires an officer to retreat at any time.**

23     Q.   Okay.  And was there a de-escalation policy

24 with the City of St. Helens prior to eight months

25 ago?

55

1      **A.    Not that I can recall.  I just don't**

2   **recall.  It was a few years ago, sir.**

3      Q.   I understand.  Okay.  I have no more

4   questions.

5          Thanks.

6          MR. STEFFEN:  Or did you have --

7          MR. HANSEN:  No, I don't have any.

8              (Deposition concluded at 4:38 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

56

```
 1   STATE OF OREGON      )
                          )  ss.
 2   COUNTY OF MULTNOMAH )

 3          I, Amy A. Dalton, Certified Court Reporter

 4   and Notary Public, do hereby certify that ADAM

 5   RAETHKE personally appeared before me at the time

 6   and place mentioned in the caption herein; that the

 7   witness was by me first duly sworn under oath and

 8   examined upon oral interrogatories propounded by

 9   counsel; that said examination, together with the

10   testimony of said witness, was taken down by me in

11   stenotype and thereafter reduced to typewriting;

12   and, that the foregoing transcript, pages 1 to 55,

13   both inclusive, contains a full, true and correct

14   record of all such testimony adduced and oral

15   proceedings had and of the whole thereof.

16          Witness my hand and notarial stamp at

17   Portland, Oregon, this 18th day of January, 2022.

18

19

20

21   _____
     Amy A. Dalton
22   Certified Court Reporter
     CCR No. 3353
23   Notary Commission No. 1001815
     My commission expires 7-20-24
24

25
```