UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ROBERT BARROR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:20-cv-00731-SB |
| | ) |
| CITY OF SAINT HELENS, and | ) |
| ADAM RAETHKE, in his | ) |
| individual capacity, | ) |
| | ) |
| Defendants. | ) |

VIDEO CONFERENCE DEPOSITION OF

TROOPER CHRISTOPHER COWEN

January 31, 2022

2

Christopher Cowen

```
 1          BE IT REMEMBERED That, pursuant to stipulations
 2     between the parties, the deposition of TROOPER
 3     CHRISTOPHER COWEN was taken before Anne K. Love, a
 4     Certified Shorthand Reporter for Oregon on Monday,
 5     January 31, 2022, at 1:02 p.m.; all participants
 6     appearing remotely.
 7
 8                    APPEARANCES
 9
10     Appearing in behalf of the Plaintiff:
11          MR. JUSTIN STEFFEN
            Attorney at Law
12          1500 SE Lake Rd., Suite 5
            Milwaukie, Oregon 97222
13          Phone:  971 570-9225
            E-Mail:  info@steffenlegal.com
14
15     Appearing in behalf of the Defendants:
16          CHOCK BARHOUM, LLP
            121 SW Morrison St., Suite 500
17          Portland, Oregon 97204
            By:  Mr. Jeffrey W. Hansen
18          Phone:  503 223-3000
            E-Mail:  jeff.hansen@chockbarhoum.com
19
20     Appearing in behalf of Trooper Cowen:
21          OREGON DEPARTMENT OF JUSTICE
            100 SW Market Street
22          Portland, Oregon 97201
            By:  James S. Smith
23          Phone: 503 947-4700
            E-Mail: james.s.smith@doj.state.or.us
24
25     ALSO PRESENT:   None.
```

Christopher Cowen

```
 1                         INDEX

 2

              WITNESS:TROOPER CHRISTOPHER COWEN

 3

 4      EXAMINATION:                    PAGE:LINE

 5          Mr. Steffen                     4:5
            Mr. Hansen                     28:13

 6

 7

 8

 9

10

        OBJECTIONS:                      PAGE:LINE

11

            Mr. Hansen                      16:22

12                                          18:23
                                            19:8

13                                          20:3
                                            26:16

14

15

16

17

18      EXHIBITS:                        PAGE:LINE

19          1. OSP Incident Report          23:2

20

21

22

23

24

25
```

4

Christopher Cowen

```
1                  TROOPER CHRISTOPHER COWEN
2      was called as a witness and, after having been first
3      duly sworn, was examined and testified via video
4      conference as follows:
5                           EXAMINATION
6      BY MR. STEFFEN:
7          Q.  Good afternoon, Trooper Cowen.  My name is
8      Justin Steffen.  I am Robert Barror's attorney and he's
9      filed a lawsuit against the City of Saint Helens
10     alleging violation of his constitutional rights.  I want
11     to be clear neither the Oregon State Police or any
12     troopers are named in the lawsuit.  They're -- you're
13     here just as a third-party witness only.
14             Do you understand that I'm here to ask you
15     questions under oath just as if you were testifying in
16     court in front of a judge?
17         A.  I do understand.
18         Q.  And I want to go over a couple of simple ground
19     rules here.  It's important that we try not to talk over
20     each other so the court reporter can make a record, so
21     please try to wait until I'm done asking a question
22     before you answer and I'll try to wait until you're done
23     with your answer before I ask my next question.  Does
24     that make sense?
25         A.  Makes sense.
```

Christopher Cowen

```
 1        Q.  And if I ask you a yes or no question it's
 2    important to answer with an affirmative yes or no
 3    instead of uh-huh or huh-uh just so it's easier for the
 4    court reporter to transcribe everything.  Does that make
 5    sense?
 6        A.  Understood.
 7        Q.  Are you currently taking any medications or other
 8    substances that would affect your ability to recall
 9    events?
10        A.  No.
11        Q.  Have you ever been deposed before?
12        A.  I believe this is the first time I've been
13    deposed.
14        Q.  Okay.  Well, you said you believe.  Are you -- do
15    you think you maybe were deposed but you can't quite
16    remember?
17        A.  I don't remember a time where I've been deposed.
18        Q.  Okay.  Have you reviewed any documents in order
19    to prepare yourself for this deposition?
20        A.  I have.
21        Q.  And what documents were those?
22        A.  My police reports or my narrative of the reports.
23        Q.  Anything else?
24        A.  I've reviewed the video.  That's the only thing.
25        Q.  Are you referring to the dash cam video from your
```

Christopher Cowen

```
 1    patrol car?
 2         A.  Yes, sir.
 3         Q.  Other than with your attorney, have you spoken to
 4    anyone about this lawsuit?
 5         A.  The only people that I've discussed it with have
 6    been Trooper Travis Killens and then Sergeant Luke
 7    Schwartz who is my immediate supervisor.
 8         Q.  What did you talk about with Trooper Killens in
 9    relation to this lawsuit?
10         A.  That we were both being required to do a
11    deposition of this and -- yeah, so we were made aware of
12    the deposition when we got the notification.  I don't
13    remember when it was but we had chatted about it.  And
14    then I believe I had a conversation with Sergeant Luke
15    Schwartz to notify him that I was being required to do a
16    deposition.
17         Q.  And what was Sergeant Schwartz's reply?
18         A.  I don't recall what his exact reply was but more
19    of the affirmative saying -- (audio interruption) --
20    that he understood that I was doing a deposition.
21         Q.  Did Trooper Schwartz -- sorry -- Sergeant
22    Schwartz instruct you to answer in any particular way?
23         A.  Not that I recall, no.
24         Q.  Did Trooper Killens express any concern about
25    being deposed?
```

Christopher Cowen

1      A.  No.

2      Q.  Since the incident we're going to talk about, the

3   arrest of Mr. Barror, have you spoken to Officer Raethke

4   since then?

5      A.  Yes, but not about the incident.

6      Q.  When did you last talk to Officer Raethke?

7      A.  I've covered him on a couple of different calls

8   since then but they've been very short and basically in

9   the scope of a lawsuit enforcement contact.  Nothing

10  more than that.

11     Q.  Have you spoken to Officer Raethke outside of

12  work?

13     A.  No, I have not.

14     Q.  Other than the people you've already mentioned,

15  have you spoken to anyone else about this lawsuit?

16     A.  Other than my significant other, no.

17     Q.  What did you tell your significant other about

18  this lawsuit?

19     A.  Just kind of voiced kind of what happened and

20  that I was being -- doing a deposition today.

21     Q.  How long have you been employed by Oregon State

22  Police?

23     A.  Five years on January 1 of this year.

24     Q.  And have you been employed as a trooper that

25  entire time?

Christopher Cowen

1      A.  I have, yes.

2      Q.  And where were you employed before that?

3      A.  The Scappoose Police Department.

4      Q.  How long were you employed there?

5      A.  Just a tad over two years.

6      Q.  And what about before the Scappoose Police

7   Department?

8      A.  Columbia City Police Department.  For there I

9   worked just a tad over a year full time, and before full

10  time I believe it was four years as a reserve police

11  officer with Columbia City.

12     Q.  And was that your first law enforcement job?

13     A.  That was.  That's where I entered into law

14  enforcement was with Columbia City.

15     Q.  Okay.  Can you briefly describe your job duties

16  as a trooper with the Oregon State Police?

17     A.  Yeah.  So basically I'm assigned to the Saint

18  Helens office and the state police kind of has a

19  multitude of responsibilities.  One, our primary

20  responsibility is responding to calls for service along

21  state-owned highway and property.  So you'll commonly

22  see us do traffic enforcement, DUI investigations, crash

23  investigations, any calls for service out here on Sauvie

24  Island in the ODFW, Oregon Department of Fish &

25  Wildlife, state-owned beaches.

Christopher Cowen

1          And then our secondary role really is

2    supplementing law enforcement services for other

3    agencies because out here in Columbia County there's a

4    limited number of staff, so we find ourselves covering

5    outside agencies such as Scappoose, Saint Helens,

6    Clatskanie, Rainier, so forth.

7          Also I -- part of my other responsibilities with

8    the state police I am a background investigator, so when

9    an applicant applies for Oregon State Police and there's

10    something local I'll do the background investigation.

11          I'm a field training officer, so when a recruit

12    graduates the academy and goes through our pre-and-post

13    program they'll be assigned to me if out here and I'm

14    available, of course, and basically conduct field

15    training for recruits.

16          I'm also a negotiator for our SWAT team commonly

17    known as hostage negotiator.

18          Those are my responsibilities with the state

19    police.

20    Q.  And as part of your training as an Oregon state

21    trooper are you trained in use of force techniques?

22    A.  Yes.  Yeah, we go through a defensive tactics

23    course that's put on by the Oregon State Police.

24    Q.  And is there any continuing education requirement

25    for the use of force training?

Christopher Cowen

1       A.  Yes, so we do basically trimesters, so three

2   times a year we go through kind of use of force either

3   scenarios or training.  So it's ongoing training with

4   the state police.

5       Q.  And does this training advocate the use of the

6   least amount of force necessary to either effect an

7   arrest or control the situation?

8       A.  As long as it's objectively reasonable force,

9   yes.  The goal is to ultimately use the least amount of

10  force -- (audio interruption).  The goal is obviously

11  making sure that the use of force -- using the least

12  amount of force necessary to overcome the resistance

13  that we're facing.

14      Q.  Let's talk about the incident with Mr. Barror.

15  Do you recall the Saint Helens Police Department

16  assisting OSP in arresting Mr. Barror on August 6, 2019?

17      A.  I do.

18      Q.  And can you please describe how you came to be

19  involved in that incident?

20      A.  Yes.  So I was riding in the passenger seat of

21  the patrol car and Trooper Travis Killens was operating

22  the patrol car.  I was Trooper Killens' field training

23  officer that day.  We were on patrol and we overheard

24  the Columbia County dispatch air traffic complaints and

25  the traffic complaint was in substance that a pickup

Christopher Cowen

1    truck was traveling at a high rate of speed.  I believe

2    it was like 100 miles an hour and that the RP was

3    following, and driving in the center median of the

4    highway if I recall correctly.

5          So when we got that information we were right

6    there at the intersection of Highway 30 and Gable Road

7    in Saint Helens.  Trooper Killens turned around and we

8    ended up locating the vehicle in question at the

9    intersection of Mallard Road and Highway 30.  The

10   vehicle was traveling westbound on Highway 30 at

11   Millard.

12         I remember seeing the truck pull into the

13   right-hand dedicated only turn lane onto Millard to go

14   north, and then all of a sudden you saw the vehicle yaw

15   and make a very sharp turn and cut across all lanes of

16   traffic to head southbound on Millard.

17         At that point I knew we had probable cause for

18   reckless driving based on my observations.  And so I was

19   observing Trooper Killens.  He activated his lights and

20   siren.  And we saw a passenger car follow the Chevy

21   pickup truck.  So we ended up attempting to catch up

22   with the pickup truck.  I know the speeds were pretty

23   high.  I think at one point we were at 80 miles an hour

24   on Millard Road.

25         We witnessed the truck and passenger car that was

Christopher Cowen

1     following the truck turn westbound on Ross Road, and

2     that's where we were able to overtake the passenger car

3     that was following the pickup truck and then trying to

4     close the distance with the Chevy pickup.

5           We got behind the Chevy pickup and it failed to

6     yield and ended up failing to obey the traffic control

7     device there at Ross and I believe it was Bachelor Flat

8     -- please don't quote me on that.  It ended up turning

9     kind of west/northwest-ish towards Gable, and then again

10    it -- at one point it attempted to -- we thought it was

11    going to stop because it was pulling over, and then it

12    went back onto the road.  Failed to obey a traffic

13    control device which was the stop sign there on Bachelor

14    Flat and what I believe is Gable, and then probably

15    maybe 100 yards to 200 yards is where the vehicle

16    finally stopped.

17    Q.  And then what happened?

18    A.  I remember getting out of the vehicle and we

19    ended up performing a high risk traffic stop on that

20    vehicle.  I knew my main objective was to make sure that

21    that vehicle no longer continues based on the driving

22    behavior I had seen so I ended up retrieving my spike

23    strips from the trunk of the patrol car.  And I made

24    sure that Trooper Killens was covering the driver of the

25    vehicle and I ended up deploying spike strips in front

Christopher Cowen

1    of his passenger side rear tire.  I then retreated back

2    to the passenger side of my car to continue the high

3    risk traffic stop.

4         I couldn't quite make out what the driver was

5    saying and I can't remember if it was me or Trooper

6    Killens, but we ended up calling for cover to get

7    additional units on scene.

8         Before Saint Helens arrives I could hear him say

9    something about the other vehicle that was following him

10   or what I believe that's who he was referring to had a

11   gun, so I made sure that when Saint Helens officers

12   arrived I kind of informed them of that information or

13   at least what was being alleged because my back was to

14   the other driver.

15        And then basically multiple commands were given

16   for the driver to exit the vehicle with his hands up.

17   For whatever reason he was not compliant with those

18   commands and it got to the point where it was just kind

19   of what we call an OODA loop where commands were

20   constantly being given, the same commands and nothing

21   was changing.

22        So I made the decision to take a team of three up

23   to the vehicle.  We did that at kind of an angle.  And

24   then I was giving the driver commands to keep his hands

25   up and that's when I could hear he was saying something

Christopher Cowen

```
 1    to the effect of "I can't keep my hands up."

 2          I was able to see his hands the entire time at

 3    which point I opened the driver's side door.  And I went

 4    to unbuckle his seat belt.  Then I holstered my firearm,

 5    grabbed ahold of the driver and I could feel him tense

 6    up, and I tried to pull him out of the vehicle.  Again

 7    he was tensing up.  He wasn't like actively fighting us

 8    but he wasn't doing anything to assist in -- he wasn't

 9    doing anything to help the situation by getting out of

10    the vehicle willingly.

11          We were able to pull him out of the vehicle.  It

12    was Trooper Killens, myself, and Officer Raethke.  We

13    got to the driver to the ground and, again, we were

14    trying to get his hands behind his back.  I believe if I

15    remember correctly I had his right arm and Travis was

16    trying to get his left arm possibly.  And then we

17    finally got him into custody and, yeah, that's -- I

18    don't know how far you want me to go with all the

19    details of it.

20       Q.  Well, do you recall Officer Raethke striking

21    Mr. Barror with his knee?

22       A.  So -- yes.  So it was towards the end.  I

23    remember at the time from my perception I saw the knee

24    strike and then I ended up yelling out, "He's good.

25    He's good."  And then Officer Raethke no longer used a
```

Christopher Cowen

1    knee strike after I said, "He's good.  He's good."  I

2    remember Trooper Killens yelling something to the same

3    effect out as well.

4       Q.  Do you recall if you maybe put your arm up or

5    used any kind of a physical motion to stop Officer

6    Raethke from using his knee strike?

7       A.  I honestly -- I don't have an independent

8    recollection if I put my hand out or, you know, to the

9    nature.  But I just remember yelling out, "He's good.

10   He's good," and, yeah, there was no other force.

11      Q.  And why did you feel the need to say "He's good.

12   He's good" to Officer Raethke?

13      A.  Because I felt that we had the defendant under

14   control and no further force needed to be used and he

15   was in our custody.

16      Q.  Were you concerned that Officer Raethke was going

17   to strike Mr. Barror again?

18      A.  I don't know what his mindset was at the time.  I

19   just made it very clear and I wanted to vocalize it that

20   no more force needed to be used after.

21      Q.  Do you feel that -- did Officer Raethke sound

22   angry to you that day?

23      A.  Yes.

24      Q.  Are you familiar with what may be referred to as

25   the open hand custody technique?

Christopher Cowen

1      A.  Yes, I -- yeah, I am.

2      Q.  Can you describe that for the record, please?

3      A.  Yeah.  Open hand custody techniques are basically

4      either like grabbing ahold of people -- manipulations,

5      arm bars, those sort of things.  That's my understanding

6      of open hand custody techniques.

7      Q.  And have you received training on when you should

8      or should not use an open hand custody technique?

9      A.  I want to give you the best answer possible.

10     Yes, we have, and again it boils down to objective

11     reasonableness and the totality of the situation at the

12     time.  So there's lots of different considerations where

13     that may be used or a greater level of force -- or that

14     may be skipped and a greater level of force is

15     implemented.

16     Q.  In your arrest of Mr. Barror were you attempting

17     to use an open hand custody technique?

18     A.  Yes, at the time.

19     Q.  And why did you decide to use that technique as

20     opposed to a different technique?

21     A.  Because that was the --

22          MR. HANSEN:  Objection; relevance:

23          THE WITNESS:  So from my perspective I felt

24     that, again, officer versus threat factors, we had three

25     officers, could see his hands at the time.  That would

Christopher Cowen

1    be the lowest level of force that I would use to effect

2    custody of the driver from my perspective.

3    BY MR. STEFFEN:   (Continuing)

4        Q.  Do you recall when you first realized that

5    Mr. Barror did not have a firearm on his person?

6        A.  That wouldn't have been determined until he was

7    in handcuffs and properly searched by an officer.  Until

8    that point he potentially could have a firearm.

9        Q.  That makes sense.

10        Do you recall when you first noticed that

11   Mr. Barror was not holding a firearm in his hands?

12        A.  That would be when I was at the back of the car

13   when we initiated the traffic stop when Trooper Killens

14   and I got out and conducted that high risk stop, and

15   then I remember seeing the fingertips through -- his

16   hand.  I couldn't see the whole thing because of the way

17   the truck was, but I felt confident that there wasn't a

18   firearm in the hand at that time which made me feel

19   comfortable enough to deploy those spike strips.

20        Q.  And when you and Trooper Killens and Officer

21   Raethke were approaching the driver's side door could

22   you see that Mr. Barror did not have a firearm in either

23   of his hands?

24        A.  It probably wasn't until about midway of the

25   approach that I could see that there was nothing in his

Christopher Cowen

```
 1    hands at the time.
 2       Q.  Are you familiar with a term in relation to
 3    resisting arrest called static resisting?
 4       A.  Static resistance?
 5       Q.  Yes.
 6       A.  Yes.
 7       Q.  Can you describe that for the record, please?
 8       A.  I like to refer to static resistance as -- it's
 9    like, give an example, the protesters that we dealt with
10    in Portland where they weren't complying and they
11    weren't doing anything to help the situation even though
12    you're giving lawful commands to do what you're telling
13    them to do, and when we go to put hands on they're not
14    punching, they're not biting, scratching, not assaulting
15    but, again, they're not physically cooperating with what
16    you're trying to legally accomplish.
17       Q.  In your use of force training then is the -- are
18    you trying to use a certain amount of force -- strike
19    that.
20          Does the amount of force you're trained to use
21    depend on whether or not someone is statically resisting
22    or resisting in a more active manner?
23             MR. HANSEN:  I'm going to object to the
24    relevance.  Go ahead.
25             THE WITNESS:  I'm sorry, can you repeat the
```

Christopher Cowen

1    question again?

2    BY MR. STEFFEN:  (Continuing)

3        Q.  Yeah, and I apologize for not making that clear.

4            When someone is static resisting or using static

5    resistance as opposed to a more aggressive form of

6    resistance, have you been trained to use a lesser amount

7    of force?

8            MR. HANSEN:  Objection; vague, but go ahead.

9            THE WITNESS:  I think I understand what

10   you're asking, but I want to make it very clear since

11   I'm on the record that there's a multitude of factors

12   that play into that.  There's -- again, the ultimate

13   goal is to use the minimal amount of force necessary to

14   overcome the resistance; however, if there's information

15   that the subject could be armed or that there was prior

16   assaults that could raise the level of force depending

17   on some information that the officers have prior to

18   contact.

19           So there's many different factors that play

20   into an officer's use of force or the level of force,

21   and that's a hard one for me to answer without knowing

22   the scenario.

23   BY MR. STEFFEN:  (Continuing)

24       Q.  Once you pulled Mr. Barror out of the car and he

25   was engaging in this static resistance, at that point

Christopher Cowen

```
 1    did you feel he was a threat to you or your fellow

 2    officers?

 3                 MR. HANSEN:  Objection; relevance, but go

 4    ahead.

 5                 THE WITNESS:  So, again, there's a level of

 6    threat, potential threat anytime that you're taking

 7    somebody into custody.  From my perspective there was

 8    three officers present taking him into custody and I

 9    felt like, although he was being static resistive that

10    we would be able to accomplish our goal of taking him

11    into custody.

12    BY MR. STEFFEN:  (Continuing)

13       Q.  Were you wearing a body camera during this

14    arrest?

15       A.  We were not issued body -- Trooper Killens and I

16    were not issued body cameras at this time.

17       Q.  After Mr. Barror was arrested and taken into

18    custody -- I'm sorry, give me one second.

19           Do you recall at the scene of the arrest whether

20    Mr. Barror requested medical attention?

21       A.  Yes, I believe he did request medical attention.

22       Q.  Was he seen by a medical professional at the

23    scene of the arrest?

24       A.  He was, yes.

25       Q.  And at that point Mr. Barror was not taken to the
```

Christopher Cowen

1    hospital.  Correct?  He was taken to the jail?

2        A.  Correct.  After the evaluation and he conversed

3    with the medical staff there was an agreement between

4    the two and he was transported to Columbia County jail.

5        Q.  Do you recall if Mr. Barror said he did not want

6    any -- he did not want to go to the hospital or words to

7    that effect?

8        A.  I -- I don't remember exactly what he said.  I'd

9    have to look at the report.  I remember standing by and

10   kind of monitoring some of the conversations that were

11   happening between the two, and I know he explained he

12   had some prior injuries and if I remember correctly he

13   either verbally or signed the refusal.  Normally, that's

14   the typical process for Columbia River Fire & Rescue if

15   they're not going to transport the patient -- a refusal

16   or at least verbally document that that's -- that's just

17   off my independent recollection.

18       Q.  So you can't recall whether or not Mr. Barror

19   made such a request; is that right?

20       A.  I can't recall if he specifically said, "No, I

21   want to go to the hospital," or "No, I don't want to go

22   to the hospital."

23       Q.  After Mr. Barror was taken into custody and was

24   at the Columbia County jail, in your report you state

25   that he begins screaming in the cell.  Do you remember

Christopher Cowen

```
 1    that?
 2         A.  Yes, I do, yeah.
 3         Q.  Can you describe what happened there?
 4         A.  Yeah.  I immediately ran over and opened up the
 5    window, could see him kind of grasping his arm.  I
 6    opened the door.  He said that he dislocated his
 7    shoulder or his shoulder was dislocated so I immediately
 8    called for emergency personnel to respond to the jail.
 9    There was a conversation.  I'd have to review my report
10    real quick to give you details because I think I note in
11    my report what was discussed.
12              And then the medics arrived, re-evaluated him,
13    and then the decision was made that he needed to go to
14    the hospital so, of course, we're not going to intervene
15    with that, and he was transported to the hospital.
16         Q.  Do you recall if the reason the medics wanted to
17    transport Mr. Barror to the hospital was only because of
18    his shoulder or did they have any other concerns?
19         A.  You would have to talk with the medical staff
20    that's -- yeah.
21         Q.  Do you recall if it's the same medical
22    professional -- did the same medical professional treat
23    Mr. Barror at the jail and at the scene of the arrest?
24         A.  Again, I may have mentioned it in my report but,
25    if not, I couldn't tell you.  I want to say yes, but I
```

Christopher Cowen

1    am not 100 percent confident in that answer.

2        Q.  Well, let's take a look at the report.  This is

3    going to be Exhibit 1.

4            Can you see the incident report on your screen?

5        A.  Yes, sir, I can.

6        Q.  And I'm going represent that is the incident

7    report related to Mr. Barror's arrest on August 6, 2019.

8    I'm going to scroll down to your Narrative statement

9    which I believe starts on page 6.  Here it says "Author:

10   Christopher Cowen" and this is your Narrative statement

11   related to Mr. Barror's arrest; is that correct?

12       A.  That is correct.

13       Q.  And you testified earlier that you reviewed this

14   document in preparation for your deposition.  Correct?

15       A.  I did, yeah.

16       Q.  And in reviewing that do you feel that this

17   report is still an accurate description of the events

18   that are described?

19       A.  I do.

20       Q.  So let's go to the end where we discussed

21   Mr. Barror going to the hospital.  In the middle of this

22   paragraph here you state:  "I then called for medics to

23   respond to the scene.  Once medics arrived I stayed

24   inside the cell.  BARROR told the medics again he was in

25   a motorcycle accident about 2 years ago.  When medics

Christopher Cowen

1    asked BARROR how his shoulder popped out he stated,

2    'They pulled it out, well sometimes it falls out.'"

3           Do you recall Mr. Barror making that statement?

4    A.  Yes, I do.

5    Q.  And did he elaborate on what he meant by "it

6    falls out"?

7    A.  I -- I can't recall if he elaborated or not.

8    Q.  And then it goes on to say:  "One of the medics,

9    K. Neal evaluated BARROR.  K. Neal believed BARROR's

10   shoulder was out of place and should be transported.

11   K. Neal advised me he believed BARROR's shoulder was not

12   like that when he evaluated him initially, at the

13   original scene."

14   A.  That is correct.

15   Q.  So that does sound like K. Neal is the same

16   person?  Does that help refresh your memory if --

17   A.  Yes, it does.

18   Q.  All right.  And when K. Neal advised you that he

19   believed Barror's shoulder was not like that when he

20   evaluated him initially, did K. Neal elaborate on what

21   -- how he thought Mr. Barror's shoulder got dislocated?

22   A.  No, he did not.

23   Q.  After Mr. Barror was released from medical

24   treatment did you have any other interactions with

25   Mr. Barror?

Christopher Cowen

1    A.  No.

2    Q.  And at some point after his arrest did you

3    discuss this arrest with Sergeant Schwartz?

4    A.  I did.

5    Q.  And why did you discuss it with Sergeant

6    Schwartz?

7    A.  Because Trooper Killens and I, after we were done

8    we came back to the office to debrief due to him being

9    on the field training program with me.  We ended up

10   watching the video and we ended up seeing the use of

11   force by Officer Raethke, and I felt that my supervisor

12   needed to be aware of the video and so we ended up

13   downloading a copy and notifying Sergeant Schwartz.

14   Q.  Why did you feel Sergeant Schwartz needed to be

15   made aware of the video?

16   A.  Because there were two additional knee strikes

17   that I wasn't aware of at the scene and so, again, after

18   watching the video and seeing everything from the time

19   Saint Helens arrived to the time he was taken into

20   custody I felt that Sergeant Schwartz needed to be

21   notified.

22   Q.  You're saying Officer Raethke struck Mr. Barror

23   three times?

24   A.  Is my understanding, yes.

25   Q.  And why was that concerning to you?

Christopher Cowen

1      A.  It's -- wasn't -- it wasn't the level of force

2      that I would be using at the time.

3      Q.  So after you notified Sergeant Schwartz, then did

4      you meet with him and discuss the video and the arrest?

5      A.  So -- yes, we did because we had to file a

6      pursuits form into the agency per our policy, and when I

7      submitted the video he advised me that he would take

8      care of that on his end.

9      Q.  Did you have any discussions with Sergeant

10     Schwartz after that?

11     A.  About this incident?

12     Q.  Yes, sorry, about this incident.

13     A.  No, huh-uh.

14     Q.  Did Sergeant Schwartz seem concerned to you about

15     the amount of force Officer Raethke was using?

16             MR. HANSEN:  Objection; calls for hearsay.

17             Go ahead.

18             THE WITNESS:  Yeah, you would have to ask

19     him what his thought process was.  He didn't express

20     that to me.

21             MR. STEFFEN:  I think those are most of the

22     questions I have.  I want to review my notes and I might

23     have a few followups.  So everybody want to take five

24     minutes, does that work?

25             MR. HANSEN:  Sure, that sounds fine.

Christopher Cowen

1            MR. STEFFEN:  And then I'm sure Mr. Hansen

2      will have some questions for you as well, but I'm almost

3      done.

4            (Recess was taken 1:38-1:44 p.m.)

5      BY MR. STEFFEN:  (Continuing)

6      Q.  Trooper Cowen, I just have one quick followup

7      question for you.  In your training with the Oregon

8      State Police have you received any training in how to

9      arrest an individual with physical disabilities?

10     A.  It's definitely talked about and, obviously,

11     there's a multitude of physical disabilities out there

12     and it's something that we try to accommodate as best as

13     possible if it's possible.  But, again, with a situation

14     that is fluid and dynamic, obviously, my goal is at the

15     end of the day and, again, try to use the least amount

16     of force necessary to overcome any resistance.

17          But if somebody that is handicapped or disabled

18     is actively resisting it forces us to do what we have to

19     do to take them into custody.  So, again, a magnitude of

20     scenarios that -- depending on what it is.

21     Q.  I understand.  And I'm not asking you to apply

22     that to any specific situation.  I'm just wondering if

23     you've received training either formally or informally

24     on how to go about arresting physically disabled

25     individuals?

Christopher Cowen

1     A.  There's -- yes.  So there has been conversations

2     during training on things to think about.  Maybe it

3     could be something as simple as cuffing somebody to the

4     front as opposed to the back or transporting someone via

5     ambulance as opposed to the back of the patrol car.  It

6     just all depends on what we're faced with.

7     Q.  And as far as you know, is this training part of

8     the training that all Oregon state troopers receive?

9     A.  I couldn't testify to that because I'm not a

10    defensive tactics instructor.

11            MR. STEFFEN:  Okay.  I have no more

12    questions.  Thank you very much.

13                    EXAMINATION

14    BY MR. HANSEN:

15    Q.  Trooper Cowen, my name is Jeff Hansen.  We were

16    introduced momentarily before everybody joined.

17            So you've been with the Oregon State Police force

18    five years as of January 1, 2022?

19    A.  Yes, sir.

20    Q.  And so at the time of this incident you were --

21    you had just completed your first full year plus an

22    additional eight months?

23    A.  That's correct, yes.

24    Q.  And in addition to the basic training that all of

25    the state police receive going through the academy and

Christopher Cowen

1    then also in continuing education forums from time to

2    time, have you received any additional certifications

3    like a drug recognition expert?  A member of the crash

4    reconstruction team?  Any sort of additional specific

5    trainings and certifications?

6        A.  The only other additional certifications, again,

7    is going to be with field training officer.  And then as

8    a negotiator I went through the FBI hostage negotiations

9    school, so I serve on the SWAT team still currently with

10   them.

11       Q.  And you indicated that you're not a defensive

12   tactics instructor?

13       A.  I am not, no.

14       Q.  And does the defensive tactics instruction cover

15   use of force?  Is that why you kind of link those two?

16       A.  Yes.

17       Q.  And you've never testified as an expert witness

18   on behalf of any state, federal, or local law

19   enforcement in any capacity?

20       A.  I've testified at trial.

21       Q.  Okay.  But as an expert witness or simply as a

22   responding officer?

23       A.  Just a responding officer, sir.  Not as an expert

24   witness.

25       Q.  Did you have any familiarity with Mr. Barror

Christopher Cowen

1    prior to this incident?

2        A.  Not -- not face to face, no.  I've just heard of

3    other troopers or officers dealing with him, but I've

4    never met him to my knowledge.  I -- from the record I

5    may have stopped him sometime throughout my career, but

6    I don't recall any interaction with him.

7        Q.  And as of the time of this incident, August 6,

8    2018, what was your -- what had you heard about

9    Mr. Barror as it related to his driving habits, if

10   anything?

11       A.  My understanding from what I've heard was that he

12   tends to drive recklessly and endangers other motorists

13   on the highway.

14       Q.  Now, you and Trooper Killens were the first in

15   pursuit?

16       A.  That day in question, yes.

17       Q.  Okay.  And would the CAD reports or any of the

18   additional documentation that would be generated through

19   Columbia County, Oregon state dispatch, or other

20   internal documents contain a timeline of when you

21   specifically called for backup?

22       A.  I would hope so.  It should.

23       Q.  Okay.

24       A.  Yeah, sorry.

25       Q.  And do you recall sitting here today, at what

Christopher Cowen

1    point during the pursuit or after arriving on the scene

2    you learned that a firearm might have been involved?

3        A.  So I remember hearing the driver yell out

4    something about the other vehicle having a firearm.  So

5    this was when we conducted the high risk traffic stop

6    and so it was fairly early on, and I would have to go

7    back and review video -- I just can't remember if I put

8    it out over the radio or if I just yelled it out to the

9    Saint Helens officers that responded on scene.

10       Q.  And so the Saint Helens officers, they responded

11   seconds to a minute after you had already placed the

12   spike strips?

13       A.  For an accurate timeline I'd have to review the

14   video, but that sounds close enough.

15       Q.  Close enough?  And so during the time that you

16   requested backup and the backup arrived, did you have

17   any radio communications with the responding officers?

18       A.  I don't recall talking to them directly.  So we

19   operate on a separate channel than Columbia County 911;

20   however, we do monitor Columbia County 911.  And I

21   remember keying up on my channel and I don't remember

22   switching over to Columbia County to communicate with

23   anybody at the time of the incident.

24       Q.  And sitting here today, understanding that if we

25   brought up the video we could put it down to the

Christopher Cowen

1    seconds, can you give me an estimate of how long it was

2    before Officer Raethke joined you in front of your

3    patrol car while you and Officer Killens had your guns

4    drawn; from that point in time until handcuffs were

5    placed on Mr. Barror, do you have an estimate of that

6    amount of time?

7        A.  I mean, it's hard because when you're in the

8    incident it feels like forever.  But maybe -- maybe a

9    few minutes.  Again, I'd have to review the video to

10   give you an accurate amount of time.

11       Q.  So I take it that -- you referred to this as a

12   high risk traffic stop.  How many levels of risk

13   categories are there for traffic stops?

14       A.  There's just the -- generally speaking there's

15   just a routine traffic stop where I stop somebody for

16   speeding or a traffic violation, and then the high risk

17   traffic stop where there's a level of risk posed to the

18   officers or the public where we want to as safely as

19   possible take somebody into custody that gives us a

20   tactical advantage, and that's generally a high risk

21   traffic stop.

22       Q.  And does the standard practice in a high risk

23   traffic stop include drawing your firearm?  Is that

24   something you would automatically do for a high risk

25   stop?

Christopher Cowen

1   A.  Generally speaking, yes.

2   Q.  What communication did you have with Officer

3   Raethke after he joined you and Trooper Killens in front

4   of your squad car prior to slicing the pie to take

5   Mr. Barror into custody?

6   A.  I can't remember verbatim but I can give you a

7   quick synopsis.  I think it was communicated that he

8   wasn't complying with commands to get out of the vehicle

9   and that we're going to kind the slice the pie and do an

10  approach from the driver's side of the vehicle.

11  Q.  And at that point in time was there anything

12  about Officer Raethke's behavior that caused you any

13  concern?

14  A.  I'm sorry, can you repeat the question one more

15  time?

16  Q.  As you were -- after he joined you in front of

17  the squad car and prior to opening Mr. Barror's door,

18  did you observe anything about Officer Raethke's

19  behavior or demeanor that caused you concern?

20  A.  In that specific timeline that you're defining,

21  no.

22  Q.  And just looking at your report -- I'll show it

23  to you.  Can you see the highlighted report?

24  A.  Yes, sir, I can.

25  Q.  Okay.  So I want to start after you placed the

Christopher Cowen

1    spike strips under Mr. Barror's rear tire.  You

2    indicated that at that point in time the reason you did

3    that is because you were concerned about him pulling

4    back into traffic and trying to elude and becoming a

5    danger to the public?

6        A.  Absolutely, yes.

7        Q.  And then you returned to your patrol car to

8    perform a high risk stop.  It looks like Recruit Killens

9    continued to give orders to Mr. Barror without success.

10   I take it that means he was unresponsive to both of your

11   orders at that point?

12       A.  Correct, yes.

13       Q.  "He eventually had put his hands partially up

14   where I could see his fingertips through the back of the

15   window."  That's what you wrote when you drafted your

16   report the day of the incident?

17       A.  Yes.

18       Q.  You indicated that:  "At one point I could hear

19   BARROR claim the silver car that was chasing him pulled

20   a gun."

21           Just reading through this portion of the report,

22   you were given that information by Mr. Barror, but the

23   Saint Helens police officers hadn't arrived at that

24   point?

25       A.  Correct.

Christopher Cowen

1    Q.  And then you note that it was after that that:

2    "Officers from the St. Helens Police Department arrived

3    and I informed them a gun may have been involved and to

4    have one of them watch the reporting party."

5         What did you mean by that?

6    A.  Because Barror indicated that someone in that

7    vehicle had pulled a gun.  He mentioned the vehicle

8    pulled a gun on him and so I wanted Saint Helens

9    officers to, one, watch the reporting party's vehicle

10   that was parked behind me because I had my back turned

11   to them; and, two, that a gun may be in play somewhere

12   in this scenario.  I don't know if -- I don't know who

13   exactly has the gun.  He's claiming the reporting party

14   has the gun but I don't know -- somewhere in play.

15   Q.  And then you write:  "Recruit Killens, Officer

16   Raethke and I decided to approach the BARROR vehicle as

17   he was not responding to commands.  Once I reached the

18   driver door I attempted to open the door but it was

19   locked.  I was able to reach in and unlock the driver

20   side door and open it."

21        At that point in time do you know what, if

22   anything, Officer Raethke actually was able to view from

23   his vantage point?

24   A.  You would have to talk to Officer Raethke.  I

25   don't know what he viewed or what he could see at the

Christopher Cowen

1    time.

2        Q.  "Once his seat belt was unlocked I holstered" I

3    think you meant "my firearm" -- "and grabbed ahold of

4    BARROR's left arm while instructing him to exit the

5    vehicle.

6            "BARROR resisted and began tensing his body,

7    preventing me from pulling him out of the vehicle."

8            So in your first physical contact with him he was

9    continuing to be noncompliant with your lawful commands?

10       A.  Correct, yeah.  He wasn't doing anything to help

11   or get out of the vehicle on his own accord.

12       Q.  Did you attempt to engage in any conversation

13   with him based on your hostage negotiation sort of

14   training to see if you couldn't get some further

15   agreement from him?

16       A.  Considering the totality of the situation I feel

17   that sitting there discussing further with Mr. Barror

18   would put us in a riskier situation than needed to be.

19   We gave him plenty of opportunity to comply with our

20   orders and he failed to do so.

21       Q.  Then you wrote:  "I could feel BARROR resist and

22   pull away, preventing me from taking him into custody."

23           Were you essentially trying to describe him

24   leaning away from you as you were trying to help him out

25   of the car?

Christopher Cowen

1    A.  Correct.

2    Q.  And you used the phrase "resisting."  Was that

3    because he was noncompliant?

4    A.  Correct.

5    Q.  Verbally did he indicate his willingness to

6    comply, like "Hold on, I'm just trying to get out"?

7    A.  Not to my recollection, no.

8    Q.  "With the help of Officer Raethke and Recruit

9    Killens, we were able to remove BARROR from the driver

10   seat and place him on the ground."

11        When you were able to remove him, was that

12   because he stopped resisting or because you used

13   sufficient force to begin to transfer him from a seated

14   position to a prone position on the pavement?

15   A.  I -- I don't have an independent recollection of

16   that specific question.  I just remember being able to

17   pull him out of the vehicle with the assistance of other

18   officers.

19   Q.  It says:  "While we were on the ground I

20   attempted to get BARROR's hands behind his back.  BARROR

21   was actively pulling his hands away from my attempt to

22   avoid me placing him in handcuffs."

23        And then you wrote:  "I could hear Officer

24   Raethke yelling verbal commands to stop resisting."

25        At that point in time was there any indication of

Christopher Cowen

1    compliance whatsoever by Mr. Barror?

2        A.  No, there was not.

3        Q.  Then it says:  "I then saw Office Raethke perform

4    a knee strike on BARROR which at that point, BARROR

5    stopped resisting."

6            So the only time that Mr. Barror stopped

7    resisting according to your report was after some

8    physical force, additional force was used?

9        A.  Correct.

10       Q.  And at that point you indicated that you and

11   Recruit Killens both informed Officer Raethke, "He's

12   good, he's good."  And "Officer Raethke stopped using

13   force at that point."

14       A.  That is correct.

15       Q.  So is it fair to say that the only time

16   Mr. Barror in your encounter with him began to cooperate

17   at all was after some use of physical force by

18   Officer Raethke himself?

19       A.  It's fair to say that his resistance stopped when

20   I saw that knee strike.

21       Q.  Did you interview any of the witnesses at the

22   scene?

23       A.  Not to my recollection, no.

24       Q.  Okay.  Do you recall if a toy gun like a small

25   Airsoft gun was found in the reporting driver's car?

Christopher Cowen

```
 1       A.  Yes.  It was a -- Trooper Killens indicated that
 2   he found a toy firearm with an orange tip in the back
 3   seat right next to the child is my understanding.
 4       Q.  At any point in time during this encounter did
 5   Mr. Barror try to explain why he was driving recklessly
 6   and violating multiple traffic control devices,
 7   speeding, et cetera?
 8       A.  I don't believe I interviewed much of Mr. Barror.
 9   I don't recall his statements that why he was violating
10   the laws for speeding the way he was other than what I
11   listed in the report.
12       Q.  At any point in time after you and Trooper
13   Killens, then Recruit Killens, did your debrief, did you
14   reach out to Officer Raethke for any reason?
15       A.  Not that I recall, no.
16       Q.  Did you reach out to anybody else at the Saint
17   Helens Police Department regarding this incident?
18       A.  Not that I recall, no.
19           MR. HANSEN:  Okay, that's all I have.
20           MR. STEFFEN:  I have no more questions.
21           MR. SMITH:  The witness would like to read
22   and sign, please.
23           MR. HANSEN:  Okay, I'll order it.
24           MR. STEFFEN:  I'll order it too.
25           (DEPOSITION CONCLUDED AT 2:06 P.M.)
```

Christopher Cowen

```
 1                      CERTIFICATE

 2

 3            I, Anne K. Love, a Certified Shorthand

 4     Reporter for Oregon, hereby certify that TROOPER

 5     CHRISTOPHER COWEN appeared before me via video

 6     conference at the time and place set forth in the

 7     caption hereof; that at said time and place I reported

 8     in stenotype all testimony adduced and other oral

 9     proceedings had in the foregoing matter; that thereafter

10     my notes were transcribed under my direction; and the

11     foregoing transcript, pages 1 to 39, both inclusive,

12     constitutes a full, true, and correct record of such

13     testimony adduced and oral proceedings had and of the

14     whole thereof.

15            Witness my hand at Milwaukie, Oregon this

16     15th day of February, 2022.

17

18

19

20            Anne K. Love OR WA CSR

               Certified Shorthand Reporter

21            Oregon CSR No. 02-0379

               Expires: 3/31/23

22

23

24

25
```