IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBERT BARROR,

          Plaintiff,

    v.

CITY OF ST. HELENS, and ADAM
RAETHKE, in his individual capacity,

          Defendants.

Case No. 3:20-cv-00731-SB

**FINDINGS AND
RECOMMENDATION**

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Robert Barror ("Barror") filed this case against the City of St. Helens (the

"City") and St. Helens police officer Adam Raethke ("Raethke") in his individual capacity

(together, "Defendants"), alleging constitutional violations pursuant to 42 U.S.C. § 1983. (ECF

No. 1.) Now before the Court is Defendants' motion for summary judgment. (ECF No. 33.)

The Court has jurisdiction over Barror's claims pursuant to 28 U.S.C. § 1331, but not all

parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636. The

Court heard oral argument on the motion on April 10, 2023. (ECF No. 53.) For the reasons that

follow, the Court recommends that the district judge grant in part and deny in part Defendants'
motion for summary judgment.

## BACKGROUND[1]

On August 6, 2019, at 12:31 p.m., Columbia County 911 dispatch was alerted to a traffic
complaint about a grey Chevy Silverado near St. Helens, Oregon, reportedly traveling 100 miles
per hour and passing other vehicles in the center lane of the highway. (*See* Decl. Jeffrey Hansen
Supp. Defs.' Mot. ("Hansen Decl."), Ex. 3 at 3.) Oregon State Troopers Travis Killens
("Killens") and Christopher Cowen ("Cowen") (together, the "Troopers") heard the dispatch
report and responded to the call in their patrol vehicle. (*See* Hansen Decl., Ex. 2, Depo.
Christopher Cowen ("Cowen Depo.") at 10:23-11:11.) The Troopers' pursuit of the vehicle and
Barror's subsequent arrest were recorded on the Troopers' patrol car dash camera. (*See* Hansen
Decl., Ex. 4 ("Dash Cam. Video").)

When the Troopers caught up to the vehicle, Cowen observed it "make a very sharp turn
and cut across all lanes of traffic." (Cowen Depo. at 11:14-16.) Killens activated the patrol car's
lights and sirens and the Troopers pursued the vehicle, then traveling at approximately eighty
miles per hour. (*See id*. at 19-25.) With the Troopers in pursuit, the vehicle ran two stop signs
before finally stopping. (*See id*. at 12:5-16; Dash Cam. Video at 02:50-03:31.)

///

---

[1] Unless otherwise noted, the following facts are either undisputed or viewed in the light
most favorable to Barror, "so long as [his] version of the facts is not blatantly contradicted by the
video evidence[.]" *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citation
omitted); *see also Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (concluding that where a
videotape that captures an event "blatantly contradicts the plaintiff's version of events so that no
reasonable jury could believe it, the court should not adopt that version of the facts for purposes
of ruling on a summary judgment motion").

The Troopers parked behind the vehicle, and Cowen approached to place a spike strip in front of the vehicle's rear passenger tire while Killens provided cover. (Cowen Depo. at 12:23-13:3.) The Troopers then "called for cover" to assist with the "high risk traffic stop." (*Id*. at 13:1-7.) While stopped, the Troopers gave multiple commands to the vehicle's driver—later identified as Barror—to exit the vehicle with his hands up. (*Id*. at 13:15-17.) Barror "was not compliant with those commands and it got to the point where it was . . . [a] loop where commands were constantly being given . . . and nothing was changing." (*Id*. at 13:17-21.)

Nearby on a related call, Raethke heard the "general broadcast" about the speeding vehicle and that its driver "possibly aimed a firearm" at another driver. (Hansen Decl., Ex. 1, Depo. Adam Raethke ("Raethke Depo.") at 15:15-25; 19:19-22.) Raethke responded and arrived on the scene approximately two minutes after Barror had stopped. (*See* Dash Cam. Video at 03:31-05:18.) Upon arrival, Raethke observed the Troopers "with their guns drawn aimed at the vehicle and [] Barror." (*Id*. at 16:13-16.)

Approximately thirty seconds after parking, Raethke and the Troopers "filed into . . . a column" and approached the driver's side of the vehicle with their guns drawn. (*See id*. at 16:21-25; Dash Cam. Video at 05:55; Decl. Justin Steffen Supp. Pl.'s Opp'n ("Steffen Decl."), Ex. 1, Depo. Travis Killens ("Killens Depo.") at 11:10-13.) As he approached, Raethke observed Barror "lean[ing] away . . . towards the passenger's side of the vehicle[,]" and Raethke grew "increasingly concerned" with whether Barror was "reaching for something." (*Id*. at 18:14-18.)

Raethke and the Troopers issued commands to Barror to exit the vehicle with his hands up as they approached. (*See* Cowen Depo. at 13:22-25; Dash Cam. Video at 05:55-06:09.) Barror remained in the vehicle and repeatedly shouted that he could not hold his hands up. (*See* Dash Cam. Video at 06:00-06:15.) Raethke testified that he did not hear Barror's shouts. (Raethke

Depo. at 21:7-22, 48:16-19, 50:16-18.) Barror remained "uncooperative" and once his door was

open, Raethke and the Troopers noticed that Barror "still had his seatbelt on." (Killens Depo. at

11:18-22.) Killens described Barror as exhibiting "frantic behavior." (*Id.*) Barror resisted, began

"tensing his body," and "pull[ed] away." (Steffen Decl., Ex. 5, Troopers' Police Reports

("Trooper Reports") at 6, Cowen reported that "while instructing [Barror] to exit the vehicle [he]

resisted and began tensing his body, preventing me from pulling him out of the vehicle . . . I

could feel B[arror] resist and pull away, preventing me from taking him into custody").

Once Raethke and the Troopers were able to remove Barror from the vehicle and he was

facedown on the ground, Raethke observed Barror with "his hands kind of near [] his midsection

or his beltline." (Raethke Depo. at 19:15-19.) At that time, Raethke "still hadn't determined

where the firearm was, if [Barror] was in possession of a firearm" and although Barror was on

the ground, Raethke and the Troopers "couldn't get [Barror's] arms behind his back to handcuff

him." (*Id*. at 20:3-10.) Even so, Killens "switched over" to nonlethal force, and used "the open-

hand custody technique, which is [] the lower end of our use of force spectrum." (Killens Depo.

at 12:10-20.) Further, when Killens noticed "a knee strike coming from [] Raethke . . . [Killens]

put [his] arm in front of [Raethke] and said, 'He's good. He's good. We don't need that,' or

something to that effect." (*Id*. at 12:20-24.) Raethke "still couldn't get [Barror's] arms behind

[him,]" and so Raethke delivered a second knee strike.[2] (*Id*. at 20:9-13.) Killens then told

Raethke "[h]e's good"—referring to Barror—several times. (*See* Killens Depo. at 58:15-20;

Dash Cam. Video at 06:35-06:42; Trooper Reports at 4, "[Killens] told [] Raethke he good [sic]

and to stop at that point as no further force was necessary to effect custody"). Raethke and the

---

[2] According to Cowen, Raethke "struck [] Barror three times[.]" (*See* Steffen Decl., Ex. 2, Depo. Christopher Cowen ("Cowen Depo. II") at 25:22-24.)

Troopers were then able to get Barror's arms behind his back, and Raethke "stopped delivering knee strikes." (Cowen Depo. II at 14:22-15:1.)

After Barror was placed in handcuffs, Killens "began to try and calm him down," and Barror then "mentioned [] some sort of medical need at [that] time." (Killens Depo. at 13:2-5.) Cowen called for a medic to respond to the scene to evaluate Barror and "make sure there w[ere] no injuries or any serious medical conditions [] to know about now that [Barror] was in custody." (*Id.* at 13:5-10.)

Killens issued Barror "multiple citations to include two criminal citation[s] and two violation citations[:] reckless driving, reckless endangering, fail[ure] to obey a traffic control device x3, fail[ure] to drive in lane and fail[ure] to yield to an emergency vehicle." (Trooper Reports at 5.) The medics cleared Barror and he refused medical attention at the scene. (*See id.* at 5.)

After his arrest, the Troopers determined that Barror did not have a gun. (*See id.*, describing the items recovered from a search of Barror and his vehicle; *see also* Cowen Depo. at 17:4-9, testifying that whether Barror had a firearm on his person "wouldn't have been determined until [Barror] was in handcuffs and properly searched by an officer[ and] until that point he potentially could have a firearm"). After the Troopers transported Barror to a holding cell at the Columbia County Jail, Cowen called for a medic to evaluate Barror's shoulder following his complaints that it was dislocated. (*See* Trooper Reports at 7.) Medics evaluated Barror and determined his shoulder was "out of place" but the medic advised Cowen that Barror's "shoulder was not like that when he [was] evaluated [] at the original scene." (*Id.*)

Barror asserts that Defendants violated his Fourth Amendment rights because (1) Raethke used excessive force while taking Barror into custody; and (2) the City failed properly to train its

police officers in the use of force. (*See generally* First Am. Compl., ECF No. 29.) Barror seeks

$2.1 million in economic, non-economic, and punitive damages. (*Id.* ¶ 15.)

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On a motion

for summary judgment, the court must view the facts in the light most favorable to the non-

moving party, and draw all reasonable inferences in favor of that party. *See Porter v. Cal. Dep't

of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of

witnesses, weigh evidence, or determine the truth of matters in dispute. *See Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a

rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (simplified).

## DISCUSSION

Defendants move for summary judgment on Barror's claims and argue, *inter alia*, that (1)

Raethke's use of force was reasonable under the circumstances, and (2) there is no evidence that

the City acted with deliberate indifference in its failure to train its officers in the use of force.[3]

(Defs.' Mot. at 3.)

---

[3] Barror also alleged upon information and belief in his FAC that the City "has a policy
or practice of allowing excessive use of force[.]" (FAC ¶ 12.) Barror did not present any
evidence of the City's pattern or practice of allowing the use of excessive force. (*See* Defs.'
Reply at 17, ECF No. 45, noting that Barror "has not proffered any expert opinions, [or]
established a pattern of constitutional violations among the department"). Courts in the Ninth
Circuit consistently hold that a party's failure to address an issue in response to a motion for
summary judgment is an abandonment of the claim. *See Yentz v. Nat'l Credit Adjusters, LLC,*
No. 3:20-cv-01364-AC, 2021 WL 1277961, at *5 (D. Or. Feb. 15, 2021) (collecting cases),
*findings and recommendation adopted,* 2021 WL 1270457 (D. Or. Apr. 6, 2021); *see also Lykins
v. Hohnbaum,* No. CIV. 01-63-JO, 2002 WL 32783973, at *3 (D. Or. Feb. 22, 2002) (finding
that the plaintiff's failure to "promote or defend" a claim in response to the defendant's motion

## I.    FOURTH AMENDMENT CLAIM AGAINST RAETHKE

Barror alleges in his FAC that Raethke violated his Fourth Amendment rights when he forcibly removed Barror from his vehicle, threw him on the ground, and drove his knee into Barror's rib cage multiple times. (FAC ¶¶ 4, 6.) The County argues that the Court should enter summary judgment on Barror's excessive force claim because the force Raethke used was reasonable under the circumstances. (Defs.' Mot. at 3.)

### A.    Applicable Law

It is a "fundamental premise that the use of force to effect an arrest is subject to the Fourth Amendment's prohibition on unreasonable seizures." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "There is . . . no mechanical test for determining whether a particular application of force was unreasonable; the reasonableness of a seizure must instead be assessed by carefully considering the objective facts and circumstances that confronted the arresting officer or officers." *Id.* (citing *Graham*, 490 U.S. at 396); *see also Bey v. Malec*, No. 18-cv-02626-SI, 2020 WL 2041940, at *4 (N.D. Cal. Apr. 28, 2020) ("The reasonableness inquiry in excessive force cases is an objective one, the question being whether the officer's actions are objectively reasonable considering the facts and circumstances confronting him, without regard to his underlying intent or motivation and without the '20/20 vision of hindsight.'" (quoting *Graham*, 490 U.S. at 396)).

"In determining reasonableness, 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' must be balanced against the 'countervailing government interests at stake.'" *Id.* (quoting *Graham*, 490 U.S. at 396). Importantly, "not every

---

for summary judgment was a concession of the claim). Accordingly, the Court finds that Barror has abandoned his pattern and practices claim. *See id.*

push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (simplified).

Summary judgment is appropriate if the court "concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under all circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (affirming entry of summary judgment for defendant officers where the district court concluded that the officer's use of force was "at all times [] reasonable and proper"). "Because the excessive force inquiry ordinarily 'requires a jury to sift through disputed factual contentions, and to draw inferences therefrom,' the Ninth Circuit has emphasized that 'summary judgment . . . in excessive force cases should be granted sparingly.'" *Lopez v. City of Imperial*, No. 13-cv-00597-BAS WVG, 2015 WL 4077635, at *6 (S.D. Cal. July 2, 2015) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) and citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

### 1.    Nature of the Intrusion

"The Court first considers 'the nature and quality' of the intrusion on [Barror's] rights." *Bey*, 2020 WL 2041940, at *5 (citing *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012)). "The gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to 'the type and amount of force inflicted.'" *Id.* (quoting *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1161 (9th Cir. 2011) and *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001)).

It is undisputed that Raethke and the Troopers forcibly removed Barror from his vehicle and that Raethke delivered knee strikes while Barror was on the ground. The use of knee strikes on an arrestee while they are prone constitutes at least an "intermediate" use of force. *See, e.g.*, *Perez v. City of Fresno*, 591 F. Supp. 3d 725, 751 (E.D. Cal. 2022) (finding an "intermediate

level[] of force" where an officer "administered knee strikes to [an arrestee's] side" after the arrestee was physically taken to the ground from his vehicle by three officers); *Centeno v. City of Carlsbad*, No. 3:19-cv-2098-L-DEB, 2021 WL 6064383, at *10 (S.D. Cal. Dec. 22, 2021) ("The knee strikes, under the circumstances, involved at least intermediate force."); *Lopez*, 2015 WL 4077635, at *19 ("[B]aton blows, pepper spray, and knee strikes [] constitute intermediate force[.]").

### 2.    Government Interests at Stake

"In weighing the governmental interests involved the following should be taken into account: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Chew*, 27 F.3d at 1440 (citing *Graham*, 490 U.S. at 396). "These factors, however, are not exclusive[, r]ather, we examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).

### a.    Severity of the Crime at Issue

The Court has reviewed the record evidence and the video evidence of the Troopers' pursuit of Barror, his subsequent removal from his vehicle, and his arrest. Barror does not dispute that the dash camera video accurately depicts the incident, and it is clear from that evidence that Barror did not immediately stop when the Troopers were behind him in their patrol car with the lights and siren on. (*See* Dash Cam. Video at 02:50-03:31.) Barror drove through two stop signs before finally coming to a stop. (*See id*.) Once stopped, the Troopers and Raethke gave Barror several repeated orders to exit his vehicle with his hands up and Barror did not do

so, and Barror shouted at the approaching officers that he could not raise his hands.[4] (*See* Dash Cam. Video at 03:33-04:15; 6:30-7:05, 7:50-8:10.)

  On the present record, the Court finds that reasonable jurors could disagree about whether the circumstances surrounding Barror's arrest support a strong governmental interest in Raethke's use of force to effect Barror's arrest.[5] *See, e.g.*, *Buller v. Woodrow*, No. 17-cv-06562-BLF, 2020 WL 999614, at *7 (N.D. Cal. Mar. 2, 2020) (holding that although initially suspected of a non-violent misdemeanor traffic offense, the plaintiff was, *inter alia*, "speeding and weaving in and out of his lane," had increased speed once the patrol car's "lights and sirens activated[,]" and ignored multiple orders to get on the ground and produce his hands and therefore "the totality of circumstances supports a strong governmental interest in the use of force during [the plaintiff's] arrest"); *but see Mackay v. City of Salinas*, No. 19-CV-02257-EJD, 2022 WL 2802981, at *9 (N.D. Cal. July 18, 2022) (holding that the severity of the crime at issue did not support a governmental interest in the use of force even where the plaintiff "fle[d] from [officers], [] drove against traffic on a one-way street, drove up to 80 miles per hour, and drove through red lights and stop signs").[6]

---

  [4] The record does not include footage from Raethke's body worn camera. (*See* Steffen Decl., Ex. 4, email to Barror's counsel "confirm[ing] that there [are] no electronic records for Ra[e]thke's body cam footage on the day of the incident. . . . [T]here was a transition in systems around the time Ra[e]thke came over to the department [and a]s a result, [it] is likely some footage was lost if an officer failed to 'tag' the download properly.").

  [5] Indeed, as discussed below, both Troopers who witnessed the incident firsthand reported Raethke's use of force to their superior officer as excessive. (*See* Killens Depo. at 27:6-20; Cowen Depo. at 25:2-21.)

  [6] The parties discuss several excessive force cases in their briefing, attempting to analogize or distinguish the facts from those present here. (*See* Defs.' Mot. at 12-14; Pl.'s Opp'n at 7-8, ECF No. 41, analyzing *Johnson v. Cnty. of L.A.*, 340 F.3d 787 (9th Cir. 2003), *Miller v. Clark Cnty.*, 340 F.3d 959 (9th Cir. 2003), *Meredith v. Erath*, 342 F.3d 1057 (9th Cir. 2003), and *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003)). The Court has

### b.    Threat to Safety of Officers or Others

Defendants argue that Raethke "arrived at the scene of the incident with information that Barror had eluded police at high speeds, was not responding to commands, and possibly had a gun." (Defs.' Mot. at 14; *see also* Pl.'s Opp'n at 8, acknowledging that "the fact that one of the vehicles (either [] Barror's or a vehicle following [] Barror) may have a firearm [] is supported by the dispatch records"). Barror responds that the Troopers' testimony demonstrates that he did not pose a threat at the time of arrest. (*See* Pl.'s Opp'n at 3-5.)

To support his argument, Barror relies on testimony from Killens that when the Troopers and Raethke approached Barror's vehicle, Barror "was being uncooperative, but not in a manner that appeared dangerous." (*Id*. at 3; Killens Depo. at 11:10-19.) Upon removing Barror from his vehicle, Killens "switched over" to nonlethal force, and used "the open-hand custody technique, which is [] the lower end of our use of force spectrum." (Killens Depo. at 12:10-20.) Further, when Killens noticed "a knee strike coming from [] Raethke . . . [Killens] put [his] arm in front of [Raethke] and said, 'He's good. He's good. We don't need that,' or something to that effect." (*Id*. at 12:20-24.) Killens testified that he used a lower use of force because "[f]rom my policy and training, that's all I felt I needed to do" and "with that incident [with Barror] specifically, I did not feel more force was necessary to effect that arrest." (*Id*. at 14:6-10, 24:9-15.) After viewing their patrol car dash camera footage, both Killens and Cowen reported Raethke's use of force to their superior officer, even though doing so was not "standard procedure." (*See id.* at 27:6-20; Cowen Depo. at 25:2-24.)

///

---

reviewed each case and finds that none of the factual scenarios is sufficiently analogous to those present here.

In contrast, Raethke testified that throughout the encounter he was operating under the belief that Barror may have a gun.[7] (*See* Raethke Depo. at 15:15-25, 19:19-22.) It is unclear from the record whether the Troopers shared their belief with Raethke that Barror was unarmed. (*See, e.g.*, Killens Depo at 53:11-16, testifying that he did not believe there was communication to Raethke "when he arrived on the scene about [a] firearm" but "it is potential [sic] it could have been [communicated] from [] Cowen to [Raethke]"). Raethke also testified that the reason he delivered knee strikes to Barror's body was because "there was a kind of concern of getting [] Barror detained . . . because . . . we still hadn't determined where this firearm was, if he was in possession of a firearm." (Raethke Depo. at 20:1-5.)

Under these circumstances, the Court finds that "the facts are sufficiently unclear [such] that the determination" of whether Raethke's actions were reasonable "must be made by the trier of fact[.]" *Deorle*, 272 F.3d at 1281 (reversing the district court's entry of summary judgment for officer where "[a] thorough review of the record reveals that the facts are sufficiently unclear as to what [the officer] believed or feared—reasonable or not—that the determination must be made by a trier of fact" and noting that "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury"); *see also Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1148 (E.D. Cal. 2016) (finding a genuine issue of material fact precluded summary judgment on whether the plaintiff's conduct constituted a threat where the plaintiff was, *inter alia*, "sitting or lying on the

---

[7] Defendants point out in their reply that the Troopers may not have been aware of the dispatch report Raethke heard indicating that Barror may have a firearm. (*See* Defs.' Reply at 2-4.)

ground, [] noncompliant with [the officer's] commands in that he did not move how or where [the officer] wanted him").

### c.  Actively Resisting or Attempting to Evade Arrest

Finally, based on the record before the Court, reasonable jurors could also disagree about whether Barror resisted arrest. When asked whether it was "fair to say" that "Barror was resisting attempts to remove him from the vehicle[,]" Killens responded "[n]o" and that what Barror was doing is "called static resistance, meaning that he is not doing anything to resist, but he's also not being helpful to get himself out of the vehicle." (Killens Depo. at 57:3-17.) Cowen also testified that although Barror was "tensing up[, h]e wasn't [] actively fighting us but he wasn't doing anything . . . to help the situation by getting out of the vehicle willingly." (Cowen Depo. at 14:7-10); *see also Garlick*, 167 F. Supp. 3d at 1151 (holding that "a reasonable jury could find that [the plaintiff] was [] noncompliant . . . but that such disobedience constitute[d] passive, not active, resistance" where the plaintiff "was on the ground, unarmed, nonviolent, not fleeing, did not assault any officer, and his physical resistance, if any, was a brief response to pain stimulus").

Further, there remains a dispute of fact as to whether and why Barror refused to comply with the officers' commands to raise his hands. (*See* Dash Cam. Video at 6:30-7:05, a responding officer can be heard repeatedly yelling "why not" toward Barror after Barror refused to raise his hands out of his vehicle window (Barror's responses are unintelligible), with the officer finally instructing Barror to "keep [his] hands up as high as [he] can keep them"; Dash Cam. Video at 7:50-8:10, Barror can be heard repeatedly yelling at the approaching officers "I cannot keep my hands up" and "I can't hold them up"; *but see* Raethke Depo. at 21:7-12, 48:16-19, 48:21-49:3, Raethke responding "no" when asked whether he heard Barror "try to explain that he couldn't

raise his hands and that he was injured"; Cowen Depo. at 13:4-5, 15-21, testifying that prior to

Barror's arrest, Cowen "couldn't quite make out what [Barror] was saying" and that when the

officers approached the vehicle, they gave "multiple commands" for Barror "to exit the vehicle

with his hands up [but] for whatever reason he was not compliant" but he did hear Barror "say

something to the effect of 'I can't keep my hands up'" as the officers approached the vehicle).

Viewed in the light most favorable to Barror, a reasonable juror could conclude that

Barror explained to the officers why he could not comply with their instructions, which supports

a finding that he was not resisting arrest. *See Nelson v. City of Davis*, 658 F.3d 867, 881 (9th Cir.

2012) ("[F]ailure to fully or immediately comply with an officer's orders neither rises to the

level of active resistance nor justifies the application of a non-trivial amount of force."); *cf.*

*Lopez*, 2015 WL 4077635, at *15 ("Based on the Dashcam, the fact-finder could reasonably find

that [the plaintiff's] initial movements were defensive, rather than combative [where the

plaintiff] did not attempt to strike or fight the officers [and where] most of [the plaintiff's]

physical resistance consisted of moving away from the baton blows and strikes of the arresting

officers[.]").

### 3.    Conclusion

"Because the excessive force inquiry ordinarily 'requires a jury to sift through disputed

factual contentions, and to draw inferences therefrom,' the Ninth Circuit has emphasized that

'summary judgment . . . in excessive force cases should be granted sparingly.'" *Id.* at *6 (quoting

*Smith*, 394 F.3d at 701 and citing *Santos*, 287 F.3d at 853). With that guidance in mind and

viewing the record in the light most favorable to Barror, a reasonable jury could conclude from

the totality of the circumstances that Raethke's use of force was not objectively reasonable under

the circumstances. *See Chew*, 27 F.3d at 1440 ("In determining reasonableness, 'the nature and

quality of the intrusion on the individual's Fourth Amendment interests' must be balanced against the 'countervailing government interests at stake.'" (citing *Graham*, 490 U.S. at 396)). For these reasons, the Court recommends that the district judge deny Defendants' motion for summary judgment on Barror's excessive force claim against Raethke.

## II.    *MONELL* CLAIM AGAINST THE CITY

Barror also alleges a *Monell* claim, asserting that the City "fails to properly train their police officers in the use of force[.]" (FAC ¶ 14.) Defendants argue that Barror's *Monell* claim fails for two reasons: (1) "[i]f this [C]ourt finds that Defendants prevail . . . against Barror's excessive use of force claim, his failure to train cannot proceed because there would be no basis for [Barror] to claim that [] Raethke's actions deviated from his training" and (2) there is no evidence that the City [] was deliberately indifferent about training its officers on the appropriate level of force to use during encounters with the public." (Defs.' Mot. at 14, 17.)

### A.    Applicable Law

To prevail on a *Monell* claim under Section 1983, a plaintiff must show that a municipal custom or policy caused the violation of a constitutional right. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). "[M]unicipalities may be liable under § 1983 for constitutional injuries pursuant to: (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019).

"To establish *Monell* liability, Plaintiffs must allege that: (1) they were deprived of a constitutional right; (2) the municipality had a policy, custom, or practice; (3) the policy, custom, or practice amounted to deliberate indifference of the plaintiffs' constitutional rights; and (4) the policy, custom, or practice was the 'moving force' behind the constitutional violation." *Cantu v.*

*City of Portland*, No. 3:19-cv-01606-SB, 2020 WL 2952972, at *3 (D. Or. June 3, 2020) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 397 (1997). If no constitutional violation occurred, a municipal liability claim necessarily fails. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that a *Monell* claim cannot survive without an underlying constitutional violation).

### B.    Analysis

The threshold question in determining whether Barror can establish *Monell* liability is whether a constitutional violation occurred here. Defendants argue that since "Raethke's use of force did not exceed the reasonableness standard established by the Fourth Amendment, then the [C]ity could not have failed properly to train him to handle such encounters like the one he experienced with Barror." (Defs.' Mot. at 17.)

As explained above, a reasonable jury could conclude that Raethke violated the Fourth Amendment when he arrested Barror. Accordingly, Barror's *Monell* claim does not fail as a matter of law. *Cf. Dickerson v. City of Portland*, No. 3:19-cv-01126-SB, 2020 WL 7391267, at *6 (D. Or. Dec. 16, 2020), *aff'd*, 2022 WL 824588 (9th Cir. Mar. 18, 2022) (holding that because "officers did not violate the Fourth Amendment when they arrested [the plaintiff,] no constitutional violation occurred, [and the plaintiff's] *Monell* claim fails as a matter of law").

However, Barror's *Monell* claim nevertheless fails because he has not presented evidence sufficient to create a genuine dispute of material fact about whether the City was deliberately indifferent in its failure to train its officers in the use of force.

Inadequate training can result in Section 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom police come into contact." *City of Canton v. Harris*, 489 U.S. 379, 388 (1989). To establish that level of inadequacy, plaintiffs "must demonstrate a conscious or deliberate choice" by the City not to train its officers by demonstrating that the City "disregarded the known or obvious consequence that a particular omission in their training program would cause [City] employees to violate citizens' constitutional rights." *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1158-59 (9th Cir. 2014) (simplified). "In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Brown*, 520 U.S. at 407-08.

Further, "in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* at 409. "The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right." *Id.*

Defendants argue that "[a]t the time of the incident, the City [] had a use of force policy in place[, that] is ever changing to reflect the changes in the law and is the culmination of several individual[s] and entities working together to define an appropriate policy." (Defs.' Mot. at 18, citing Decl. Sgt. Evin Eustice Supp. Defs.' Mot. ("Eustice Decl.") ¶¶ 5-6.) The policy instructs when an officer is entitled to use force. (*See* Eustice Decl., Ex. 5.) In relevant part, an officer

"shall only use that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event[.]" (*Id.*)

Barror does not dispute that the City had a use of force policy in place, nor that the City trained Raethke in that policy. Instead, Barror argues that the policy is inadequate because it "does not contain any guidance regarding the use of force when a suspect is physically disabled or incapacitated" and that Raethke received "no training related to verbal conflict and control[,]" "de-escalation techniques[,]" or "less violent uses of force" prior to Barror's arrest. (Pl.'s Opp'n at 9-10.) According to Barror, "there is a genuine issue of material fact as to whether or not a failure to train officers . . . amounts to deliberate indifference." (Pl.'s Opp'n at 10.) Defendants respond by arguing that "[s]imply identifying general and specific shortcomings of the City's training program does not establish an issue of material fact that the City failed to train its officers." (Defs.' .)

Barror has failed to present evidence sufficient to demonstrate that the City's failure to provide specific training to Raethke on verbal conflict resolution, de-escalation, less violent uses of force, or on arrests of disabled individuals, was deliberately indifferent to Barror's constitutional rights. Specifically, Barror has not presented any evidence that such training is appropriate or available, or would have prevented the type of harm Barror encountered here.[8] For example, Barror has not provided a description of such training in other jurisdictions, nor provided testimony that such training is customary. *Cf. Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004) (reversing the district court's entry of summary judgment for the defendant and finding that the district court's ruling that the plaintiff had "set forth no evidence to support the

---

[8] In addition, Barror has not presented any evidence that he is disabled.

establishment of a custom or policy" was "incorrect" because the plaintiff "had submitted the declaration of a law enforcement expert"). On this record, it is unclear if any other jurisdiction has trained its officers in these areas, or the contents of such training.[9]

Barror has not established a genuine dispute of material fact regarding whether the City disregarded a known or obvious consequence that a particular omission in its training program would cause police officers to violate an individual's constitutional rights, nor has he presented any evidence of a pattern of tortious conduct by inadequately trained police officers or that this event was a highly predictable consequence of a failure to train police officers with specific tools to handle recurring situations. Accordingly, there is not sufficient evidence in the record to support a conclusion that the City was deliberately indifferent in its decision not to offer the training Barror cites, nor that any such training would have changed the manner in which Raethke effected Barror's arrest here. *See Elifritz v. Fender*, 460 F. Supp. 3d 1088, 1119-20 (D. Or. 2020) (granting summary judgment in favor of the City of Portland because the plaintiff "offered no evidence that [the Portland Police Bureau ("PPB")] was deliberately indifferent to the need to train [] its officers" and the plaintiff "has not pointed to any category of inadequate training or explained how the training that PPB gave its officers fell so short of adequately protecting the constitutional rights of the City's residents that it amounted to deliberate indifference"); *see also Anthony v. City of NY*, No. 00 CIV. 4688 (DLC), 2001 WL 741743, at *9 (S.D.N.Y. July 2, 2001), *aff'd*, 339 F.3d 129 (2d Cir. 2003) (granting summary judgment in favor

---

[9] The only evidence in the record that arguably supports Barror's failure to train claim is Killens's testimony that the Columbia County Sheriff's Office "discussed" training in how to interact with disabled individuals, but no one testified about the contents of the training nor that it would have prevented the alleged constitutional violation here. (*See* Killens Depo. at 16:11-22.)

of the city and finding that the plaintiff "put forth no evidence to prove that [alleged] violations resulted from the [defendants'] failure to train" and reasoning that even where "a particular officer may be unsatisfactorily trained[, that alone] will not [] suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program"); *cf. Almarou v. City of Gardena*, No. CV 18-04908-CJC, 2019 WL 7945590, at *4 (C.D. Cal. Dec. 30, 2019) (dismissing *Monell* claim where the plaintiff asserted that the defendants "provid[ed] inadequate training regarding the proper procedure when encountering mentally ill persons" and "the use of force, including deadly force" because the plaintiff "provide[d] no facts regarding the training the officers received and offer[ed] no explanation for why that training was inadequate" and further failed to "offer any explanation for how the [defendant] was deliberately indifferent or how the allegedly defective training caused the constitutional violation"); *Doyle v. City of Corning*, No. 14-cv-6507-CJS-MWP, 2019 WL 360759, at *5 (W.D.N.Y. Jan. 29, 2019) (dismissing *Monell* claim based on a failure to train officers in the proper use of force when arresting a disabled person because the plaintiff provided "only one example of the use of force allegedly causing injury to a disabled citizen"); *Caputo v. City of San Diego Police Dep't*, No. 16-cv-00943-AJB-BLM, 2018 WL 4092010, at *7 (S.D. Cal. Aug. 28, 2018) (dismissing *Monell* claim and reasoning that "to the extent that [the p]laintiff is attempting to allege a failure to train, the broad conclusion [that there was a lack of training] does not sufficiently state a plausible *Monell* claim [because] the complaint does not explain how the training with respect to arresting and treating individuals with disabilities was deficient or inadequate").

For these reasons, the Court recommends that the district judge grant summary judgment in favor of the City on Barror's *Monell* claim.

**CONCLUSION**

For the reasons stated, the Court recommends that the district judge DENY Defendants'

motion for summary judgment as to Barror's Fourth Amendment claim against Raethke and

GRANT Defendants' motion for summary judgment as to Barror's *Monell* claim against the City

of St. Helens (ECF No. 33).

**SCHEDULING ORDER**

The Court will refer its Findings and Recommendation to a district judge. Objections, if

any, are due within fourteen (14) days. If no objections are filed, the Findings and

Recommendation will go under advisement on that date. If objections are filed, a response is due

within fourteen (14) days. When the response is due or filed, whichever date is earlier, the

Findings and Recommendation will go under advisement.

DATED this 12th day of June, 2023.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge