IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ROBERT BARROR,<br><br>   Plaintiff,<br> v.<br><br>CITY OF SAINT HELENS and ADAM RAETHKE, in his individual capacity,<br><br>   Defendants. | Case No.: 3:20-cv-00731-AN<br><br>OPINION AND ORDER |

   Plaintiff Robert Barror filed this case against the City of St. Helens (the "City") and St. Helens police officer Adam Raethke ("Raethke") in his individual capacity alleging Fourth Amendment violations for excessive force and failure to train under 42 U.S.C. § 1983. On June 12, 2023, U.S. Magistrate Judge Stacie Beckerman issued a Findings and Recommendation ("F&R"), ECF [54], on defendants' motion for summary judgment. Upon review, this Court adopted Judge Beckerman's recommendations in full, granted summary judgment on plaintiff's *Monell* claim against the City, and denied summary judgment on plaintiff's Fourth Amendment claim against Raethke. Order of Aug. 18, 2023 ("Order on F&R"), ECF [56], at 3.

   On January 3, 2024, the Court granted Raethke leave to file a motion for summary judgment on the limited issue of whether there was clearly established law, at the time of the conduct at issue, establishing that Raethke's alleged use of force was unconstitutional. Order of Jan. 3, 2024, ECF [68], at 6. Raethke timely filed the motion on January 10, 2024. For the following reasons, that motion is DENIED.

**LEGAL STANDARD**

   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine issue of material fact. *Rivera v. Philip*

1

*Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). Material facts are those which might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Materiality is determined using substantive law. *Id.* A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).

## BACKGROUND[1]

On August 6, 2019, at 12:31 p.m., Columbia County 911 dispatch was alerted to a traffic complaint about a grey Chevy Silverado near St. Helens, Oregon, reportedly traveling 100 miles per hour and passing other vehicles in the center lane of the highway. F&R 2. Oregon State Troopers Travis Killens ("Killens") and Christopher Cowen ("Cowen") (collectively, the "Troopers") heard the dispatch report and responded to the call in their patrol vehicle. *Id.* When the troopers caught up to the vehicle, Cowen observed it make a very sharp turn and cut across all lanes of traffic. *Id.* Killens activated the patrol car's lights and sirens, and the Troopers pursued the vehicle, which was then traveling at approximately eighty miles per hour. *Id.* With the Troopers in pursuit, the vehicle ran two stop signs before finally stopping. *Id.*

The Troopers parked behind the vehicle, and Cowen approached to place a spike strip in front of the vehicle's rear passenger tire while Killens provided cover. *Id.* at 3. The Troopers then called for cover to assist with the high-risk traffic stop. *Id.* While stopped, the Troopers gave multiple commands to the vehicle's driver—later identified as plaintiff—to exit the vehicle with his hands up. *Id.* Plaintiff did not comply with those commands. *Id.*

Nearby, on a related call, Raethke heard the general broadcast about the speeding vehicle and that its driver had possibly aimed a firearm at another driver. *Id.* Raethke responded and arrived on the scene approximately two minutes after plaintiff had stopped. *Id.* Upon arrival, Raethke observed the Troopers with their guns drawn aimed at plaintiff's car. *Id.* At this time, the Troopers were unsure if

---

[1] The following facts are taken from the F&R, which this Court adopted as its own opinion.

plaintiff had a gun, in part because, prior to Raethke's arrival, they heard plaintiff "say something about the other vehicle that was following him . . . had a gun[.]" Decl. of Justin Steffen ("Steffen Decl."), ECF [42], Ex. 2, at 13:8-11; *see* F&R 11. It is unclear whether the Troopers shared this information with Raethke; Killens testified that he did not believe the information was communicated to Raethke, but Cowen testified that he "made sure that when Saint Helens officers arrived [he] kind of informed them of that information or at least what was being alleged because my back was to the other driver." F&R 12; Steffen Decl., Ex. 2, at 13:11-14. Cowen testified that they did not confirm that plaintiff was unarmed until he was properly searched after his arrest. F&R 5.

Approximately thirty seconds after Raethke parked, Raethke and the Troopers filed into a column and approached the driver's side of the vehicle with their guns drawn. *Id.* at 3. As he approached, Raethke observed plaintiff leaning away, towards the passenger's side of the vehicle, and Raethke grew increasingly concerned with whether plaintiff was reaching for something. *Id.*

Raethke and the Troopers issued commands to plaintiff to exit the vehicle with his hands up as they approached. *Id.* Plaintiff remained in the vehicle and repeatedly shouted that he could not hold his hands up. *Id.* Raethke testified that he did not hear plaintiff's shouts. *Id.* Plaintiff can be heard on the dash camera video of the incident, recorded by the Troopers' patrol car, repeatedly yelling, "I cannot keep my hands up" and "I can't hold them up." *Id.* at 13. Cowen also stated that he heard plaintiff "say something to the effect of 'I can't keep my hands up'" as the officers approached the vehicle. *Id.* Once plaintiff's car door was open, Raethke and the Troopers noticed that he still had his seatbelt on. *Id.* at 4.

Killens described plaintiff as exhibiting frantic behavior. *Id.* Plaintiff began tensing his body and pulled away. *Id.* When asked whether it was "fair to say" that "[plaintiff] was resisting attempts to remove him from the vehicle," Killens responded "no" and described plaintiff's behavior as "static resistance, meaning that he is not doing anything to resist, but he's also not being helpful to get himself out of the vehicle." *Id.* at 13. Similarly, Cowen testified that plaintiff "wasn't actively fighting us but he wasn't doing anything to help the situation by getting out of the vehicle willingly." *Id.*

Once Raethke and the Troopers were able to remove plaintiff from the vehicle and he was face down on the ground, Raethke observed that plaintiff's hands were near his midsection or beltline. *Id.* At that time, Raethke testified that he still had not determined if plaintiff was in possession of a firearm and, if so, where the firearm was located. *Id.* Although plaintiff was on the ground, Raethke and the Troopers could not get plaintiff's arms behind his back to handcuff him. *Id.* Killens began using a nonlethal, open-hand custody technique, which he described as on "the lower end of our use of force spectrum." *Id.* Killens testified that he used a lower level of force because "from my policy and training, that's all I felt I needed to do" and "with that incident specifically, I did not feel more force was necessary to effect that arrest." *Id.* at 11.

When Killens noticed that Raethke was using a knee strike on plaintiff, Killens put his arm in front of Raethke and said something along the lines of, "[h]e's good. He's good. We don't need that." *Id.* Raethke still could not get plaintiff's arms behind him, so Raethke delivered a second knee strike. *Id.* Cowen indicated that Raethke delivered a third knee strike. *Id.* at 4 n.2. Killens then told Raethke "he's good"—referring to plaintiff—several times. *Id.* at 4. Raethke and the Troopers were then able to get plaintiff's arms behind his back, and Raethke stopped delivering knee strikes. *Id.* at 5.

After plaintiff was handcuffed, the Troopers determined that plaintiff did not have a firearm. *Id.* Killens issued plaintiff multiple citations, including reckless driving, reckless endangering, failure to obey a traffic control device, failure to drive in lane, and failure to yield to an emergency vehicle. *Id.* After viewing their patrol car's dash camera footage, both Killens and Cowen reported Raethke's use of force to their superior officer, even though doing so was not "standard procedure." *Id.* at 11.

In adopting Judge Beckerman's F&R, this Court determined that the following issues should be determined by a jury: (1) whether the circumstances surrounding plaintiff's arrest supported a strong governmental interest in Raethke's use of force to effect plaintiff's arrest; (2) the reasonableness of Raethke's belief that plaintiff had a gun; (3) the level of threat that plaintiff posed; and (4) whether plaintiff resisted arrest. *Id.* at 9-15; Order on F&R 1. However, Raethke did not raise the issue of qualified immunity

4

in the original motion for summary judgment;[2] thus, neither the F&R nor this Court's order considered the merits of that defense. Accordingly, the Court now considers Raethke's qualified immunity defense as asserted in his limited motion for summary judgment.

## DISCUSSION

Qualified immunity shields an official from damages in a civil suit so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). If applicable, qualified immunity provides immunity against liability, as well as immunity from suit and other litigation burdens. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, qualified immunity is designed to dismiss "insubstantial claims" against government officials before the discovery phase. *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987). Qualified immunity questions should, therefore, be resolved at the earliest possible stage of litigation. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

In the context of excessive force claims, a qualified immunity analysis can be distilled into three elements: (1) whether the alleged conduct would violate a constitutional or statutory right; (2) whether the law clearly established, at the time of the conduct at issue, that the alleged conduct violated a constitutional or statutory right. *Gordon v. Cnty. of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021). The Court has already adopted Judge Beckerman's conclusion that a reasonable jury could conclude that Raethke's conduct was not objectively reasonable, satisfying the first inquiry. However, whether the law governing Raethke's conduct was clearly established at the time the challenged conduct occurred, and whether, under that clearly established law, a reasonable officer could have believed that the conduct was lawful, remain unresolved.

The plaintiff bears the burden of establishing that the right allegedly violated was clearly established at the time of the alleged misconduct. *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991). A clearly established right is "sufficiently clear that every reasonable official would have understood

---

[2] Defendants' answer asserts qualified immunity as an affirmative defense, negating any potential issue of waiver.

that what he is doing violates that right." *Mullenix*, 577 U.S. at 11 (internal quotation marks omitted). Thus, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 12 (internal quotation marks omitted). However, the question of "whether the violative nature of particular conduct is clearly established," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), "must be undertaken in light of the specific context of the case, not as a broad general proposition," *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (internal quotation marks omitted).

In the excessive force context, the Supreme Court has cautioned that "specificity is especially important" because "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12 (internal quotation marks omitted). Put another way, "the clearly established law must be 'particularized' to the facts of the case," such as "a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. 73, 79 (2017). Although controlling precedent need not always address the precise conduct at issue, it must, at the least, consider "closely analogous" conduct. *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017). However, when controlling precedent is not directly on point, "'the salient question . . . is whether the state of the law [at the time of the alleged wrong] gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Davis v. City of Las Vegas*, 478 F.3d 1048, 1056 (9th Cir. 2007) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)) (alterations in original).

Both parties agree that, for the purposes of qualified immunity and viewing the facts in the light most favorable to plaintiff, Raethke's alleged conduct was delivering knee strikes to plaintiff's torso during an arrest while plaintiff was passively resisting. Plaintiff points to a series of cases as evidence that the unconstitutionality of using knee strikes on a passively resisting arrestee, under the circumstances presented in this case, is clearly established. Pl.'s Resp. to Def.'s Mot. ("Pl.'s Resp."), ECF [70], at 3-4.

Plaintiff relies on *City of Escondido v. Emmons*, 586 U.S. __, 139 S. Ct. 500 (2019), for the proposition that the right to be free from the application of non-trivial force when engaged in passive resistance was clearly established at the time of plaintiff's arrest. Pl.'s Resp. 3. In that case, the Supreme

6

Court reviewed the Ninth Circuit's decision to reverse a district court's grant of qualified immunity for officers who allegedly used excessive force to arrest the plaintiff. *Emmons*, 139 S. Ct. at 502. The *Emmons* Court criticized the Ninth Circuit for relying on *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013), to define the clearly established right too generally as a "right to be free from excessive force." *Emmons*, 139 S. Ct. at 503. The Ninth Circuit had also identified a right to be "free from the application of non-trivial force or engaging in mere passive resistance." *Id.* (quoting *Gravelet-Blondin*, 728 F.3d at 1093). However, the *Emmons* Court noted that *Gravelet-Blondin* "involved police force against individuals engaged in *passive* resistance," and the Ninth Circuit had not explained how *Gravelet-Blondin* prohibited the officer's actions in *Emmons*. *Id.* at 503-04. Standing alone, *Emmons* does not clearly establish that Raethke's alleged conduct was unconstitutional. First, it is a case *denying* qualified immunity, and second, it makes no determination as to whether the arrestee in *Emmons* was passively resisting.

*Emmons* does, however, point the Court's attention to *Gravelet-Blondin*, where the Ninth Circuit denied a defendant-officer's qualified immunity defense. 728 F.3d at 1093. In that case, the officer allegedly used excessive force when he tased a bystander in "dart" mode for not complying with police directives to "get back," even though the bystander "made no threatening gestures" and "appeared frozen with fear." *Id.* at 1089-90. In determining that the officer was not entitled to qualified immunity, the Ninth Circuit emphasized that the "right to be free from the application of non-trivial force for engaging in passive resistance was clearly established prior to 2008." *Id.* at 1094. Although the court acknowledged that it was not clear what specific level of force using a taser constituted until 2010, it was well known as of 2008 that the use of a taser in dart mode was "non-trivial" force. *Id.* at 1096. Indeed, the court cited *Nelson v. City of Davis*, 685 F.3d 867, 811 (9th Cir. 2012), for the proposition that "cases dating back to 2001 have established that '[a] failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force.'" *Gravelet-Blondin*, 728 F.3d at 1094.

Though the factual circumstances of *Gravelet-Blondin* differ from those presented here, it sets forth the general rule that, since 2001, the law has clearly established the right to be free from non-

7

trivial force for engaging in passive resistance. For Raethke's conduct to fall under this rule, (1) plaintiff must have been passively resisting, and (2) Raethke must have used non-trivial force. Raethke does not dispute that, for purposes of this motion, plaintiff was passively resisting the officers. Thus, the question is whether Raethke's use of force was non-trivial.

The Ninth Circuit has stated that blows "capable of inflicting significant pain and causing serious injury . . . are regarded as 'intermediate force' that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests." *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1161 (9th Cir. 2011); *see Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012). In adopting Judge Beckerman's F&R, this Court incorporated her finding that "[t]he use of knee strikes on an arrestee while they are prone constitutes at least an 'intermediate' use of force." F&R 8. Raethke "does not dispute the Court's determination that the use of knee strikes constitutes an intermediate level of force" but still argues in a footnote that there is a "lack of clearly established authority on law enforcement officials' use of knee strikes." Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF [69], at 10 n.1. Given this inconsistency, the Court will provide a more comprehensive analysis of whether knee strikes are an intermediate use of force.

One of the cases cited in the F&R regarding a knee strike's level of force, *Centeno v. City of Carlsbad*, No. 3:19-cv-2098-L-DEB, 2021 WL 6064383 (S.D. Cal. Dec. 22, 2021), involves a similar fact pattern.[3] In that case, the plaintiff sued a defendant-officer, alleging Fourth Amendment violations after the officer used knee strikes during the plaintiff's arrest. *Id.* at *10. The incident underlying the plaintiff's claims arose when two officers responded to a call about someone breaking into a car and found the plaintiff at the vehicle with a "metal tool" and flashlight. *Id.* at *1. One officer grabbed the metal tool from the plaintiff's hand and threw it approximately ten feet away. *Id.* When the plaintiff began to walk toward the tool, the officer ordered him "to remain there," but the plaintiff stepped backward. *Id.* The

---

[3] *Centeno* was decided after the incident giving rise to the present litigation occurred, so it cannot, by itself, be a source of clearly established law. However, because the incident in *Centeno* occurred prior to the date of the incident here, its clearly established law analysis remains relevant to the Court's own inquiry.

officers then stated that they were detaining the plaintiff and began to attempt to arrest him. *Id.* The plaintiff was ordered to drop the flashlight, but it was unclear when he dropped the flashlight. *Id.*

While attempting to arrest the plaintiff, the officers brought him to the ground. *Id.* The officer contended that the plaintiff resisted arrest by keeping his arms rigid and pinning one arm under his torso despite orders to put his hands behind his back. *Id.* The officer did not warn the plaintiff that he would perform knee strikes before he "struck [the plaintiff's] back with his knee at least two times." *Id.* In denying the officer's qualified immunity defense, the court found that "[t]he knee strikes, under the circumstances, involved at least intermediate force," that the plaintiff "did not resist [the officers'] commands," and that the plaintiff was "in a position that would make it difficult to comply with orders." *Id.* at *10. Based on these facts, the court held that "it would have been clear to any reasonable officer that performing knee strikes was objectively unreasonable." *Id.*

Additionally, there is a general consensus from district courts in the Ninth Circuit that knee strikes are, at a minimum, an intermediate level of force: in addition to the cases cited in the F&R, *see Harris v. Perez*, No. 21-cv-01335-BHS-TLF, 2023 WL 7169552, at *13 (W.D. Wash. Sept. 27, 2023) ("[P]unches and knee strikes[ ] . . . may fall in the categories of intermediate to significant."); *Stickney v. City of Phoenix*, No. CV 20-01401-PHX-SMB (DCB), 2023 WL 2976943, at *17 (D. Ariz. Mar. 17, 2023), *appeal filed*, *Stickney v. Arnold*, No. 23-15555 (9th Cir. Apr. 17, 2023) ("Impact blows by punching or kicking are generally considered intermediate force."); *McCrae v. Larned*, No. 6:20-cv-2180-MK, 2022 WL 4451844, at *7 (D. Or. July 14, 2022) (citing another court's finding that "punches and knee strikes are a significant use of force"); *Harper v. Cnty. of Merced*, No. 1:18-cv-00562-LJO-SKO, 2018 WL 5880786, at *14 (E.D. Cal. Nov. 8, 2018) (finding "dart taser knee kicks to the Plaintiff's head and chest" to be "significant"); *Jones v. Cnty. of San Bernardino*, No. EDCV 15-00080-DTB, 2016 WL 4425711, at *11 (C.D. Cal. Aug. 17, 2016) ("[T]he law clearly established that knee strikes, which constitute intermediate force, against a noncompliant arrestee can be excessive."); *Lopez v. City of Imperial*, No. 13-cv-00597-BAS(WVG), 2015 WL 4077635, at *7 (S.D. Cal. July 2, 2015) ("Fist and knee strikes may also

9

be considered a significant use of force."). Thus, despite Raethke's assertions, the law seems sufficiently clear that knee strikes constitute more than a "non-trivial" use of force.

In the present case, construing the facts in the light most favorable to plaintiff, the Court finds that Raethke's conduct falls under *Gravelet-Blondin*'s prohibition on the use of non-trivial force against passive resistance. However, this alone does not end the qualified immunity analysis because "the clearly established law must be 'particularized' to the facts of the case," such as "a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment." *White*, 580 U.S. at 79. *Gravelet-Blondin* presents a significantly different factual scenario than that which Raethke faced—the *Gravelet-Blondin* plaintiff was a bystander who did not "engage[ ] in [ ] behavior that could have been perceived by [the officer] as threatening or resisting." 728 F.3d at 1094.

However, plaintiff also draws the Court's attention to *Blankenhorn v. City of Orange*. 485 F.3d 463 (9th Cir. 2007). In that case, the plaintiff brought a Fourth Amendment violation claim against officers, alleging that they used excessive force by punching him several times during his arrest. *Id.* at 467, 469-70. The incident occurred when officers approached the plaintiff, who they believed to be trespassing at a shopping mall, to "determine his identity and confirm with security whether he was allowed at the location." *Id.* at 468. The officers were aware that the plaintiff had a prior robbery conviction and was a known gang member. *Id.* at 469. The parties characterized the initial encounter somewhat differently, with the officers describing the plaintiff as "rude, uncooperative, and verbally abusive," and the plaintiff admitting only that he was "angry," "loud," used profanity, and threw his driver's license on the ground. *Id.* There were also factual disputes regarding whether the plaintiff was acting in a "threatening manner." *Id.* at 469.

Eventually, three of the officers attempted to arrest the plaintiff, "struggling for several seconds before . . . finally tak[ing] him to the ground." *Id.* At least two officers had arrived to a call for back-up, and one of the officers involved in the arrest arrived only seconds before the takedown. *Id.* at 469 n.2. The plaintiff alleged that the officers "jumped on him," but the officers asserted that one officer first reached for his wrist. *Id.* The officers alleged that the plaintiff was resisting arrest "by maneuvering his

hands and arms under his body," and one officer punched the plaintiff at least four times during the arrest. *Id.* at 470. After he was handcuffed, the officers secured his wrists and ankles with hobble restraints. *Id.* at 469.

The plaintiff's excessive force claims were based on the three officers "jumping on him," the use of hobble restraints, and the punches. *Id.* at 478-80. Despite the factual disputes, the Ninth Circuit denied the officers qualified immunity, relying on the holding set forth in *Graham v. Connor*, 490 U.S. 386, 396 (1989), that "force is only justified when there is a need for force." *Blankenhorn*, 485 F.3d at 481. The court held that the officers were "on notice that gang-tackling without first attempting a less violent means of arresting a relatively calm trespass suspect . . . was a violation of that person's Fourth Amendment Rights[,]" and that they were "on notice that punching [an arrestee] to free his arms when, in fact, he was not manipulating his arms in an attempt to avoid being handcuffed was a Fourth Amendment violation." *Id.*

The factual similarities between *Blankenhorn* and the present case are noteworthy. Both cases: (1) involve plaintiffs who were struck by officers for pinning their arms under their torso; (2) involve plaintiffs who were passively resisting; (3) involve an arrest performed by three officers, including one officer who was responding to a back-up request; (4) involve officers who could have believed that the plaintiff was armed; and (4) involve plaintiffs who were perceived by officers as "uncooperative."

Yet, Raethke argues that the facts are "materially distinguishable," making *Blankenhorn* an insufficient basis for clearly established law. Def.'s Mot. 10. There are indeed factual differences between the present case and *Blankenhorn*; however, those differences only emphasize that Raethke was on notice that his alleged conduct would violate plaintiff's rights. For example, Raethke knew that plaintiff had allegedly been driving recklessly, whereas the *Blankenhorn* officers suspected that the plaintiff was trespassing. However, the *Blankenhorn* officers also knew significantly more about the plaintiff, including that he was a known gang member and had a prior robbery conviction. Further, the *Blankenhorn* plaintiff gave officers no explanation for his lack of cooperation, whereas the plaintiff in this case repeatedly stated that he could not comply with the officers' orders. Indeed, the *Blankenhorn* plaintiff admitted that he was

11

"angry," "loud," and used profanity, but the plaintiff in this case was only ever described as "frantic." Finally, the Ninth Circuit highlighted that the *Blankenhorn* officers did not "first attempt[ ] a less violent means of arresting" the plaintiff when finding that the officers' use of force was not justified. *Blankenhorn*, 485 F.3d at 481. In the present case, Killens had already resorted to a lower use-of-force method, substantiating the implication that Raethke's use of force was not justified under clearly established law.

Raethke also argues that *Blankenhorn* is inapplicable because it does not involve the use of knee strikes. Notably, Raethke does not argue that punching would constitute a different level of force or is otherwise distinguishable from using a knee strike. Regardless, precedent need only address "closely analogous conduct," and punching an arrestee is not substantively different from a knee strike. *See, e.g.*, *Harris*, 2023 WL 7169552, at *13 ("[P]unches and knee strikes[ ] . . . may fall in the categories of intermediate to significant."); *Stickney*, 2023 WL 2976943, at *17 ("Impact blows by punching or kicking are generally considered intermediate force."); *McCrae*, 2022 WL 4451844, at *7 (citing another court's finding that "punches and knee strikes are a significant use of force"). Further, "'[a]n officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury.'" *Doerle v. Rutherford*, 272 F.3d 1272, 1286 (quoting *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994)).

Raethke also points to several cases from this district where officers were granted qualified immunity in excessive force cases, including *Carmona-Perez v. City of Salem*, No. 6:20-cv-00186-IM, 2023 WL 6216167 (D. Or. Sept. 25, 2023), *Gilliland v. Eason*, No. 6:22-cv-00496-MO, 2023 WL 6850237 (D. Or. Oct. 16, 2023), *Elifritz v. Fender*, 460 F. Supp. 3d 1088 (D. Or. 2020), and *Williams v. Baskett*. No. 6:19-CV-00069-MO, 2021 WL 4494189 (D. Or. Sept. 30, 2021). Def.'s Mot. 7. *Carmona-Perez* actually undermines Raethke's qualified immunity arguments because Judge Immergut expressly found that *Blankenhorn* governed the defendant-officer's use of palm strikes against the plaintiff and denied the officer qualified immunity on that claim. 2023 WL 6216167, at *12. *Gilliland* has little relevance to the present case considering it involved excessive force claims brought under the Eighth Amendment. 2023 WL 6850237, at *2. *Elifritz* presents materially different facts given that the plaintiff "carjacked a vehicle,

12

engaged in aggressive road-rage style driving, crashed the vehicle he stole, . . . tried to stab people inside the shelter," was "wielding a knife," and "tried to grab a bystander." 460 F. Supp. 3d at 1115.

The only arguably similar case is *Williams*. Yet even this case is readily distinguishable. In *Williams*, unlike here, the court first held that the officer's conduct was "objectively reasonable." *Compare* 2021 WL 4494189, at *5 *with* F&R 14. In its qualified immunity analysis, the court acknowledged that the officer "used intermediate force to apprehend a nonviolent criminal suspect who he believed could be in possession of a firearm but who had only engaged in passive resistance." *Williams*, 2021 WL 4494189, at *5. However, the court noted that in *Brown v. Diaz*, No. 2:17-cv-01157-KJM-AC, 2020 WL 4755357 (E.D. Cal. Aug. 17, 2020), the case that the plaintiff relied on, the suspect "did not 'pose[e] an apparent threat to officer safety.'" *Williams*, 2021 WL 4494189, at *5 (quoting *Diaz*, 2020 WL 4755357, at *10-12). The court emphasized that, the *Williams* officer knew that the plaintiff "was commonly in possession of a handgun, that he was likely to flee arrest, and that he had previously been arrested on related charges." *Id.* Thus, the court held that *Davis* did not govern because the *Williams* officer "could have reasonably concluded that [the plaintiff] did pose a threat to his safety." *Id.*

Here, Raethke had no such information about plaintiff. Plaintiff's identity was unknown until after his arrest, making any inferences that Raethke could have drawn about his criminal history speculatory, and a spike strip was in front of plaintiff's tire, diminishing any fear that he could flee. Further, there is a factual dispute regarding whether Raethke, once on the scene, had reason to believe that plaintiff was armed. *Compare* F&R 3 ("Raethke heard the 'general broadcast' about the speeding vehicle and that its driver 'possibly aimed a firearm' at another driver.") *with* Steffen Decl., Ex. 2, at 13:11-14 ("Before Saint Helens arrive[d] I could hear [plaintiff] say something about the other vehicle that was following him . . . had a gun, so I made sure that when Saint Helens officers arrived I . . . informed them of that information.").

Ultimately, reasonableness "'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396). Putting aside what knowledge Raethke did or did not have at the time of the arrest, unlike in *Williams*, Raethke performed this arrest with the Troopers. They were

13

primarily responsible for the scene, making them better positioned to assess the scenario and plaintiff's behavior, and they gave Raethke numerous verbal and behavioral indications that they did not perceive plaintiff as a safety threat during the arrest. *See, e.g.*, F&R 4 ("Killens 'switched over' to nonlethal force, and used 'the open-hand custody technique . . . when Killens noticed 'a knee strike coming from Raethke, Killens put his arm in front of Raethke and said, 'He's good. He's good. We don't need that.'"). The facts in *Williams* that warranted granting qualified immunity are simply not present in this case.

In sum, the law is clearly established that (1) an arrestee has a right to be free from the use of non-trivial force when engaged in passive resistance, and (2) knee strikes constitute a non-trivial amount of force. Raethke allegedly used knee strikes on plaintiff while he was passively resisting. The factual circumstances and officer conduct discussed in *Blankenhorn* are sufficiently analogous to Raethke's alleged conduct to put him on notice that using knee strikes on plaintiff while he was passively resisting was a constitutional violation. Further, given the Troopers' conduct, the circumstances that Raethke faced, and the relevant factual disputes, the Court finds that a reasonable officer in Raethke's position would not have believed that his conduct was lawful. Therefore, Raethke is not entitled to qualified immunity.

## CONCLUSION

Accordingly, defendant Raethke's Motion for Summary Judgment on Qualified Immunity, ECF [69], is DENIED.

IT IS SO ORDERED.

DATED this 18th day of March, 2024.

Adrienne Nelson
United States District Judge