IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| ROBERT BARROR, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:20-cv-00731-SB |
| | ) | |
| v. | ) | April 10, 2023 |
| | ) | |
| CITY OF ST. HELENS and ADAM | ) | Portland, Oregon |
| RAETHKE, in his individual | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**TRANSCRIPT OF PROCEEDINGS**

(Oral Argument)

BEFORE THE HONORABLE STACIE F. BECKERMAN

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

**COURT REPORTER:**
Kellie M. Humiston, RMR, CRR
(503) 326-8186
Kellie_Humiston@ord.uscourts.gov

**A P P E A R A N C E S**

FOR THE PLAINTIFF:

STEFFEN LEGAL SERVICES
By:  Justin R. Steffen
2100 SE Lake Road
Suite 5
Milwaukie, OR 97222

FOR THE DEFENDANTS:

CHOCK BARHOUM
By:  Jordyn M. Parsons
121 SW Morrison Street
Suite 500
Portland, OR 97204

(April 10, 2023, 3:32 p.m.)

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Your Honor, we are here in Case Number 3:20-cv-00731-SB, Barror vs. City of St. Helens, et al., for oral argument on defendants' motion for summary judgment, Docket Number 33.

Counsel, please identify yourselves, beginning with plaintiff.

MR. STEFFEN:  Good afternoon, Your Honor.  Justin Steffen, the attorney for plaintiff.

THE COURT:  Good afternoon.

MS. PARSONS:  Good afternoon, Your Honor.  Jordyn Parsons.  I'm appearing on behalf of Jeff Hansen in this case for defendants.

THE COURT:  Good afternoon.  And thank you for covering for Mr. Hansen.  Please let him know that I hope he's feeling better soon.

MS. PARSONS:  I will.

THE COURT:  I wanted to give you both a chance to argue the motion.  I'll save my questions for after you've made your presentation, but let's take it one claim at a time, starting with the first claim, the excessive force claim.  And I'll have Ms. Parsons go first, because it's your motion.

MS. PARSONS:  Thank you, Your Honor.  As Your Honor

knows, this is a case that involves an excessive force case and a failure to -- failure to train claim.  Because the excessive force claim involves so much analysis of the facts involving the interaction between Mr. Barror and my client, I would like to take a moment to kind of go through some of those key facts, if Your Honor will allow it.

THE COURT:  Go ahead.

MS. PARSONS:  Okay.

(Discussion off the record)

MS. PARSONS:  So this case involves a -- an incident that occurred between my client, Officer Raethke, and the plaintiff, Mr. -- I know I'm pronouncing his name wrong.  Is it Barror?

MR. STEFFEN:  Barror.

MS. PARSONS:  Barror.  I apologize.  Okay.

-- Mr. Barror on August 6th, 2019.  This incident started with a dispatch call to 911 that reported an individual who was driving erratically and at high rates of speed on Highway 30 headed towards St. Helens.

An individual driving a gray Chevy Silverado was seen by two Columbia County troopers cut across five lanes of traffic on -- off of Highway 30 onto Millard Road, again at high rates of speed.

They pursue this individual, who turned out to be Mr. Barror.  They witnessed him pass through at least two stop

signs, fail to stop despite the lights and sirens going behind him, and abruptly stopped in front of a home.

During the course of this, they -- "they" being the troopers -- relayed back to their dispatcher that this individual was failing to stop, was continuing to drive at high rates of speed, failing to comply with general traffic safety rules.  This information was conveyed to the 911 dispatch that St. Helens PD uses and in turn conveyed to Officer Raethke, who was responding to this incident, who was also attempting to arrive at the scene to assist the Columbia County troopers.

At some point before Officer Raethke arrived, 911 dispatch conveyed to him that the individual driving the pickup was armed with a firearm.

Once the troopers were able to stop Mr. Barror, they -- they treated the stop as a high risk stop, as he had failed to -- to, you know, slow down, stop, failed to stop at stop signs. They had their weapons drawn.  They lay down a spike strip.  And they commanded him to get out of the vehicle and put his hands in the air, which he did not do.

A few minutes later, Officer Raethke arrives, again, witnessing a scene with two troopers who have their firearms aimed at the driver, Mr. Barror, who have laid down a spike strip, and with the understanding that this individual has yet to comply with any sort of lawful demand -- or command, I'm sorry, or -- or otherwise cooperate with -- with the officers.

Within seconds of him arriving -- I should also back up. And with the understanding this individual may be armed.

Within seconds of arriving, the troopers and Officer Raethke approached the vehicle to extract Mr. Barror from the vehicle, and a struggle essentially ensues. Mr. Barror does not voluntarily get out of the vehicle. It takes all three officers to pull him out and get him to the ground.

Once on the ground, Mr. Barror still continues to struggle. The depositions of all the officers involved indicate that he failed to cooperate in putting restraints on his -- on his wrists behind his back, at which point Officer Raethke delivers two knee strikes, and Mr. Barror consents to the -- the arrest and is able to be put in restraints and is arrested.

It's undisputed that no firearm is found at the scene of the incident. And there is no additional use of force and no additional knee strikes or undue force, I guess, once -- once Mr. Barror -- once the arrest has been effectuated against Mr. Barror.

So turning to the use of force claim, as Your Honor knows, the use of force, it comes from -- the claim comes from the Fourth Amendment: seizures of an individual must be objectively reasonable. An analysis of the objective reasonableness standard relies on an analysis of the totality of the circumstances.

And so while there's no formula per se that helps, you

know, an individual decide with, you know, a key position that a threshold has crossed, the court has -- the court -- the Supreme Court has offered us with a number of factors that help us decide when -- evaluate a circumstance whether the use of force in such a circumstance is objectively reasonable.

So examples that the Supreme Court has offered us through the *Graham* case are, you know, the severity of the underlying crime; whether there's a threat, an immediate threat to safety of either officers or individuals; and whether the suspect is actively resisting arrest or is evading arrest by flight.

It's defense position that at least in this case, all three -- or I'm sorry, all four of these elements that have been offered by the Supreme Court are present in this case. There's -- there's no dispute that Mr. Barror failed to stop and caused the officers, the troopers pursuing him, to follow him at high speeds, or that he, you know, failed to stop at stop signs or failed to stop when -- with lights and -- with officer in pursuit with lights and sirens.

There's also no dispute in the evidence that, at least from Officer Raethke's perspective, there was a report that he was potentially armed, and that naturally increases the risk of harm to both Officer Raethke and the troopers who are present there, as well as any individuals near this public road.  As I mentioned, he stopped in front of an individual's home.

And then, of course, there is also no dispute on the record that Mr. Barror was actively resisting arrest. He did not comply with any sort of lawful command by any of the troopers or Officer Raethke. It took three officers to take him out of his car, and once on the ground, he still continued to hold his hands by his waist, which if he was armed, would pose a serious risk of harm, as many individuals hold their -- their firearms at their belt area.

And then -- so taking the totality of circumstances and then also looking at other cases that have evaluated excessive force claims, we find there's a lot of consistencies in cases where courts have found that summary judgment was appropriate for a municipality like my -- or for the public entity.

I don't want to, you know, spit out everything that I said in my brief, but we referred to four cases, the *Miller vs. Clark County*, *Johnson vs. County of Los Angeles*, *Meredith vs. Erath*, and *Drummond vs. City of Anaheim*.

And, again, when you look at the cases where summary judgment on behalf of the public entity was found to be appropriate, there's many parallels between the totality of circumstances in those cases and what we see in this case, so individuals fleeing via vehicle, individuals armed or potentially armed, situations where the risk of harm to officer or officers is -- is elevated; whereas, in the other cases where summary judgment was either found not appropriate or overturned, which

are the *Meredith* case and the *Drummond* case, we're dealing with case -- or with crimes such as a tax fraud crime, which is a non-violent crime, or in *Drummond*, there was no underlying crime at all.  You're dealing with individuals who are not actively resisting officers or attempting to evade officers, or in the case of *Drummond* especially, you're dealing with a circumstance in which force is applied, an individual was detained and then force was continued to be applied even though the individual was restrained and no longer posed a threat or danger to the public or to the officers.

So, again, in short, there -- this requires review of the totality of circumstances, and it's the defense position the totality of circumstances here, especially the fact that Officer Raethke believed this individual could be armed, which would pose an extreme threat of, you know, harm or even death to these officers, made the use of knee strikes to effectuate the arrest and secure the scene appropriate and objectively reasonable.

THE COURT:  Thank you, Ms. Parsons.  Would you agree with me that most excessive force cases should go to a jury to determine whether the seizure here was reasonable?  And whether or not you agree, what makes this case different than the cases in which courts hold that this type of analysis should go to a jury?

MS. PARSONS:  I think what makes it distinct is I struggle to find where a reasonable jury could look at this and

see that force, you know, wasn't reasonable.  And then, again, when you compare it to the cases where a court did actually grant summary judgment and the case was ruled at summary judgment level, the parallels between this case and the facts present in this case are so similar, that, again, our position's no reasonable jury could look at the facts in this case, watch the dash cam footage, listen to the testimony of the officers, and find otherwise.

THE COURT:  You noted the testimony of the officers.  And it is an unusual case in the sense that two of the three officers who were there documented the fact that they believed Officer Raethke's use of force was inappropriate.  And if the test is what would a reasonable officer believe as to how much force is necessary, how can I make a determination as a legal matter that the force here was not excessive, when two of the three officers onsite trained in law enforcement had deemed that the use of force was excessive?

MS. PARSONS:  So this is -- this is something we discussed in our reply brief pretty extensively.  There -- it's our position there's pretty sufficient evidence on the record that the two troopers did not have -- were not operating under the information that Officer Raethke -- or I'm sorry, that Mr. Barror had a firearm.

These two law enforcement agencies operate under two dispatch communication systems.  The one that communicates to

Officer Raethke indicated that the individual driving the Silverado, so Mr. Barror's vehicle, had -- possibly had a weapon. I believe, if I'm remembering correctly, that the dispatch reported that a silver car following Mr. Barror maybe had a gun.

In either event, it's significant that the troopers were not operating under the possibility that Mr. Barror had a firearm, because that significantly reduces the level of risk that an officer is perceiving when responding to -- to a crime. And it -- and I agree, it would materially change what an appropriate response is if -- depending on whether an individual is armed or unarmed.

And so, yes, while their response is different, it's -- it's important to understand their response is different because of information and the totality of circumstances dictating their response to that scene of the accident -- or of the crime versus Mr. Raethke's -- or I'm sorry, Officer Raethke's understanding and the information he is operating on when he is responding to that crime.

THE COURT:  The other issue I'm struggling with is the test that the court is applying here to determine if the use of force was reasonable is three prongs, as you noted, and two of those prongs address whether there was a threat to officers or others and whether Mr. Barror was actively resisting arrest.

And you've outlined the facts as undisputed.  And it does sound like up until the car is stopped, the facts are

largely undisputed, but the one fact I'm struggling with is whether any of the three law enforcement officers heard Mr. Barror say, "I can't hold my arms up."  And it seems that that is a pretty relevant fact to determine if he was being cooperative or uncooperative, if he was complying with the commands, or if he was resisting or not resisting, because if they were aware that he couldn't cooperate, he couldn't comply, it seems that that is highly relevant to whether the pulling him out of the car was reasonable and whether the knee strikes are reasonable if he physically couldn't put his hands behind his back.

And my recollection is once Officer Raethke arrived and they were approaching the car, all three of them said they didn't hear Mr. Barror make those comments, but you can hear the comments in the video.  And so it seems to me that's either a disputed fact or a jury would need to adjudge the credibility of the three officers who said we didn't hear him even though you can hear it on the video.  So how should I address that issue as an undisputed fact?

MS. PARSONS:  I think -- and, again, I think the important fact is really the fact that Mr. Barror reportedly has a firearm on him.  So when we review Officer Raethke's testimony, he's talking about his decision-making in deciding to apply the knee strikes is because there is still continued resistance and still an unrecovered firearm, potential firearm.

So the decision-making to use the knee strikes isn't related to his disability, it's related to the fact that -- that there is a potential risk of serious harm or -- or even officer death.

There's -- I understand -- I understand what you're saying by, you know, him trying to communicate that he can't raise his arms and -- but, again, that when -- when you look at what Officer Raethke's testimony is, his testimony is that, I decided to make these knee strikes because he has his arms by his belt, which is potentially where a firearm could be, he has continued to resist arrest.

If he can't lift his arms, he's still -- it's still undisputed he's fighting officers as they're trying to take him out of the car, and there's a potential that he's armed, and that is what drives the decision to apply the force of knee strikes.

THE COURT: Okay. Thank you. Let me give Mr. Steffen a chance to argue the first claim.

MR. STEFFEN: Yes. Thank you, Your Honor. I -- you know, summary judgment in excessive force cases should be granted sparingly, which has been the law in the Ninth Circuit for decades. And I know you've already touched on that, but there's nothing about this case that would warrant deviating from that well-established precedent.

The only force the officers are allowed to use is the minimum amount of force necessary to effectuate the arrest. And

given that we have two officers on the scene who have testified that the open hand technique was the minimum amount of force they thought was necessary, I mean, that alone should create a question of fact for the jury.

The dispatch records -- and I'm sorry I don't have a citation, but I believe when you look at the evidence in the record, is that Officer Raethke was only aware one of the cars had a gun in it.  It could have been Mr. Barror's, it could have been the silver car.  But in any case, the dispatch records become irrelevant once the officers arrive on the scene and they can assess the situation at that time.

It was apparent to the State troopers that Mr. Barror didn't seem to have a firearm on his person and didn't pose a threat.

You know, the reason we have this excessive force law -- I mean, the body of law surrounding excessive force is to prevent officers from saying, "Well, I thought he might have had a gun, so I shot him," or "I assaulted him."  You know, there -- if an officer is worried about their safety, that needs to be a reasonable concern before they use excessive force.

And, again, viewing in the light -- viewing all the facts in the light most favorable to plaintiff, there's more than enough evidence here that suggests Mr. Barror was not a threat at all.

The reckless driving is also irrelevant.  Again,

it's -- it's the force needed to effectuate the arrest.  Whether Mr. Barror maybe broke the law 15 minutes earlier does not change the amount of force the officers get to use if they need to arrest Mr. Barror.

And in defendants' reply, they keep stating that the Court needs to look at the totality of the circumstances.  And plaintiff's agree with that as a general proposition, but then in the reply, the court keeps wanting the Court to -- I'm sorry, the defendants keep wanting the Court to narrow in on this one specific aspect, on this one single circumstance that Officer Raethke might have thought Mr. Barror had had a weapon, and that's the only circumstance they want you to focus on, despite saying that we need to look at all the circumstances.  And when we do look at all the circumstances, I think it's clear that there are genuine issues of material fact here relating to whether or not the force was excessive.

And what the State troopers did or didn't know, it's undisputed they were treating this as a high risk stop.  They had their guns drawn because they didn't know what was going on exactly, and they understandably need to protect themselves and others.  So they treated it as a high risk stop, they realized that the risk to themselves was essentially non-existent, they holstered their weapons, and they took Mr. Barror into custody. And it would have been a completely peaceful arrest but for the actions of Officer Raethke.

And then I believe that's all I have on the excessive force matter, Your Honor.

THE COURT:  Okay.  Thank you.  You answered the questions I was going to ask, so let me turn back to Ms. Parsons for anything further.

MS. PARSONS:  A couple things.  Mr. Steffen mentioned that the law that Mr. Barror may or may not have committed prior to his arrest is irrelevant.  And I think that's pretty patently contradicted by what the case law says.  It was one of the several elements that the *Graham* court mentions as something to consider as the severity of an underlying crime.  And, in fact, most arrests happen subsequent to a crime when they're responding to a crime.

So to the extent that this -- I disagree with the notion that the Court shouldn't consider the fact that he is evading or eluding or driving erratically as part of this analysis, because it's very relevant.

I'm struggling with my computer to confirm entirely, but my recollection is the C-COM, the 911 dispatch that communicates directly to Officer Raethke, does definitively describe a gun being in the pickup.  And I don't want to misrepresent that to the Court, but that is my recollection.

And then as I said, I'm struggling to get my computer to cooperate.

THE COURT:  No problem.  I'll look it up.

MS. PARSONS:  I appreciate it.  Thank you, Your Honor.

And I believe that's all I had in response to Mr. Steffen's argument.  Thank you.

THE COURT:  Okay.  Thank you.  Let's turn to the second claim, the failure to train *Monell* claim.  And I'll start with Ms. Parsons again.

MS. PARSONS:  Okay.  Thank you, Your Honor.  So the failure to train claim, as Your Honor knows, comes from Section 1983 and allows a municipality to be held liable under that statute for failing to train its employees, including police officers, but only where such failure to train amounts to deliberate indifference, which is a difficult standard to reach.

There is kind of a broad scope of circumstances that might equate to a failure to train situation.  There is a case we cite in our brief called Board vs. County Commission -- I'm sorry, *Board of County Commissioners vs. Brown*, that identifies certain examples or certain instances when a failure to train claim could attach or could demonstrate -- or where liability could attach.

So, for example, there could be evidence of deliberate indifference if a policy has persisted over time and has not responded to changes in law and authorities that could demonstrate deliberate indifference to a pol- -- or a policy that does not protect adequately the rights of individuals.

Deliberate indifference could be demonstrated by

showing that there is an ongoing pattern of, for example in this case, excessive force that is not addressed adequately by training or policies.

There is even some case law that suggests out there when there are circumstances that an employee, such as a police officer, would likely face or would obviously face and there's no policy to address that or train an individual to respond to such an event, that could amount to deliberate indifference.

In this case, we don't see that any of those circumstances are supported by the evidence on the record. City -- the City of St. Helens has a policy, a use of force policy, that officers are trained on every single year. It is -- Sergeant Eustice's declaration comments that this is something that is regularly reviewed and updated to reflect changes in the law or to reflect kind of new developments that happen related to use of force.

The policy itself mirrors the exact language of the *Graham vs. Connor* case, and is, therefore, consistent with Oregon and federal law.

Plaintiff did not present any evidence of repeated issues with use of force with St. Helens police officers or complaints or other cases involving St. Helens police officers that would establish some sort of pattern of deliberate indifference towards a defective policy.

The defense presented evidence from an expert that says

the policy is consistent with both Oregon and federal law that plaintiff has not rebutted with similar expert testimony or evidence.

And then to the extent that plaintiff's argument is that Officer Raethke himself was inadequately trained, there's some on-point case law there.  I can get you the names.  The *Blackenhorn* and *Alexander* case, both of which are cited in our reply brief, I believe, indicate that it's not enough to establish a failure to train claim against a municipality simply by asserting that a specific individual has been improperly trained.  They liken that to potential negligence, but does not reach the deliberate indifference standard that is required to establish a failure to train claim.

So, again, without evidence on the record that suggests that the policy's contrary to law or is so inadequate that it fails to offer police officers an opportunity -- the ability to respond to any sort of crime, whether it's a -- you know, a simple non-violent crime or a car chase or a robbery, there's just no evidence on the record that suggests that the policy is so deficient and that the municipality, that the City, has so blatantly ignored or failed to adapt their policy to meet those concerns.  It's just not -- it's not -- that's not -- I apologize.  There's no evidence of that on the record.

THE COURT:  Ms. Parsons, is the evidence in the summary judgment record clear that St. Helens had no specialized training

for officers on how to manage encounters with individuals with a disability?

MS. PARSONS:  Again, I'm very confused where -- where the -- where the disability issue comes in, because I don't recall anything on the record that specifically states that Mr. Barror has a disability.  And, again, I -- well, and I guess backing up from that further, I think the issue with that is, I mean, the notion that a municipality or a government agency should have a specific sort of response for every feasible disability is, I think, a lot to ask, considering the broad scope of disability that can become both physically visible and not.

And I also don't know of any authority out there that requires a police officer to respond with less force or differently or in a manner simply because an individual has a disability.  I mean, for instance, if an individual is in a wheelchair and is brandishing a gun, they're still going to be treated with more force or differently than an individual who's not.

So, again, I don't know that a use of force policy has to entirely hinge on -- or has to require an officer to evaluate the potential disabilities of every individual when they're in a situation where their priority is to keep the public safe and to keep themselves safe and, in this case, effectuate an arrest.

THE COURT:  You mentioned that one of the scenarios under which courts have found a failure to train claim to be

viable is if it involves a situation that an officer is likely to encounter or obviously encounter.  Doesn't this fit under that category?  Isn't it pretty much common sense that officers may encounter people with either physical or mental disabilities?

MS. PARSONS:  That is true, but I also don't think that the -- the policy that is established prevents an officer from making reasonable objective responses based on a -- like, based on the totality of circumstances.  So if an officer arrives on the scene -- and the *Drummond* case is a good example of this.  If an officer arrives on the scene and can see someone having a mental health crisis or can see, you know, a pregnant woman or a person with an obvious physical limitation, their response has to take that into consideration.

So, again, the fact that -- I mean, their -- their use of force policy allows them to -- or requires them to make reasonable decisions.  And if it is unreasonable to respond a certain way because potentially of someone's disability, that doesn't make their policy deficient.  It means it's giving the officers the necessary room to make decisions when responding to crimes.

THE COURT:  And the plaintiff has not presented any expert testimony with respect to whether this type of training is common amongst other police departments.  The only thing in the record that is relevant, I believe, is that one of the State troopers testified, or perhaps both, I don't recall, that they

received such training as an Oregon State trooper.  Is that relevant to the Court's determination about whether the City of St. Helens was deliberately indifferent for not offering that same training?

MS. PARSONS:  I'd say it's difficult to make that decision based -- because it's not a national standard.  One other -- one other agency who may or may not do -- because, again, that actual policy isn't part of the record.  So we're just relying on what the officer's saying, and we don't actually understand what the officer means by, "I got training related to disabilities."

One -- one law enforcement agency does not set a benchmark for whether something is a national or something that all -- you know, that the City of St. Helens is an outlier for failing to provide to its officers.

THE COURT:  Okay.  Thank you.

Mr. Steffen.

MR. STEFFEN:  Thank you, Your Honor.  We have defendants' own employees -- well, we have Officer Raethke testifying he's unaware of any use of force training by the City of St. Helens that relates to detaining individuals with disabilities.  Officer Raethke testified he received no training related to verbal conflict or control with the City of St. Helens.

Sergeant Eustice has stated that he's identified

several areas where further training is needed for recruit and lateral officers, and de-escalation techniques were not part of the training or policy for the City of St. Helens Police Department at the time of Mr. Barror's arrest.

And *Board of County Commissioners v. Brown* has laid out the standard when a single incident can be used as evidence for deliberate indifference and a failure to train, and it's that the likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decisions not to train the officer reflected deliberate indifference.

And I think, again, looking at all the facts in the light most beneficial to plaintiff, the likelihood that the situation would recur where a St. Helens police officer encounters someone with some kind of physical disability -- in this case, Mr. Barror was unable to raise his hands over his head -- I think it's certainly reasonable that that situation will occur again in the future.  And if officers aren't trained on how to handle people with disabilities, which Officer Raethke has testified under oath that he was not, then that's going to lead to potential violations of citizens' rights to be free from excessive force.

So I -- I think there's more than enough here to let the jury decide as to whether or not the City of St. Helens was

deliberately indifferent.

The fact that they have an expert testifying otherwise should not be considered at summary judgment.  You know, that's -- that's weighing the facts and the credibility of a witness, and that's a question for the jury to decide if that expert is credible or not.  And perhaps they will agree with him, perhaps not, but it would be inappropriate, I think, for the Court to consider that at summary judgment.  Thank you.

THE COURT:  Did Mr. Barror have a disability?  And, of course, "disability" is a legal term, but I know that he's alleged that he had a shoulder injury, but is that a disability and does that matter?

MR. STEFFEN:  I don't think it matters.  I -- to the extent whether he meets the definition of disabled under the ADA wouldn't matter.  It's clear he had some kind of a medical condition at the time that was preventing him from raising his hands.  And that's clearly audible in the video record.  And I believe one of the State troopers testified that he heard Mr. Barror say words to that effect.

Officer Raethke has testified he didn't hear Mr. Barror say that.  And whether he did or not, I think would be a credibility matter for the jury, but I think there is evidence in the record, especially viewed in the light most favorable to plaintiff, that Mr. Barror had a medical condition.

THE COURT:  Is there any evidence in the record to

support that other than Mr. Barror's testimony?  Is there --
there's no medical -- at least in -- on my record before me, I
don't believe there are any medical records.

MR. STEFFEN:  That's correct, Your Honor.  There's
nothing in the record.

THE COURT:  Okay.  Do you know -- it's not part of the
record, but is it relevant if most police departments train
officers in these three types of areas:  disabilities, verbal
conflict, and de-escalation?  Is that relevant or not relevant if
everyone else is doing it and St. Helens is not?

MR. STEFFEN:  Yeah.  I would agree that would be
relevant, again, before the jury to determine -- if it's the
industry standard for all these other police departments to do
that, then a jury could find that the City of St. Helens is
deliberately indifferent to the needs of their citizens by not
complying with these industry standards.

THE COURT:  But do you contest the expert's conclusion
that St. Helens' training complies with state and federal law?

MR. STEFFEN:  Well, I would certainly contest that.  I
mean, it's -- we would argue that this witness is biased.  You
know, in addition to being paid, he was the chief of police of a
small town for, I believe, 30-some years.

So if you're asking me what I -- you know, what I think
of that witness's credibility, I would say, not much, and I think
a jury would -- would agree with that if we go to trial on that

issue.

THE COURT:  Well, there's nothing in the record to demonstrate what the industry standard is other than we do have at least the testimony of the Oregon State Police trooper saying, "Well, we got the training with respect to the disabilities."  So I don't -- but I don't have anything definitive or any expert testimony about what an industry standard is.  And on this record, we have an expert saying, "Well, it didn't violate any state or federal laws or guidelines or guidance," I guess, and you're saying he's not credible, but do you have -- are there any laws or regulations you can point to that would demonstrate that the City of St. Helens' training was deficient?

MR. STEFFEN:  Not at this time, Your Honor.  But it's defendants' motion for summary judgment, and they're arguing that they are within the industry standard.  I think they would need more evidence than just a paid -- a paid opinion to establish that.  And I don't think they've established that with their motion.

THE COURT:  Okay.  Thank you.

Ms. Parsons, anything further on the *Monell* claim?

MS. PARSONS:  I think all I want to add is, you know, even if -- even if we accept that Mr. Barror has a disability and is -- you know, wasn't able to raise his arms, that's not a deficiency in the use of force policy, because, again, the policy gives an officer room to evaluate the circumstances and evaluate

the scene that they're responding to and make decisions about using force or not using force consistent with Oregon law, consistent with federal law, that still allows an officer to respect the fact that someone may or may not or is or isn't disabled.

How am I trying to say this?  Again, the decision to use force stemmed from information that Officer Raethke had that this individual was potentially armed.  An officer gets to take that type of information in when deciding to make decisions about how to apprehend somebody, and that's reflected in the policy that St. Helens offers.

So I almost think it's -- it would be counterintuitive to over-delegate instructions about specific disabilities or to try to create policies for every sort of circumstance, because the circumstances aren't predictable.  There's a whole variety of situations that an officer responds to.

And the use of force policy that St. Helens has in place, again, instructs an officer to take into consideration things like an individual's disability, but also take into consideration things like he may or may not have a firearm, and respond accordingly and consistently with what the law provides. That's all I have to add.

THE COURT:  Okay.  Thank you.

Mr. Steffen, let me ask you one more question.  Another piece of a *Monell* claim under these circumstances is that the

failure to train is what caused or resulted in the constitutional violation such that if he had only been trained to encounter people with disabilities, the outcome might have been different here.  Where is that demonstrated in the record?

MR. STEFFEN:  Well, Officer Raethke has testified that he thought Mr. Barror was resisting arrest in part because he wasn't complying with the order to put his hands up.  So I think if Mr. Raethke had the -- the requisite training and realized he needs to adjust his approach because he's encountered someone who may be physically disabled, then he wouldn't have proceeded with, you know, screaming at him to stop resisting, and pulling him down to the ground and issuing the knee strikes because he thought Mr. Barror was resisting.

THE COURT:  For me to reach that conclusion, do I not need in front of me a typical or even example of a policy or training materials regarding what Officer Raethke should have done here?

MR. STEFFEN:  Again, I think a jury would certainly need that evidence, but I think looking at the record in the light most favorable to plaintiff, when we have sworn testimony of the State troopers who have received training on how to handle disabled people and Officer Raethke stating under oath that he has not received such training, I think that's enough to survive summary judgment.

THE COURT:  Remind me.  Did either of the officers go

into any -- sorry, either of the troopers go into any detail about what that training looked like?

MR. STEFFEN:  I -- they may have gone into a bit more detail.  It certainly wasn't much.  And I can look at the transcript records, the exhibit, right now.

THE COURT:  It's okay.  I'll look back at it.  I just don't recall off the top of my head.

Because it seems to me if such training would include a situational awareness where officers should stop and consider maybe the reason this person's not holding up their hands is because they cannot do so, you know, coupled with the fact that this individual is telling me he can't hold up his hands, should I ask the question, why can't you hold up your hands, for example.  That would seem like a reasonable training exercise, but that's just me, you know, making things up.

Is there anything in the record to point to that would demonstrate that that may be an element of such training that was not provided here?

MR. STEFFEN:  I -- I don't believe so, Your Honor.  It doesn't get that detailed.

THE COURT:  Okay.  Ms. Parsons, anything further?

MS. PARSONS:  No, Your Honor.

THE COURT:  Okay.  Well, thank you both.  And, Ms. Parsons, thanks again for covering without much notice, I hear.  I appreciate you standing in today so that we could get

this done.

I believe there's not full consent to a magistrate judge, so I'll take the matter under advisement today. I will docket my Findings and Recommendations just as soon as I can. At that point, there will be a backup district judge assigned, and both sides will have 14 days to object to the Findings and Recommendation and then another 14 days to respond.

Thank you. Court is adjourned.

MR. STEFFEN: Thank you, Your Honor.

MS. PARSONS: Thank you, Your Honor.

(Proceedings concluded at 4:17 p.m.)

**C E R T I F I C A T E**

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-entitled cause.

A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

DATED this 12th day of April 2023.


/s/ Kellie M. Humiston

Kellie M. Humiston, RMR, CRR
Official Court Reporter
Certificates Expire:  9/2024

1

## /

**/s** [1] - 31:12

## 1

**10** [2] - 1:7, 3:1
**121** [1] - 2:8
**12th** [1] - 31:9
**14** [2] - 30:6, 30:7
**15** [1] - 15:2
**1983** [1] - 17:9

## 2

**2019** [1] - 4:16
**2023** [3] - 1:7, 3:1, 31:9
**2100** [1] - 2:4

## 3

**30** [2] - 4:19, 4:22
**30-some** [1] - 25:22
**326-8186** [1] - 1:24
**33** [1] - 3:7
**3:20-cv-00731-SB** [2] - 1:6, 3:5
**3:32** [1] - 3:1

## 4

**4:17** [1] - 30:11

## 5

**5** [1] - 2:5
**500** [1] - 2:9
**503** [1] - 1:24

## 6

**6th** [1] - 4:16

## 9

**9/2024** [1] - 31:14
**911** [4] - 4:17, 5:7, 5:11, 16:19
**97204** [1] - 2:9
**97222** [1] - 2:5

## A

**ability** [1] - 19:16
**able** [3] - 5:14, 6:13, 26:23
**above-entitled** [1] - 31:5
**abruptly** [1] - 5:2
**accept** [1] - 26:22
**accident** [1] - 11:15
**accordingly** [1] - 27:21
**actions** [1] - 15:25
**actively** [4] - 7:10, 8:2, 9:4, 11:23
**actual** [1] - 22:8
**ADA** [1] - 24:14
**ADAM** [1] - 1:8
**adapt** [1] - 19:21
**add** [2] - 26:21, 27:22
**addition** [1] - 25:21
**additional** [2] - 6:15, 6:16
**address** [3] - 11:22, 12:18, 18:7
**addressed** [1] - 18:2
**adequately** [2] - 17:24, 18:2
**adjourned** [1] - 30:8
**adjudge** [1] - 12:16
**adjust** [1] - 28:9
**advisement** [1] - 30:3
**afternoon** [4] - 3:10, 3:12, 3:13, 3:16
**agencies** [1] - 10:24
**agency** [3] - 20:8, 22:7, 22:12
**agree** [7] - 9:18, 9:21, 11:9, 15:7, 24:6, 25:11, 25:25
**ahead** [1] - 4:7
**aimed** [1] - 5:22
**air** [1] - 5:19
**al** [1] - 3:5
**Alexander** [1] - 19:7
**alleged** [1] - 24:11
**allow** [1] - 4:6
**allowed** [1] - 13:24
**allows** [3] - 17:9, 21:15, 27:3
**almost** [1] - 27:12
**alone** [1] - 14:3
**Amendment** [1] - 6:21
**amount** [4] - 13:25, 14:2, 15:3, 18:8
**amounts** [1] - 17:11
**Anaheim** [1] - 8:17
**analysis** [5] - 4:3, 6:22, 6:23, 9:22, 16:17
**Angeles** [1] - 8:16
**answered** [1] - 16:3
**apologize** [2] - 4:15, 19:23
**apparent** [1] - 14:12
**appearing** [1] - 3:14
**applied** [2] - 9:7, 9:8
**apply** [2] - 12:23, 13:15
**applying** [1] - 11:20
**appreciate** [2] - 17:1, 29:25
**apprehend** [1] - 27:10
**approach** [1] - 28:9
**approached** [1] - 6:4
**approaching** [1] - 12:13
**appropriate** [5] - 8:12, 8:20, 8:25, 9:17, 11:10
**April** [3] - 1:7, 3:1, 31:9
**area** [1] - 8:8
**areas** [2] - 23:1, 25:8
**argue** [3] - 3:20, 13:17, 25:20
**arguing** [1] - 26:14
**Argument** [1] - 1:15
**argument** [3] - 3:6, 17:3, 19:4
**armed** [10] - 5:13, 6:2, 7:22, 8:6, 8:22, 8:23, 9:14, 11:11, 13:14, 27:8
**arms** [5] - 12:3, 13:7, 13:9, 13:12, 26:23
**arrest** [16] - 6:13, 6:17, 7:10, 8:2, 9:16, 11:23, 13:11, 13:25, 15:1, 15:4, 15:24, 16:8, 20:23, 23:4, 28:6
**arrested** [1] - 6:13
**arrests** [1] - 16:12
**arrive** [2] - 5:9, 14:10
**arrived** [2] - 5:11, 12:12
**arrives** [3] - 5:20, 21:8, 21:10
**arriving** [2] - 6:1, 6:3
**aspect** [1] - 15:10
**assaulted** [1] - 14:18
**asserting** [1] - 19:10
**assess** [1] - 14:11
**assigned** [1] - 30:5
**assist** [1] - 5:10
**attach** [2] - 17:18, 17:19
**attempting** [2] - 5:9, 9:5
**attorney** [1] - 3:11
**audible** [1] - 24:17
**August** [1] - 4:16
**authorities** [1] - 17:22
**authority** [1] - 20:12
**aware** [2] - 12:7, 14:7
**awareness** [1] - 29:9

## B

**backing** [1] - 20:7
**backup** [1] - 30:5
**BARHOUM** [1] - 2:7
**Barror** [40] - 3:5, 4:4, 4:13, 4:14, 4:15, 4:16, 4:25, 5:14, 5:22, 6:4, 6:5, 6:8, 6:12, 6:17, 6:18, 7:15, 8:2, 10:23, 11:4, 11:6, 11:23, 12:3, 12:14, 12:21, 14:12, 14:23, 15:2, 15:4, 15:11, 15:23, 16:7, 20:6, 23:17, 24:9, 24:19, 24:20, 24:24, 26:22, 28:6, 28:13
**BARROR** [1] - 1:5
**Barror's** [4] - 11:2, 14:8, 23:4, 25:1
**based** [3] - 21:7, 22:6
**BECKERMAN** [1] - 1:17
**become** [2] - 14:10, 20:11
**BEFORE** [1] - 1:17
**beginning** [1] - 3:8
**behalf** [2] - 3:14, 8:19
**behind** [3] - 5:1, 6:11, 12:10
**below** [1] - 31:3
**belt** [2] - 8:8, 13:10
**benchmark** [1] - 22:13
**beneficial** [1] - 23:14
**better** [1] - 3:18
**between** [4] - 4:4, 4:11, 8:20, 10:4
**biased** [1] - 25:20
**bit** [1] - 29:3
**Blackenhorn** [1] - 19:7
**blatantly** [1] - 19:21
**Board** [3] - 17:15, 17:16, 23:5
**body** [1] - 14:16
**brandishing** [1] - 20:16
**brief** [4] - 8:15, 10:19, 17:15, 19:8
**broad** [2] - 17:13, 20:10
**broke** [1] - 15:2
**brown** [1] - 23:5
**Brown** [1] - 17:16

## C

**C-COM** [1] - 16:19
**cam** [1] - 10:7
**cannot** [1] - 29:11
**capacity** [1] - 1:9
**car** [8] - 8:5, 11:4, 11:25, 12:9, 12:13, 13:14, 14:9, 19:18
**cars** [1] - 14:7
**Case** [1] - 3:4
**case** [31] - 3:14, 4:1, 4:10, 7:7, 7:12, 7:14, 8:21, 9:1, 9:2, 9:6, 9:21, 10:3, 10:4, 10:5, 10:6, 10:10, 13:22, 14:9, 16:9, 17:14, 18:2, 18:4, 18:9, 18:18, 19:6, 19:7, 20:23, 21:9, 23:17
**cases** [11] - 8:10, 8:11, 8:15, 8:18, 8:21, 9:19, 9:21, 10:2, 13:19, 18:22
**category** [1] - 21:3
**caused** [2] - 7:16, 28:1
**certain** [3] - 17:17, 21:17
**certainly** [4] - 23:18, 25:19, 28:18, 29:4
**Certificates** [1] - 31:14
**certified** [1] - 31:7
**certify** [1] - 31:3
**chance** [2] - 3:20, 13:17
**change** [2] - 11:9, 15:2
**changes** [2] - 17:22, 18:14
**chase** [1] - 19:18
**Chevy** [1] - 4:20
**chief** [1] - 25:21
**CHOCK** [1] - 2:7
**Circuit** [1] - 13:20
**circumstance** [6] - 7:4, 7:5, 9:6, 15:10, 15:12, 27:14
**circumstances** [16] - 6:24, 8:9, 8:21, 9:12, 9:13, 11:14, 15:6, 15:13, 15:14, 17:13, 18:5, 18:10, 21:8, 26:25, 27:15, 27:25
**citation** [1] - 14:6
**cite** [1] - 17:15
**cited** [1] - 19:7
**citizens** [1] - 25:15
**citizens'** [2] - 23:10, 23:22
**CITY** [1] - 1:8
**City** [12] - 3:5, 8:17, 18:11, 19:20, 22:2,

22:14, 22:20, 22:23, 23:3, 23:25, 25:14, 26:12
**city** [1] - 18:11
**claim** [17] - 3:22, 3:23, 4:2, 4:3, 6:19, 6:20, 13:17, 17:5, 17:8, 17:18, 19:9, 19:13, 20:25, 26:20, 27:25
**claims** [1] - 8:11
**Clark** [1] - 8:16
**clear** [3] - 15:14, 19:25, 24:15
**clearly** [1] - 24:17
**client** [2] - 4:4, 4:11
**Columbia** [2] - 4:21, 5:10
**COM** [1] - 16:19
**command** [2] - 5:24, 8:3
**commanded** [1] - 5:18
**commands** [1] - 12:6
**comments** [3] - 12:14, 12:15, 18:13
**Commission** [1] - 17:15
**Commissioners** [2] - 17:16, 23:5
**committed** [1] - 16:7
**common** [2] - 21:3, 21:23
**communicate** [1] - 13:6
**communicates** [2] - 10:25, 16:20
**communication** [1] - 10:25
**compare** [1] - 10:2
**complaints** [1] - 18:22
**completely** [1] - 15:24
**complies** [1] - 25:18
**comply** [4] - 5:6, 5:24, 8:3, 12:7
**complying** [3] - 12:5, 25:16, 28:7
**computer** [2] - 16:18, 16:23
**concern** [1] - 14:20
**concerns** [1] - 19:22
**concluded** [1] - 30:11
**conclusion** [2] - 25:17, 28:14
**condition** [2] - 24:16, 24:24
**confirm** [1] - 16:18
**conflict** [2] - 22:23, 25:9
**conformed** [1] - 31:6
**confused** [1] - 20:3
**Connor** [1] - 18:18

**consent** [1] - 30:2
**consents** [1] - 6:12
**consider** [4] - 16:11, 16:15, 24:8, 29:9
**consideration** [3] - 21:13, 27:18, 27:20
**considered** [1] - 24:3
**considering** [1] - 20:10
**consistencies** [1] - 8:11
**consistent** [4] - 18:18, 19:1, 27:2, 27:3
**consistently** [1] - 27:21
**constitutional** [1] - 28:1
**contest** [2] - 25:17, 25:19
**continued** [4] - 8:5, 9:8, 12:24, 13:11
**continues** [1] - 6:8
**continuing** [1] - 5:5
**contradicted** [1] - 16:9
**contrary** [1] - 19:15
**control** [1] - 22:23
**conveyed** [3] - 5:7, 5:8, 5:12
**cooperate** [4] - 5:25, 6:10, 12:7, 16:24
**cooperative** [1] - 12:5
**correct** [2] - 25:4, 31:4
**correctly** [1] - 11:3
**counsel** [1] - 3:8
**counterintuitive** [1] - 27:12
**County** [7] - 4:21, 5:10, 8:16, 17:15, 17:16, 23:5
**couple** [1] - 16:6
**coupled** [1] - 29:11
**course** [3] - 5:3, 8:1, 24:10
**court** [7] - 7:2, 10:2, 11:20, 15:8, 16:10, 30:8
**COURT** [30] - 1:1, 1:18, 1:23, 3:12, 3:16, 3:20, 4:7, 9:18, 10:9, 11:19, 13:16, 16:3, 16:25, 17:4, 19:24, 20:24, 21:21, 22:16, 24:9, 24:25, 25:6, 25:17, 26:2, 26:19, 27:23, 28:14, 28:25, 29:6, 29:21, 29:23
**Court** [10] - 7:3, 7:6, 7:14, 15:6, 15:8,

15:9, 16:15, 16:22, 24:8, 31:13
**Court's** [1] - 22:2
**COURTROOM** [1] - 3:4
**courts** [3] - 8:12, 9:22, 20:25
**covering** [2] - 3:16, 29:24
**create** [2] - 14:3, 27:14
**credibility** [4] - 12:16, 24:4, 24:22, 25:24
**credible** [2] - 24:6, 26:10
**crime** [12] - 7:8, 9:2, 9:3, 11:8, 11:15, 11:18, 16:11, 16:12, 16:13, 19:17, 19:18
**crimes** [2] - 9:2, 21:20
**crisis** [1] - 21:11
**crossed** [1] - 7:2
**CRR** [2] - 1:24, 31:13
**custody** [1] - 15:23
**cut** [1] - 4:21

## D

**danger** [1] - 9:9
**dash** [1] - 10:7
**DATED** [1] - 31:9
**days** [2] - 30:6, 30:7
**de** [2] - 23:2, 25:9
**de-escalation** [2] - 23:2, 25:9
**dealing** [3] - 9:1, 9:4, 9:6
**death** [2] - 9:15, 13:4
**decades** [1] - 13:21
**decide** [4] - 7:1, 7:3, 23:25, 24:5
**decided** [1] - 13:9
**deciding** [2] - 12:23, 27:9
**decision** [5] - 12:23, 13:1, 13:15, 22:6, 27:6
**decision-making** [2] - 12:23, 13:1
**decisions** [5] - 21:16, 21:19, 23:11, 27:1, 27:9
**declaration** [1] - 18:13
**deemed** [1] - 10:16
**defective** [1] - 18:24
**Defendants** [1] - 1:10
**defendants** [2] - 3:15, 15:9
**DEFENDANTS** [1] - 2:7
**defendants'** [4] - 3:6,

15:5, 22:19, 26:14
**defense** [3] - 7:12, 9:12, 18:25
**deficiency** [1] - 26:24
**deficient** [3] - 19:20, 21:18, 26:12
**definition** [1] - 24:14
**definitive** [1] - 26:6
**definitively** [1] - 16:20
**delegate** [1] - 27:13
**deliberate** [9] - 17:12, 17:20, 17:23, 17:25, 18:8, 18:23, 19:12, 23:7, 23:12
**deliberately** [3] - 22:3, 24:1, 25:15
**delivers** [1] - 6:12
**demand** [1] - 5:24
**demonstrate** [5] - 17:18, 17:23, 26:3, 26:11, 29:17
**demonstrated** [2] - 17:25, 28:4
**Department** [1] - 23:4
**departments** [3] - 21:23, 25:7, 25:13
**depositions** [1] - 6:9
**DEPUTY** [1] - 3:4
**describe** [1] - 16:21
**despite** [2] - 5:1, 15:12
**detail** [2] - 29:1, 29:4
**detailed** [1] - 29:20
**detained** [1] - 9:7
**detaining** [1] - 22:21
**determination** [2] - 10:14, 22:2
**determine** [4] - 9:20, 11:20, 12:4, 25:12
**developments** [1] - 18:15
**deviating** [1] - 13:22
**dictating** [1] - 11:14
**different** [4] - 9:21, 11:12, 11:13, 28:3
**differently** [2] - 20:14, 20:17
**difficult** [2] - 17:12, 22:5
**digitally** [1] - 31:7
**directly** [1] - 16:20
**disabilities** [9] - 20:21, 21:4, 22:11, 22:22, 23:20, 25:8, 26:5, 27:13, 28:3
**disability** [14] - 13:2, 20:2, 20:4, 20:6, 20:10, 20:11, 20:15, 21:17, 23:16, 24:9, 24:10, 24:11, 26:22,

27:19
**disabled** [4] - 24:14, 27:5, 28:10, 28:22
**disagree** [1] - 16:14
**discussed** [1] - 10:19
**Discussion** [1] - 4:9
**dispatch** [8] - 4:17, 5:7, 5:12, 10:25, 11:3, 14:5, 14:9, 16:19
**dispatcher** [1] - 5:4
**dispute** [3] - 7:15, 7:20, 8:1
**disputed** [1] - 12:16
**distinct** [1] - 9:24
**district** [1] - 30:5
**DISTRICT** [3] - 1:1, 1:2, 1:18
**DIVISION** [1] - 1:3
**Docket** [1] - 3:7
**docket** [1] - 30:4
**documented** [1] - 10:11
**done** [2] - 28:17, 30:1
**down** [4] - 5:16, 5:17, 5:22, 28:12
**drawn** [2] - 5:17, 15:19
**drive** [1] - 5:5
**driver** [1] - 5:22
**drives** [1] - 13:15
**driving** [6] - 4:18, 4:20, 5:12, 11:1, 14:25, 16:16
**Drummond** [5] - 8:17, 9:1, 9:3, 9:6, 21:9
**during** [1] - 5:3

## E

**effect** [1] - 24:19
**effectuate** [4] - 9:16, 13:25, 15:1, 20:23
**effectuated** [1] - 6:17
**either** [7] - 7:9, 8:25, 11:5, 12:15, 21:4, 28:25, 29:1
**element** [1] - 29:17
**elements** [2] - 7:13, 16:10
**elevated** [1] - 8:24
**eluding** [1] - 16:16
**employee** [1] - 18:5
**employees** [2] - 17:10, 22:19
**encounter** [4] - 21:2, 21:4, 28:2
**encountered** [1] - 28:9
**encounters** [2] - 20:1,

23:16
**enforcement** [4] - 10:16, 10:24, 12:2, 22:12
**ensues** [1] - 6:5
**entirely** [2] - 16:18, 20:20
**entitled** [1] - 31:5
**entity** [2] - 8:13, 8:19
**equate** [1] - 17:14
**Erath** [1] - 8:17
**erratically** [2] - 4:18, 16:16
**escalation** [2] - 23:2, 25:9
**especially** [3] - 9:6, 9:13, 24:23
**essentially** [2] - 6:5, 15:22
**establish** [4] - 18:23, 19:9, 19:13, 26:16
**established** [3] - 13:23, 21:6, 26:17
**et** [1] - 3:5
**Eustice** [1] - 22:25
**Eustice's** [1] - 18:13
**evade** [1] - 9:5
**evading** [2] - 7:10, 16:16
**evaluate** [4] - 7:4, 20:20, 26:25
**evaluated** [1] - 8:10
**event** [2] - 11:5, 18:8
**evidence** [18] - 7:20, 10:20, 14:6, 14:23, 17:20, 18:10, 18:20, 18:25, 19:3, 19:14, 19:19, 19:23, 19:24, 23:6, 24:22, 24:25, 26:16, 28:19
**exact** [1] - 18:17
**exactly** [1] - 15:20
**example** [5] - 17:20, 18:1, 21:9, 28:15, 29:14
**examples** [2] - 7:6, 17:17
**excessive** [15] - 3:23, 4:1, 4:2, 8:10, 9:19, 10:15, 10:17, 13:19, 14:15, 14:16, 14:20, 15:16, 16:1, 18:2, 23:23
**exercise** [1] - 29:14
**exhibit** [1] - 29:5
**existent** [1] - 15:22
**expert** [7] - 18:25, 19:2, 21:22, 24:2, 24:6, 26:6, 26:8
**expert's** [1] - 25:17

**Expire** [1] - 31:14
**extensively** [1] - 10:19
**extent** [3] - 16:14, 19:4, 24:14
**extract** [1] - 6:4
**extreme** [1] - 9:15

## F

**face** [2] - 18:6
**fact** [17] - 9:13, 10:11, 12:1, 12:4, 12:16, 12:19, 12:21, 13:2, 14:4, 15:15, 16:11, 16:15, 21:14, 24:2, 27:4, 29:11
**factors** [1] - 7:3
**facts** [9] - 4:3, 4:5, 10:4, 10:6, 11:24, 11:25, 14:22, 23:13, 24:4
**fail** [1] - 5:1
**failed** [7] - 5:15, 5:16, 6:10, 7:15, 7:17, 7:18, 19:21
**failing** [4] - 5:5, 5:6, 17:10, 22:15
**fails** [1] - 19:16
**failure** [12] - 4:2, 17:5, 17:8, 17:11, 17:14, 17:17, 19:9, 19:13, 20:25, 23:7, 28:1
**favorable** [3] - 14:22, 24:23, 28:20
**feasible** [1] - 20:9
**federal** [5] - 18:19, 19:1, 25:18, 26:9, 27:3
**few** [1] - 5:20
**fighting** [1] - 13:13
**Findings** [2] - 30:4, 30:6
**firearm** [10] - 5:13, 6:14, 10:23, 11:7, 12:22, 12:25, 13:10, 14:13, 27:20
**firearms** [2] - 5:21, 8:7
**first** [3] - 3:23, 3:24, 13:17
**fit** [1] - 21:2
**five** [1] - 4:21
**fleeing** [1] - 8:22
**flight** [1] - 7:11
**focus** [1] - 15:12
**follow** [1] - 7:16
**following** [1] - 11:4
**footage** [1] - 10:7
**FOR** [3] - 1:2, 2:3, 2:7
**force** [45] - 3:23, 4:1, 4:3, 6:15, 6:16, 6:19,

6:20, 7:4, 8:11, 9:7, 9:8, 9:19, 10:1, 10:12, 10:14, 10:15, 10:17, 11:21, 13:15, 13:19, 13:24, 13:25, 14:2, 14:15, 14:16, 14:20, 15:1, 15:3, 15:16, 16:2, 18:2, 18:11, 18:16, 18:21, 20:13, 20:17, 20:19, 21:15, 22:20, 23:23, 26:24, 27:2, 27:7, 27:17
**foregoing** [1] - 31:3
**formula** [1] - 6:25
**four** [2] - 7:13, 8:15
**Fourth** [1] - 6:21
**fraud** [1] - 9:2
**free** [1] - 23:22
**front** [3] - 5:2, 7:25, 28:15
**full** [1] - 30:2
**future** [1] - 23:19

## G

**general** [2] - 5:6, 15:7
**genuine** [1] - 15:15
**given** [1] - 14:1
**government** [1] - 20:8
**Graham** [3] - 7:7, 16:10, 18:18
**grant** [1] - 10:2
**granted** [1] - 13:19
**gray** [1] - 4:20
**ground** [4] - 6:7, 6:8, 8:5, 28:12
**guess** [3] - 6:16, 20:6, 26:9
**guidance** [1] - 26:9
**guidelines** [1] - 26:9
**gun** [5] - 11:4, 14:8, 14:18, 16:21, 20:16
**guns** [1] - 15:19

## H

**hand** [1] - 14:2
**handle** [3] - 23:9, 23:20, 28:21
**hands** [9] - 5:18, 8:5, 12:10, 23:17, 24:17, 28:7, 29:10, 29:12, 29:13
**Hansen** [2] - 3:14, 3:17
**harm** [5] - 7:23, 8:7, 8:23, 9:15, 13:3
**head** [2] - 23:18, 29:7
**headed** [1] - 4:19

**health** [1] - 21:11
**hear** [6] - 12:14, 12:17, 12:18, 24:20, 29:25
**heard** [2] - 12:2, 24:18
**held** [1] - 17:9
**Helens** [18] - 3:5, 4:19, 5:7, 18:11, 18:21, 18:22, 19:25, 22:3, 22:14, 22:21, 22:24, 23:3, 23:15, 23:25, 25:10, 25:14, 27:11, 27:17
**HELENS** [1] - 1:8
**Helens'** [2] - 25:18, 26:12
**help** [1] - 7:3
**helps** [1] - 6:25
**high** [7] - 4:18, 4:22, 5:5, 5:15, 7:17, 15:18, 15:21
**highly** [1] - 12:8
**Highway** [2] - 4:19, 4:22
**himself** [1] - 19:5
**hinge** [1] - 20:20
**hold** [6] - 8:5, 8:7, 9:22, 12:3, 29:12, 29:13
**holding** [1] - 29:10
**holstered** [1] - 15:23
**home** [2] - 5:2, 7:25
**Honor** [19] - 3:4, 3:10, 3:13, 3:25, 4:6, 6:19, 13:18, 16:2, 17:1, 17:7, 17:8, 22:18, 25:4, 26:13, 29:19, 29:22, 30:9, 30:10
**HONORABLE** [1] - 1:17
**hope** [1] - 3:17
**Humiston** [3] - 1:24, 31:12, 31:13

## I

**identified** [1] - 22:25
**identifies** [1] - 17:16
**identify** [1] - 3:8
**ignored** [1] - 19:21
**immediate** [1] - 7:8
**important** [2] - 11:13, 12:21
**improperly** [1] - 19:10
**IN** [1] - 1:1
**inadequate** [1] - 19:15
**inadequately** [1] - 19:5
**inappropriate** [2] - 10:12, 24:7

**incident** [5] - 4:10, 4:16, 5:9, 6:15, 23:6
**include** [1] - 29:8
**including** [1] - 17:10
**increases** [1] - 7:22
**indicate** [2] - 6:9, 19:8
**indicated** [1] - 11:1
**indifference** [9] - 17:12, 17:21, 17:23, 17:25, 18:8, 18:24, 19:12, 23:7, 23:12
**indifferent** [3] - 22:3, 24:1, 25:15
**individual** [23] - 1:9, 4:17, 4:20, 4:24, 5:4, 5:12, 5:23, 6:2, 6:21, 7:1, 9:7, 9:8, 9:14, 11:1, 11:10, 18:7, 19:10, 20:14, 20:15, 20:17, 20:21, 27:8, 29:12
**individual's** [2] - 7:25, 27:19
**individuals** [9] - 7:9, 7:24, 8:7, 8:22, 9:4, 17:24, 20:1, 22:21
**industry** [5] - 25:13, 25:16, 26:3, 26:7, 26:15
**information** [6] - 5:7, 10:22, 11:14, 11:17, 27:7, 27:9
**injury** [1] - 24:11
**instance** [1] - 20:15
**instances** [1] - 17:17
**instructions** [1] - 27:13
**instructs** [1] - 27:18
**interaction** [1] - 4:4
**involved** [1] - 6:9
**involves** [4] - 4:1, 4:3, 4:10, 21:1
**involving** [2] - 4:3, 18:22
**irrelevant** [3] - 14:10, 14:25, 16:8
**issue** [5] - 11:19, 12:18, 20:4, 20:7, 26:1
**issues** [2] - 15:15, 18:21
**issuing** [1] - 28:12
**itself** [1] - 18:17

## J

**Jeff** [1] - 3:14
**Johnson** [1] - 8:16
**jordyn** [1] - 2:8
**Jordyn** [1] - 3:13

**JUDGE** [1] - 1:18
**judge** [2] - 30:3, 30:5
**judgment** [12] - 3:6, 8:12, 8:19, 8:25, 10:3, 13:19, 19:25, 24:3, 24:8, 26:14, 28:24
**jury** [13] - 9:19, 9:23, 9:25, 10:6, 12:16, 14:4, 23:25, 24:5, 24:22, 25:12, 25:14, 25:25, 28:18
**justify** [1] - 23:10
**Justin** [2] - 2:4, 3:10

## K

**keep** [4] - 15:5, 15:9, 20:22, 20:23
**keeps** [1] - 15:8
**Kellie** [3] - 1:24, 31:12, 31:13
**Kellie_Humiston@ord.uscourts.gov** [1] - 1:25
**key** [2] - 4:5, 7:1
**kind** [5] - 4:5, 17:13, 18:15, 23:16, 24:15
**knee** [9] - 6:12, 6:16, 9:16, 12:9, 12:24, 13:1, 13:9, 13:15, 28:12
**knows** [3] - 4:1, 6:20, 17:8

## L

**lacking** [1] - 23:9
**laid** [2] - 5:22, 23:5
**Lake** [1] - 2:4
**lanes** [1] - 4:21
**language** [1] - 18:17
**largely** [1] - 12:1
**lateral** [1] - 23:2
**law** [21] - 10:16, 10:24, 12:2, 13:20, 14:16, 15:2, 16:7, 16:9, 17:22, 18:4, 18:15, 18:19, 19:1, 19:6, 19:15, 22:12, 25:18, 27:2, 27:3, 27:21
**lawful** [2] - 5:24, 8:3
**laws** [2] - 26:9, 26:11
**lay** [1] - 5:17
**lead** [1] - 23:22
**least** [5] - 4:25, 7:12, 7:20, 25:2, 26:4
**legal** [2] - 10:14, 24:10
**LEGAL** [1] - 2:3
**less** [1] - 20:13

**level** [2] - 10:4, 11:7
**liability** [1] - 17:18
**liable** [1] - 17:9
**lift** [1] - 13:12
**light** [5] - 14:21, 14:22, 23:14, 24:23, 28:20
**lights** [3] - 5:1, 7:18, 7:19
**likelihood** [2] - 23:8, 23:14
**likely** [2] - 18:6, 21:1
**liken** [1] - 19:11
**limitation** [1] - 21:12
**listen** [1] - 10:7
**look** [11] - 8:18, 9:25, 10:6, 13:7, 14:6, 15:6, 15:13, 15:14, 16:25, 29:4, 29:6
**looked** [1] - 29:2
**looking** [3] - 8:10, 23:13, 28:19
**Los** [1] - 8:16

## M

**magistrate** [1] - 30:2
**MAGISTRATE** [1] - 1:18
**manage** [1] - 20:1
**manner** [1] - 20:14
**material** [1] - 15:15
**materially** [1] - 11:9
**materials** [1] - 28:16
**matter** [6] - 10:15, 16:2, 24:12, 24:15, 24:22, 30:3
**matters** [1] - 24:13
**mean** [6] - 14:3, 14:16, 20:8, 20:15, 21:14, 25:20
**means** [3] - 21:18, 22:10, 31:5
**medical** [4] - 24:15, 24:24, 25:2, 25:3
**meet** [1] - 19:21
**meets** [1] - 24:14
**mental** [2] - 21:4, 21:11
**mentioned** [3] - 7:25, 16:6, 20:24
**mentions** [1] - 16:10
**Meredith** [2] - 8:16, 9:1
**might** [4] - 14:17, 15:11, 17:14, 28:3
**Millard** [1] - 4:22
**Miller** [1] - 8:15
**Milwaukie** [1] - 2:5
**minimum** [2] - 13:25,

14:2
**minutes** [2] - 5:20, 15:2
**mirrors** [1] - 18:17
**misrepresent** [1] - 16:22
**moment** [1] - 4:5
**Monell** [3] - 17:5, 26:20, 27:25
**Morrison** [1] - 2:8
**most** [7] - 9:19, 14:22, 16:12, 23:14, 24:23, 25:7, 28:20
**motion** [5] - 3:6, 3:21, 3:24, 26:14, 26:18
**MR** [14] - 3:10, 4:14, 13:18, 22:18, 24:13, 25:4, 25:11, 25:19, 26:13, 28:5, 28:18, 29:3, 29:19, 30:9
**MS** [18] - 3:13, 3:19, 3:25, 4:8, 4:10, 4:15, 9:24, 10:18, 12:20, 16:6, 17:1, 17:7, 20:3, 21:5, 22:5, 26:21, 29:22, 30:10
**municipality** [5] - 8:13, 17:9, 19:9, 19:20, 20:8
**must** [1] - 6:21

## N

**name** [1] - 4:12
**names** [1] - 19:6
**narrow** [1] - 15:9
**national** [2] - 22:6, 22:13
**naturally** [1] - 7:22
**near** [1] - 7:24
**necessary** [4] - 10:14, 13:25, 14:3, 21:19
**need** [7] - 12:16, 15:3, 15:13, 15:20, 26:15, 28:15, 28:19
**needed** [2] - 15:1, 23:1
**needs** [4] - 14:19, 15:6, 25:15, 28:9
**negligence** [1] - 19:11
**new** [1] - 18:15
**Ninth** [1] - 13:20
**non** [3] - 9:3, 15:22, 19:18
**non-existent** [1] - 15:22
**non-violent** [2] - 9:3, 19:18
**noted** [2] - 10:9, 11:21
**nothing** [3] - 13:22,

25:5, 26:2
**notice** [1] - 29:24
**notion** [2] - 16:15, 20:8
**Number** [2] - 3:5, 3:7
**number** [1] - 7:3

## O

**oath** [2] - 23:21, 28:22
**object** [1] - 30:6
**objective** [2] - 6:22, 21:7
**objectively** [3] - 6:22, 7:5, 9:17
**obvious** [1] - 21:12
**obviously** [2] - 18:6, 21:2
**occur** [1] - 23:19
**occurred** [1] - 4:11
**OF** [3] - 1:2, 1:8, 1:14
**offer** [1] - 19:16
**offered** [3] - 7:3, 7:6, 7:14
**offering** [1] - 22:3
**offers** [1] - 27:11
**Officer** [30] - 4:11, 5:8, 5:11, 5:20, 6:3, 6:11, 7:21, 7:23, 8:4, 9:13, 10:12, 10:22, 11:1, 11:16, 12:12, 12:22, 13:8, 14:7, 15:10, 15:25, 16:20, 19:5, 22:19, 22:22, 23:20, 24:20, 27:7, 28:5, 28:16, 28:22
**officer** [22] - 7:18, 8:23, 10:13, 11:8, 13:3, 14:19, 18:6, 20:13, 20:20, 21:1, 21:6, 21:8, 21:10, 22:10, 23:9, 23:11, 23:15, 26:25, 27:3, 27:8, 27:16, 27:18
**officer's** [1] - 22:9
**officers** [38] - 5:25, 6:6, 6:9, 7:9, 7:16, 8:4, 8:23, 9:5, 9:10, 9:16, 10:7, 10:9, 10:11, 10:16, 11:22, 12:2, 12:17, 13:13, 13:24, 14:1, 14:10, 14:17, 15:3, 17:11, 18:12, 18:21, 18:22, 19:16, 20:1, 21:3, 21:19, 22:15, 23:2, 23:19, 25:8, 28:25, 29:9
**Official** [1] - 31:13
**on-point** [1] - 19:6

**once** [8] - 5:14, 6:8, 6:16, 6:17, 8:5, 12:12, 14:10
**one** [15] - 3:22, 10:25, 12:1, 14:7, 15:9, 15:10, 16:9, 20:24, 21:24, 22:6, 22:7, 22:12, 24:18, 27:24
**ongoing** [1] - 18:1
**onsite** [1] - 10:16
**open** [1] - 14:2
**operate** [1] - 10:24
**operating** [3] - 10:21, 11:6, 11:17
**opinion** [1] - 26:16
**opportunity** [1] - 19:16
**OR** [2] - 2:5, 2:9
**oral** [1] - 3:6
**Oral** [1] - 1:15
**order** [1] - 28:7
**OREGON** [1] - 1:2
**Oregon** [6] - 1:8, 18:18, 19:1, 22:1, 26:4, 27:2
**original** [1] - 31:6
**otherwise** [3] - 5:25, 10:8, 24:2
**outcome** [1] - 28:3
**outlier** [1] - 22:14
**outlined** [1] - 11:24
**over-delegate** [1] - 27:13
**overturned** [1] - 8:25
**own** [1] - 22:19

## P

**p.m** [2] - 3:1, 30:11
**paid** [3] - 25:21, 26:16
**parallels** [2] - 8:20, 10:4
**Parsons** [10] - 2:8, 3:14, 3:24, 9:18, 16:4, 17:6, 19:24, 26:20, 29:21, 29:24
**PARSONS** [18] - 3:13, 3:19, 3:25, 4:8, 4:10, 4:15, 9:24, 10:18, 12:20, 16:6, 17:1, 17:7, 20:3, 21:5, 22:5, 26:21, 29:22, 30:10
**part** [5] - 16:16, 22:8, 23:2, 25:6, 28:6
**pass** [1] - 4:25
**patently** [1] - 16:8
**pattern** [2] - 18:1, 18:23
**PD** [1] - 5:7

**peaceful** [1] - 15:24
**people** [4] - 21:4, 23:20, 28:3, 28:22
**per** [1] - 6:25
**perceiving** [1] - 11:8
**perhaps** [3] - 21:25, 24:6, 24:7
**persisted** [1] - 17:21
**person** [2] - 14:13, 21:12
**person's** [1] - 29:10
**perspective** [1] - 7:21
**physical** [3] - 21:4, 21:12, 23:16
**physically** [3] - 12:10, 20:11, 28:10
**pickup** [2] - 5:12, 16:21
**piece** [1] - 27:25
**place** [1] - 27:18
**Plaintiff** [1] - 1:6
**plaintiff** [10] - 3:9, 3:11, 4:12, 14:22, 18:20, 19:2, 21:21, 23:14, 24:24, 28:20
**PLAINTIFF** [1] - 2:3
**plaintiff's** [2] - 15:7, 19:4
**point** [6] - 5:11, 6:11, 19:6, 26:11, 29:16, 30:5
**pol** [1] - 17:23
**Police** [2] - 23:3, 26:4
**police** [11] - 17:10, 18:5, 18:21, 18:22, 19:16, 20:13, 21:23, 23:15, 25:7, 25:13, 25:21
**policies** [2] - 18:3, 27:14
**policy** [21] - 17:21, 17:23, 18:7, 18:11, 18:12, 18:17, 18:24, 19:1, 19:19, 19:21, 20:19, 21:6, 21:15, 21:18, 22:8, 23:3, 26:24, 27:10, 27:17, 28:15
**policy's** [1] - 19:15
**policymakers'** [1] - 23:11
**PORTLAND** [1] - 1:3
**Portland** [2] - 1:8, 2:9
**pose** [3] - 8:6, 9:14, 14:13
**posed** [1] - 9:9
**position** [4] - 7:1, 7:12, 9:12, 10:20
**position's** [1] - 10:5
**possibility** [1] - 11:6

**possibly** [1] - 11:2
**potential** [6] - 12:25, 13:3, 13:14, 19:11, 20:21, 23:22
**potentially** [5] - 7:22, 8:22, 13:10, 21:17, 27:8
**precedent** [1] - 13:23
**predictability** [1] - 23:8
**predictable** [1] - 27:15
**pregnant** [1] - 21:11
**present** [4] - 7:14, 7:23, 10:4, 18:20
**presentation** [1] - 3:22
**presented** [2] - 18:25, 21:21
**pretty** [5] - 10:19, 10:20, 12:4, 16:8, 21:3
**prevent** [1] - 14:17
**preventing** [1] - 24:16
**prevents** [1] - 21:6
**priority** [1] - 20:22
**problem** [1] - 16:25
**proceeded** [1] - 28:10
**PROCEEDINGS** [1] - 1:14
**Proceedings** [1] - 30:11
**proceedings** [1] - 31:5
**prongs** [2] - 11:21, 11:22
**pronouncing** [1] - 4:12
**proposition** [1] - 15:7
**protect** [2] - 15:20, 17:24
**provide** [1] - 22:15
**provided** [1] - 29:18
**provides** [1] - 27:21
**public** [5] - 7:24, 8:13, 8:19, 9:9, 20:22
**pull** [1] - 6:7
**pulling** [2] - 12:8, 28:11
**pursue** [1] - 4:24
**pursuing** [1] - 7:16
**pursuit** [1] - 7:19
**put** [4] - 5:18, 6:13, 12:10, 28:7
**putting** [1] - 6:10

**Q**

**questions** [2] - 3:21, 16:4

**R**

**Raethke** [26] - 4:11, 5:8, 5:11, 5:20, 6:4, 6:11, 7:23, 8:4, 9:14, 10:22, 11:1, 12:12, 14:7, 15:11, 15:25, 16:20, 19:5, 22:19, 22:22, 23:20, 24:20, 27:7, 28:5, 28:8, 28:16, 28:22
**RAETHKE** [1] - 1:9
**Raethke's** [6] - 7:21, 10:12, 11:16, 12:22, 13:8
**raise** [3] - 13:7, 23:17, 26:23
**raising** [1] - 24:16
**rates** [3] - 4:18, 4:22, 5:5
**reach** [3] - 17:12, 19:12, 28:14
**realized** [2] - 15:21, 28:8
**really** [1] - 12:21
**reason** [2] - 14:15, 29:10
**reasonable** [16] - 6:22, 7:5, 9:17, 9:20, 9:25, 10:1, 10:6, 10:13, 11:21, 12:9, 12:10, 14:20, 21:7, 21:16, 23:18, 29:14
**reasonableness** [1] - 6:23
**rebutted** [1] - 19:2
**received** [4] - 22:1, 22:22, 28:21, 28:23
**reckless** [1] - 14:25
**recollection** [3] - 12:12, 16:19, 16:22
**Recommendation** [1] - 30:7
**Recommendations** [1] - 30:4
**record** [24] - 4:9, 8:2, 10:20, 14:7, 18:10, 19:14, 19:19, 19:23, 19:25, 20:5, 21:24, 22:8, 24:17, 24:23, 24:25, 25:2, 25:5, 25:7, 26:2, 26:8, 28:4, 28:19, 29:16, 31:4
**records** [4] - 14:5, 14:9, 25:3, 29:5
**recruit** [1] - 23:1
**recur** [2] - 23:8, 23:15
**reduces** [1] - 11:7
**referred** [1] - 8:15

**reflect** [2] - 18:14, 18:15
**reflected** [2] - 23:11, 27:10
**regarding** [1] - 28:16
**regularly** [1] - 18:14
**regulations** [1] - 26:11
**related** [5] - 13:2, 18:15, 22:10, 22:23
**relates** [1] - 22:21
**relating** [1] - 15:15
**relayed** [1] - 5:4
**relevant** [9] - 12:4, 12:8, 16:17, 21:24, 22:2, 25:7, 25:9, 25:12
**relies** [1] - 6:23
**relying** [1] - 22:9
**remembering** [1] - 11:3
**remind** [1] - 28:25
**repeated** [1] - 18:20
**reply** [4] - 10:19, 15:5, 15:8, 19:8
**report** [1] - 7:21
**reported** [2] - 4:17, 11:4
**reportedly** [1] - 12:21
**Reporter** [1] - 31:13
**REPORTER** [1] - 1:23
**require** [1] - 20:20
**required** [1] - 19:12
**requires** [3] - 9:11, 20:13, 21:15
**requisite** [1] - 28:8
**resist** [1] - 13:11
**resistance** [1] - 12:24
**resisting** [9] - 7:10, 8:2, 9:5, 11:23, 12:6, 28:6, 28:11, 28:13
**respect** [3] - 21:22, 26:5, 27:4
**respond** [6] - 18:7, 19:17, 20:13, 21:16, 27:21, 30:7
**responded** [1] - 17:22
**responding** [6] - 5:8, 11:8, 11:17, 16:12, 21:19, 27:1
**responds** [1] - 27:16
**response** [7] - 11:10, 11:12, 11:13, 11:15, 17:2, 20:9, 21:12
**responses** [1] - 21:7
**restrained** [1] - 9:9
**restraints** [2] - 6:10, 6:13
**resulted** [1] - 28:1
**review** [2] - 9:11, 12:22

**reviewed** [1] - 18:14
**rights** [3] - 17:24, 23:10, 23:22
**risk** [9] - 5:15, 7:22, 8:6, 8:23, 11:7, 13:3, 15:18, 15:21, 15:22
**RMR** [2] - 1:24, 31:13
**road** [1] - 7:24
**Road** [2] - 2:4, 4:22
**robbery** [1] - 19:18
**ROBERT** [1] - 1:5
**room** [2] - 21:19, 26:25
**ruled** [1] - 10:3
**rules** [1] - 5:6

**S**

**safe** [2] - 20:22, 20:23
**safety** [3] - 5:6, 7:9, 14:19
**save** [1] - 3:21
**scenarios** [1] - 20:24
**scene** [10] - 5:9, 5:21, 6:14, 9:17, 11:15, 14:1, 14:10, 21:9, 21:10, 27:1
**scope** [2] - 17:13, 20:10
**screaming** [1] - 28:11
**se** [1] - 6:25
**SE** [1] - 2:4
**second** [1] - 17:4
**seconds** [2] - 6:1, 6:3
**Section** [1] - 17:9
**secure** [1] - 9:17
**see** [5] - 8:21, 10:1, 18:9, 21:10, 21:11
**seem** [2] - 14:13, 29:14
**seizure** [1] - 9:20
**seizures** [1] - 6:21
**sense** [2] - 10:10, 21:3
**sergeant** [1] - 22:25
**Sergeant** [1] - 18:13
**serious** [2] - 8:6, 13:3
**SERVICES** [1] - 2:3
**set** [1] - 22:12
**several** [2] - 16:10, 23:1
**severity** [2] - 7:7, 16:11
**short** [1] - 9:11
**shot** [1] - 14:18
**shoulder** [1] - 24:11
**showing** [1] - 18:1
**sides** [1] - 30:6
**signature** [3] - 31:6, 31:7
**signed** [1] - 31:7

**significant** [1] - 11:5
**significantly** [1] - 11:7
**signing** [1] - 31:3
**signs** [3] - 5:1, 5:16, 7:17
**silver** [2] - 11:4, 14:9
**Silverado** [2] - 4:20, 11:2
**similar** [2] - 10:5, 19:2
**simple** [1] - 19:18
**simply** [2] - 19:9, 20:14
**single** [3] - 15:10, 18:12, 23:6
**sirens** [2] - 5:1, 7:19
**situation** [8] - 14:11, 17:14, 20:22, 21:1, 23:8, 23:9, 23:15, 23:18
**situational** [1] - 29:9
**situations** [2] - 8:23, 27:16
**slow** [1] - 5:16
**small** [1] - 25:22
**someone** [4] - 21:10, 23:16, 27:4, 28:9
**soon** [2] - 3:18, 30:4
**sorry** [8] - 5:24, 7:13, 10:22, 11:16, 14:5, 15:8, 17:16, 29:1
**sort** [6] - 5:24, 8:3, 18:23, 19:17, 20:9, 27:14
**sound** [1] - 11:25
**sparingly** [1] - 13:20
**specialized** [1] - 19:25
**specific** [5] - 15:10, 19:10, 20:9, 23:9, 27:13
**specifically** [1] - 20:5
**speed** [3] - 4:18, 4:23, 5:6
**speeds** [1] - 7:17
**spike** [2] - 5:17, 5:22
**spit** [1] - 8:14
**ST** [1] - 1:8
**St** [20] - 3:5, 4:19, 5:7, 18:11, 18:21, 18:22, 19:25, 22:3, 22:14, 22:21, 22:24, 23:3, 23:15, 23:25, 25:10, 25:14, 25:18, 26:12, 27:11, 27:17
**STACIE** [1] - 1:17
**standard** [9] - 6:23, 17:12, 19:12, 22:6, 23:6, 25:13, 26:3, 26:7, 26:15
**standards** [1] - 25:16
**standing** [1] - 29:25

**start** [1] - 17:5
**started** [1] - 4:17
**starting** [1] - 3:22
**state** [2] - 25:18, 26:9
**State** [7] - 14:12, 15:17, 21:24, 22:1, 24:18, 26:4, 28:21
**STATES** [2] - 1:1, 1:18
**states** [1] - 20:5
**stating** [2] - 15:5, 28:22
**statute** [1] - 17:10
**STEFFEN** [15] - 2:3, 3:10, 4:14, 13:18, 22:18, 24:13, 25:4, 25:11, 25:19, 26:13, 28:5, 28:18, 29:3, 29:19, 30:9
**Steffen** [6] - 2:4, 3:11, 13:16, 16:6, 22:17, 27:24
**Steffen's** [1] - 17:3
**stemmed** [1] - 27:7
**stenographic** [1] - 31:4
**still** [8] - 6:8, 8:5, 12:24, 12:25, 13:12, 20:16, 27:3
**stop** [17] - 4:25, 5:1, 5:5, 5:14, 5:15, 5:16, 7:15, 7:17, 7:18, 15:18, 15:21, 28:11, 29:9
**stopped** [3] - 5:2, 7:25, 11:25
**Street** [1] - 2:8
**strikes** [9] - 6:12, 6:16, 9:16, 12:9, 12:24, 13:1, 13:9, 13:15, 28:12
**strip** [2] - 5:17, 5:23
**struggle** [3] - 6:5, 6:9, 9:25
**struggling** [4] - 11:19, 12:1, 16:18, 16:23
**subsequent** [1] - 16:12
**sufficient** [1] - 10:20
**suggests** [4] - 14:23, 18:4, 19:14, 19:19
**Suite** [2] - 2:5, 2:9
**summary** [12] - 3:6, 8:12, 8:18, 8:24, 10:3, 13:19, 19:24, 24:3, 24:8, 26:14, 28:24
**support** [1] - 25:1
**supported** [1] - 18:10
**Supreme** [3] - 7:2, 7:6, 7:14

**surrounding** [1] - 14:16
**survive** [1] - 28:23
**suspect** [1] - 7:10
**SW** [1] - 2:8
**sworn** [1] - 28:20
**systems** [1] - 10:25

## T

**tax** [1] - 9:2
**technique** [1] - 14:2
**techniques** [1] - 23:2
**term** [1] - 24:10
**test** [2] - 10:13, 11:20
**testified** [7] - 14:1, 21:25, 22:22, 23:21, 24:18, 24:20, 28:5
**testifying** [2] - 22:20, 24:2
**testimony** [11] - 10:7, 10:9, 12:22, 13:8, 19:2, 21:22, 25:1, 26:4, 26:7, 28:20
**THE** [33] - 1:1, 1:2, 1:17, 2:3, 2:7, 3:4, 3:12, 3:16, 3:20, 4:7, 9:18, 10:9, 11:19, 13:16, 16:3, 16:25, 17:4, 19:24, 20:24, 21:21, 22:16, 24:9, 24:25, 25:6, 25:17, 26:2, 26:19, 27:23, 28:14, 28:25, 29:6, 29:21, 29:23
**themselves** [3] - 15:20, 15:22, 20:23
**therefore** [1] - 18:18
**they've** [1] - 26:17
**threat** [7] - 7:8, 9:9, 9:15, 11:22, 14:14, 14:23
**three** [10] - 6:6, 7:13, 8:4, 10:10, 10:16, 11:21, 12:2, 12:13, 12:17, 25:8
**threshold** [1] - 7:2
**today** [2] - 29:25, 30:3
**took** [2] - 8:4, 15:23
**tools** [1] - 23:9
**top** [1] - 29:7
**totality** [8] - 6:23, 8:9, 8:20, 9:12, 9:13, 11:14, 15:6, 21:8
**touched** [1] - 13:21
**towards** [2] - 4:19, 18:24
**town** [1] - 25:22
**traffic** [2] - 4:21, 5:6
**train** [15] - 4:2, 17:5,

17:8, 17:10, 17:11, 17:14, 17:17, 18:7, 19:9, 19:13, 20:25, 23:7, 23:11, 25:7, 28:1
**trained** [6] - 10:16, 18:12, 19:5, 19:11, 23:19, 28:2
**training** [21] - 18:3, 19:25, 21:22, 22:1, 22:4, 22:10, 22:20, 22:22, 23:1, 23:3, 25:18, 26:5, 26:12, 28:8, 28:16, 28:21, 28:23, 29:2, 29:8, 29:14, 29:17
**transcript** [3] - 29:5, 31:4, 31:6
**TRANSCRIPT** [1] - 1:14
**treated** [3] - 5:15, 15:21, 20:17
**treating** [1] - 15:18
**trial** [1] - 25:25
**trooper** [2] - 22:1, 26:4
**troopers** [17] - 4:21, 5:4, 5:10, 5:14, 5:21, 6:3, 7:16, 7:23, 8:3, 10:21, 11:5, 14:12, 15:17, 21:25, 24:18, 28:21, 29:1
**true** [2] - 21:5, 31:4
**try** [1] - 27:14
**trying** [3] - 13:6, 13:13, 27:6
**turn** [3] - 5:8, 16:4, 17:4
**turned** [1] - 4:24
**turning** [1] - 6:19
**two** [11] - 4:21, 4:25, 5:21, 6:12, 10:10, 10:15, 10:21, 10:24, 11:21, 14:1
**type** [3] - 9:22, 21:22, 27:9
**types** [1] - 25:8
**typical** [1] - 28:15

## U

**unable** [1] - 23:17
**unarmed** [1] - 11:11
**unaware** [1] - 22:20
**uncooperative** [1] - 12:5
**under** [11] - 10:21, 10:24, 11:6, 17:9, 20:25, 21:2, 23:21, 24:14, 27:25, 28:22,

30:3
**underlying** [3] - 7:8, 9:3, 16:11
**understandably** [1] - 15:20
**undisputed** [6] - 6:14, 11:24, 12:1, 12:19, 13:13, 15:18
**undue** [1] - 6:16
**UNITED** [2] - 1:1, 1:18
**unreasonable** [1] - 21:16
**unrecovered** [1] - 12:25
**unusual** [1] - 10:10
**up** [10] - 6:2, 11:25, 12:3, 16:25, 20:7, 28:7, 29:10, 29:12, 29:13, 29:15
**updated** [1] - 18:14
**uses** [1] - 5:8

## V

**variety** [1] - 27:15
**vehicle** [6] - 5:18, 6:4, 6:5, 6:6, 8:22, 11:2
**verbal** [2] - 22:23, 25:8
**versus** [1] - 11:15
**via** [1] - 8:22
**viable** [1] - 21:1
**video** [3] - 12:15, 12:18, 24:17
**viewed** [1] - 24:23
**viewing** [2] - 14:21
**violate** [2] - 23:10, 26:8
**violation** [1] - 28:2
**violations** [1] - 23:22
**violent** [2] - 9:3, 19:18
**visible** [1] - 20:11
**voluntarily** [1] - 6:6
**vs** [8] - 3:5, 8:15, 8:16, 8:17, 17:15, 17:16, 18:18

## W

**waist** [1] - 8:6
**warrant** [1] - 13:22
**watch** [1] - 10:6
**weapon** [2] - 11:2, 15:11
**weapons** [2] - 5:17, 15:23
**weighing** [1] - 24:4
**well-established** [1] - 13:23
**wheelchair** [1] - 20:16
**whereas** [1] - 8:24

**whole** [1] - 27:15
**witness** [2] - 24:5, 25:20
**witness's** [1] - 25:24
**witnessed** [1] - 4:25
**witnessing** [1] - 5:21
**woman** [1] - 21:11
**words** [1] - 24:19
**worried** [1] - 14:19
**wrists** [1] - 6:11

## Y

**year** [1] - 18:12
**years** [1] - 25:22
**yourselves** [1] - 3:8